Scott A. Sell
OSB#: 144297
THOMAS, COON, NEWTON & FROST
The Thomas Mann Building
820 SW 2nd Avenue, Suite 200
Portland, Oregon 97204
Phone: (503) 228-5222
Fax: (503) 273-9175
E-mail: ssell@tcnf.legal

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| TRACEY K. TURKOLY,<br><br>Plaintiff,<br><br>v.<br><br>LINCOLN NATIONAL LIFE INSURANCE COMPANY<br><br>Defendant. | Case No.: 3:21-cv-01019-SI<br><br><br>PLAINTIFF'S MOTION FOR JUDGMENT |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................viii

I.    LR 7-1(a) Certification ...................................................... 1

II.   Plaintiff's Motion .............................................................. 1

III.  Introduction ..................................................................... 1

IV.   Discussion....................................................................... 3

      1. Ms. Turkoly has proved by a preponderance of the evidence that she is disabled from her own occupation as a Global Account Manager and from any occupation under the terms of the plan ..................................................................... 3

      2. Ms. Turkoly moves for judgment under ERISA 29 U.S.C. § 1132(a)(1)(B). ...................................................... 3

      3. The Plan's disability provisions ............................................ 4

      4. The applicable standard of review is *de novo*....................... 4

      5. The medical record established that Ms. Turkoly is disabled by CFS and FM.................................................................. 7

          a. Ms. Turkoly was at the height of an impressive career when her illness began .............................................. 7

          b. The medical record documents significant physical health symptoms beginning in January 2018 ............. 8

          c. In February 2019, Ms. Turkoly's psychiatrist and therapist treated her illness with mental health interventions, but continued treatment showed physical symptoms and with a physical etiology........................ 8

          d. Ms. Turkoly's treating physicians diagnosed CFS and

FM.................................................................. 13

    i. The consensus diagnostic criteria for CFS....... 13

    ii. The consensus diagnostic criteria for FM......... 15

    iii. In the Ninth Circuit, courts follow the consensus diagnostic criteria for CFS and FM ................... 15

    iv. Ms. Turkoly treating physicians concluded that she meets the diagnostic criteria for CFS and FM .................................................................. 15

e. Ms. Turkoly's medical history after the diagnoses of CFS and FM continued to show disabling fatigue and widespread pain............................................. 16

f. A four-day neuropsychological evaluation confirmed continuing cognitive dysfunction, diagnosing Mild Neurocognitive Disorder Due to Another Medical Condition...................................................... 18

g. Ms. Turkoly's symptoms of CFS and FM constitute a disability under the policy……………………………21

    i. Ms. Turkoly's symptoms…………………………21

    ii. The standards of disability……………………....24

        1. Ms. Turkoly's disability prevents her from performing her "own occupation": Global Accounts Manager .................................25

        2. Ms. Turkoly's disability prevents her from performing any occupation matching her "station in life."…………………………..27

6. Evidence extrinsic to the medical record corroborates the medical evidence of disability ..........................................28

a. Lincoln's surveillance shows that Ms. Turkoly did not leave her home for days on end .................................29

    i. In-person covert surveillance…………………...30

    ii. Social media surveillance………………………32

b. SSA independently concluded that Ms. Turkoly is incapable of performing any occupation that exists in significant numbers in the national economy .............32

c. Ms. Turkoly's employer determined that her medical conditions were too severe to accommodate ............34

7. Hartford erroneously denied Ms. Turkoly's claim and appeal, relying upon file reviews prepared by consultants who ignored and misstated the record and the nature of CFS and FM....................................................................................35

a. Dr. Cumberbatch's review has little if any basis in the record...........................................................................35

    i. Dr. Cumberbatch asserted that Ms. Turkoly's disability ended because medical improvement on the exact date that Dr. Parsons charted "no improvement"...................................................36

    ii. Dr. Cumberbatch asserted that disabled people may not leave their home for days on end but ignored evidence that Ms. Turkoly did not leave her home for days on end ...............................37

    iii. Dr. Cumberbatch asserted that Ms. Turkoly must have recovered from her conditions because she did not undergo extreme interventions including psychoactive medication not recommended by her treating psychiatrist and "electroconvulsive shock therapy" ................................................38

b. Dr. Rosen's file review shows that Ms. Turkoly is disabled from her own occupation, despite his use of obsolete diagnostic criteria ......................................40

    i. Dr. Rosen failed to use the CDC-endorsed consensus criteria for diagnosing CFS ............40

    ii. Dr. Rosen opined that Ms. Turkoly cannot engage in frequent air travel; however, her occupation requires traveling 25-35% of the time. Consequently, under Dr. Rosen's analysis, she is disabled from her own occupation....................41

c. Dr. Herzka's self-contradictory and error-filled reports concede that the medical evidence supports a diagnosis of a mild neurocognitive disorder, among other conditions, and that the neuropsychological evaluation utilized relevant marker of validity and was conducted consistent with the standard of care ........42

    i. Dr. Herzka conceded that the neuropsychological evaluation was conducted consistent with the standard of care and utilized relevant markers of validity, but asserted that Ms. Turkoly had no limitations because the neuropsychological evaluation did not have his preferred markers of validity ............................................................43

        1. Dr. Ludolph's findings.............................43

        2. Dr. Herzka's initial rejection of Dr. Ludolph's findings....................................43

        3. Dr. Ludolph's response to Dr. Herzka ....44

        4. Dr. Herzka explicitly conceded that Dr. Ludolph's markers of validity were relevant

and tacitly conceded that she conducted the evaluation using the proper standard of care .........................................................46

    a.  Markers of validity ..........................46

    b.  Standard of care.............................46

ii.  Dr. Herzka's reports are filled with errors and self-contradictions................................................48

    1.  Dr. Herzka contradicted himself and erred on the issue of whether the mental status examinations showed functional limitations ................................................................48

    2.  Dr. Herzka contradicted himself and erred on the issue of whether Ms. Turkoly received psychotherapy ..........................49

    3.  Dr. Herzka contradicted himself and erred on the issue of whether the medical records support Ms. Turkoly's diagnosis . 50

d.  Dr. Trangle's review ignored all relevant medical evidence and asserts that the only objective medical signs can diagnose CFS and FM, rejecting the consensus, CDC-endorsed criteria and 9th circuit caselaw ....................................................................51

    i.  Dr. Tangle rejected the consensus, CDC-endorsed criteria for CFS and 9th circuit caselaw which holds that "Fibromyalgia and chronic fatigue syndrome are not established through objective tests or evidence ...............................51

    ii.  Dr. Trangle acknowledges a "plethora" of complaints of fatigue and myalgia and a "multiple

of physical complaints including diffuse muscle and joint pain/stiffness, severe fatigue, headaches and irritable bowels, among others." Yet, he ignores those medical signs in his analysis............................................................52

iii.  Dr. Trangle conceded that Ms. Turkoly had positive markers for EBV, but dismissed the significance of EBV infection despite the CDC's finding that 10% of people with EBV infections develop CFS ...................................................54

8.  Lincoln did not behave as fiduciary in this claim and did not provide a full and fair review, as required by the law ..........54

a.  The history of this case shows that Lincoln engaged in a pattern of deceptive and unfair behavior designed to exclude facts that favored disability, refusing to develop the record, and rejecting valid evidence once Ms. Turkoly obtained it..............................................54

i.  The neuropsychological evaluation .................55

1.  In December 2019, Lincoln's file review consultant noted that a neuropsychological evaluation was the proper tool for assessing cognitive impairment, but Lincoln did not obtain one ......................55

2.  After Ms. Turkoly obtained a neuropsychological evaluation based on a referral for treatment from her primary care physician, Lincoln rejected the neuropsychological evaluation asserting that it lacked evidence of validity.............56

3.  After the evaluating neuropsychologist

provided a detailed analysis of the markers of the validity contained in the evaluation, Lincoln's file review consultant expressly conceded that those markers of validity were relevant and tacitly conceded that the neuropsychological evaluation was performed consistent with the standard of care, yet still rejected the report

ii. SSA disability analysis.....................................56

1. SSA independently concluded that Ms. Turkoly is incapable of performing any occupation that exists in significant numbers in the national economy ...........56

2. Ms. Turkoly's attorney alerted Lincoln of SSA's disability determination on May 20, 2021, stating that the details were not yet known and requesting that Lincoln withhold final decision. Lincoln confirmed that it would do that.........................................56

3. Three business days after assuring that Ms. Turkoly's counsel that it would consider the details of SSA's disability determination, Lincoln closed the claim asserting that it would not consider the details of SSA's disability determination and would not add those details to the administrative record ..............................58

V.    Conclusion ..............................................................59

# TABLE OF AUTHORITIES

## Cases

*Abatie v. Alta Health & Life Ins. Co.,* 458 F3d 955 (9th Cir 2006)....6, 15, 52

*Armani v. Nw. Mut. Life Ins. Co., 840 F3d 1159 (9th Cir 2016)* ...................6

*Bethany Coleman-Fire v. Standard Ins. Co*., No. 3:18-cv-00180-SB, 2019 US Dist LEXIS 76726 (D Or May 7, 2019) ...................................................6

*Brandon F. v. Berryhill,* No. 3:18-cv-00195-SB, 2019 US Dist LEXIS 64907 (D Or Feb. 27, 2019) ...............................................................................27

*Calvert v. Firstar Fin., Inc.,* 409 F3d 286 (6th Cir 2005)............................55

*Derek M. v. Comm'r SSA,* No. 3:20-cv-01713-AC, 2022 US Dist LEXIS 26322 (D Or Feb. 14, 2022) ...................................................................... 28

*Dykman v. Life Ins. Co. of N. Am*., No. 3:20-cv-01547-IM, 2021 US Dist LEXIS 216616 (D Or Nov. 8, 2021)............................................................ 16

*Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 109 S Ct 948, 103 Led2d 80 (1989)....................................................................................5

*Gonzales v. Berryhill,* 261 F Supp 3d 1085 (D Or 2017)...........................27

*Grosz-Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1161 (9th Cir. 2001).....................................................................................................5

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 266 F3d 1130, 370 F3d 869 (9th Cir 2004).............................................................. 15, 52

*Kearney v. Standard Ins. Co.,* 175 F3d 1084 (9th Cir 1999).......................5

*Metro. Life Ins. Co. v. Glenn, 554 US 105, 128 S Ct 2343, 171 LEd2d 299 (2008)*...............................................................................................3, 5

*Montour v. Hartford Life & Accident Ins. Co*., 588 F.3d 623, 636 (9th Cir. 2009 ................................................................................................. 34, 55

*Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan,* 856 F3d 686 (9th Cir 2017) ................................................................... 15, 52

*Pannebecker v. Liberty Life Assurance Co.,* 542 F3d 1213 (9th Cir 2008) .... ..............................................................................................................4, 25

*Rabbat v. Standard Ins. Co.,* 894 F. Supp. 2d 1311, 1313 (D. Or. 2012) ...... .................................................................................................................5, 6

*Robert Cody T. v. Saul,* No. 3:20-cv-00310-AC, 2021 US Dist LEXIS 120029 (D Or June 28, 2021) ...................................................................27

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) ................................................................................. 15, 16, 52, 55

## **Statutes, Regulations, and Rulings**

29 U.S.C.S. § 1002 ...............................................................................54

29 U.S.C. § 1132(a) ............................................................................... 1

29 U.S.C. § 1132(a)(1)(B) ...................................................................... 3

29 USCS § 1133 ...................................................................................54

42 U.S.C. § 423(d)(1)(A), (2)(A) ............................................................33

California Insurance Code §10110.6...........................................................5

Fed.R.Civ.P. 52(a) ................................................................................. 1

## **Other Authorities**

Black's Law Dictionary ..........................................................................54

The Employee Retirement Income Security Act of 1974 ............................. 4

ix

### I.    LR 7-1(a) Certification

The undersigned certifies that the parties have made a good faith effort through telephone conferences and correspondence to resolve this dispute but have been unable to do so.

### II.    Plaintiff's Motion

This action is brought pursuant to § 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a). Plaintiff Tracey Turkoly hereby moves pursuant to Fed.R.Civ.P. 52(a) for a judgment in her favor, declaring her disabled within the meaning of Lincoln Group's Disability Income Policy ("the Plan") upon the Record for Judicial Review.

### III.    Introduction

When she became ill, Ms. Turkoly was at the height of her career begun 30 years earlier when she was a young pioneering woman in the technology industry. Over the course of her career, she engineered large technology projects for major airlines and worked as a regional manager for IBM in the aerospace and defense industry, among other things. At the time of her illness, she was a top-performing Global Account Manager for the technology company, DocuSign.

In 2018, while working as a Global Account Manager, she developed flu-like symptoms and pneumonia. After she recovered from the acute illness, she began to develop fatigue, widespread pain, depression, and anxiety. Later, testing showed positive for a past infection with the Epstein Bar Virus ("EBV").

Beginning February 15, 2019, Ms. Turkoly took medical leave due to her symptoms. Her physicians treated her illness with mental health interventions, but continued treatment showed a physical etiology. By the end of 2019, each of her several physicians and her treating psychotherapist had concluded that Ms. Turkoly's mental health complaints were secondary to a physical illness, which her physicians diagnosed as post-viral chronic fatigue syndrome ("CFS") and fibromyalgia ("FM").

At the onset of her illness, Lincoln concluded that Ms. Turkoly was disabled under the Plan and paid her short-term disability and long-term disability ("LTD") benefits through March 23, 2020. On that date, following review by two file review consultants, Lincoln terminated benefits. Through counsel, Ms. Turkoly submitted a detailed appeal letter with updated medical records, including the results of a four-day neuropsychological evaluation. While the appeal was pending with Lincoln, the Social Security Administration ("SSA") independently concluded that Ms. Turkoly was disabled.

Ultimately, Lincoln upheld its denial, erroneously denying Ms. Turkoly her benefits based upon assertions made by file review consultants commissioned by Lincoln. Lincoln and its consultants ignored, dismissed, and misstated the record and the well-founded opinions of Ms. Turkoly's treating providers. They relied upon assertions that contradicted the medical consensus represented by the findings of the Centers for Disease Control and Prevention ("CDC") and were inconsistent with the medical record when asserting that Ms. Turkoly was not disabled by CFS and FM. Because the record establishes that Ms. Turkoly became and remained disabled by CFS and FM, judgment under *de novo* review should be entered in Ms. Turkoly's favor

Plaintiff's Motion for Judgment
Page 2

and Lincoln should be ordered to approve and pay her the LTD benefits owed under the terms of the Plan.

## IV.    Discussion

The medical record establishes disability under the Plan's own occupation and any occupation definitions of disability. The evidence extrinsic to the medical record corroborates disability. Every physician who has treated or examined Ms. Turkoly has concluded that she is disabled. The file review consultants that Lincoln commissioned and relied upon ignored and misstated the record and the nature of CFS and FM. Throughout the history of this case, Lincoln failed to act as a fiduciary. Rather, it engaged in a pattern of behavior designed to unfairly exclude evidence that showed disability.

1. **Ms. Turkoly has proved by a preponderance of the evidence that she is disabled from her own occupation as a Global Account Manager and from any occupation under the terms of the plan.**

The record establishes that Ms. Turkoly has been disabled from performing her regular occupation as a Global Account Manager since she left work on February 15 2019, due to CFS and FM.

2. **Ms. Turkoly moves for judgment under ERISA, 29 U.S.C. § 1132(a)(1)(B).**

ERISA provides that a plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108

Plaintiff's Motion for Judgment
Page 3

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

(2008) ("The Employee Retirement Income Security Act of 1974 (ERISA) permits a person denied benefits under an employee benefit plan to challenge that denial in federal court.")

### 3. The Plan's disability provisions.

The Plan contains a shifting standard of disability. For the first 24 months after the end of elimination period, the Plan employs an "own occupation" standard of disability. During that period, which runs from May 17, 2019, through May 16, 2021, Ms. Turkoly is disabled if

> [she] is unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue h[er] Own Occupation in the usual and customary way.

AR 1716 (containing date calculations); AR 2238 (containing the own occupation definition of disability).

After the "own occupation" period, the "any occupation" period begins. During the "any occupation" period, Ms. Turkoly is disabled if

> [she] is unable to perform, with reasonable continuity, the Substantial and Material Acts of any occupation, meaning that as a result of sickness or injury the Covered Person is not able to engage with reasonable continuity in any occupation in which [s]he could reasonably be expected to perform satisfactorily in light of h[er] age, education, training, experience, station in life,[1] and physical and mental capacity.

*Id.*

### 4. The applicable standard of review is *de novo*.

---

[1] Under ninth circuit case law, the phrase "station in life" used in the context of the definition of disability means that the Plan must take into account factors such as the claimant's most recent salary and status in her field when considering occupations that meet her "station in life." *Pannebecker v. Liberty Life Assurance Co.*, 542 F.3d 1213, 1220 (9th Cir. 2008) (discussing "station in life" in the context of a definition of disability that does not include the phrase.)

Plaintiff's Motion for Judgment
Page 4

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

In this case, both Ms. Turkoly and Lincoln have agreed that the standard of review is de novo. *See* Joint Rule 26 Report and Proposed Schedule at 2.

The ERISA statute does not state "the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Rabbat v. Standard* Ins. Co., 894 F. Supp. 2d 1311, 1313 (D. Or. 2012) (*quoting Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). However, the Supreme Court has "prescribed a simple test to determine" the applicable standard of review. *Rabbat,* 894 F. Supp. 2d at 1313. Review is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*, 489 U.S. at 115. If the ERISA plan expressly states the administrator has the discretionary authority to determine benefit eligibility or construe the terms of the plan, the applicable standard of review is "abuse of discretion." *Rabbat*, 894 F. Supp. 2d at 1313 (*citing Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)). Because the Plan does not contain a discretionary clause, the applicable standard of review is *de novo*.[2]

Under a *de novo* review in an ERISA-governed benefits case, the court conducts a bench trial pursuant to Rule 52, weighing the evidence in the record and making credibility determinations and factual findings. *See Kearney v. Standard Ins. Co*., 175

---

[2] Any discretionary clause contained in the Plan has no effect because, (1) California, where DocuSign is headquartered -- like approximately half the states (including Oregon) -- has banned discretionary clauses in disability insurance contracts, California Insurance Code §10110.6; and (2) the absence of a discretionary clause in the policy controls; the certificate (a summary) does not. *See Grosz-Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1161 (9th Cir. 2001) (discretionary language appearing only in a plan summary that is not fully integrated with the insurance contract cannot be enforced).

Plaintiff's Motion for Judgment
Page 5

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

F.3d, 1084, 1095 (9th Cir. 1999) ("In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true"); *Rabbat*, 894 F. Supp. 2d at 1314 ("Thus, when applying the *de novo* standard in an ERISA benefits case, a trial on the administrative record, which permits the court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute."). *Bethany Coleman-Fire v. Standard Ins. Co.*, 2019 U.S. Dist. LEXIS 76726 at *2 (D. Or. May 7, 2019) ("The Court agrees that a trial on the administrative record is the appropriate procedure to resolve this dispute because it turns on whether Plaintiff's treating and examining doctors' opinions are more reliable and probative of her condition than the consulting physicians' reports").

The claimant has the burden of proof to establish by a preponderance of the evidence that she is disabled and entitled to benefits according to the policy's terms. *Armani v. NW. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016). Under a de novo review of the record, the Court "does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) ("The court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits."); *Coleman-Fire*, 2019 U.S. Dist. LEXIS 76726, at *26 ("[w]hen a court engages in *de novo* review, it may evaluate and give credence to the [evidence] that it finds more reliable and probative.").

Plaintiff's Motion for Judgment
Page 6

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

**5. The medical record established that Ms. Turkoly is disabled by CFS and FM**

**a. Ms. Turkoly was at the height of an impressive career when her illness began.**

Ms. Turkoly began her career in the 1990s, working as a pioneering woman in the technology field. She became an industry expert, engineering large technology projects for United Airlines, American Airlines and Southwest Airlines.  AR 651. In 1997, she moved into technology sales, eventually becoming a regional manager in the aerospace and defense industry, working for IBM. AR 652.

Most recently, Ms. Turkoly worked at DocuSign as a Global Account Manager. Over five years at DocuSign, she closed approximately $15 million in new product revenue. She managed approximately $80 million in business. She closed approximately $7 million in services revenue. In 2019, she closed $9 million in product revenue, $2 million in services, and managed a $16 million book of business with some of the largest and most strategic accounts. Throughout multiple years, she was the top-performing salesperson in her unit. AR 653.

Ms. Turkoly's colleagues offered high praise of her performance at work. In March 2016, the Senior Manager of Customer Success at DocuSign stated,

> I have had the privilege of working with Tracey at DocuSign during the hypergrowth years and she knows how to manage, build, and grow the business based on an excellent foundation to always drive customer success.

AR 464.  In August 2018, the Head of Enterprise Marketing at DocuSign stated:

> She's an excellent partner to work with and I've seen firsthand how she builds lasting relationships across all stakeholders and clients alike. Tracey is a trusted partner and a joy to work with […] Tracey inspires all of us to outperform our own

Plaintiff's Motion for Judgment
Page 7

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

standards and outpace the competition, which is why everyone loves working with Tracey no matter where they fall on the org chart.

*Id.* In June 2019, a file review consultant hired by Lincoln discussed Ms. Turkoly's

employment and performance at DocuSign with her treating psychiatrist, Dr. Parsons.

The file review consultant summarized that conversation:

> We discussed [Dr. Parsons's] impression that the insured was well liked and valued by her employer. The insured is extremely intelligent, socially effective, and it is in the employer's best interest to facilitate the insured's return to work.

AR 1672.

### b. The medical record documents significant physical health symptoms beginning in January 2018.

Although Ms. Turkoly did not begin her medical leave until February 15, 2019,

the medical record documents significant physical health symptoms beginning in

January 2018. As her treating physician Dr. Connor Coffin summarized in June 2019:

> She had pneumonia Jan 2018. She has a h[istory] of asthma. She was very ill. She was ill for about a month. Went on antibiotics and recovered. She was in Chicago and moved last summer. Her hands really started hurting. Thought it was from packing. Knees and back painful. They got here [Portland, Oregon] and the pains have not improved. She was not sleeping and having bad headaches. Eventually she saw a doctor who gave her xanax. She was not thinking as clearly. She also got more stomach trouble.

AR 1047.

### c. In February 2019, Ms. Turkoly's psychiatrist and therapist treated her illness with mental health interventions, but continued treatment showed physical symptoms with a physical etiology.

In early 2019, Ms. Turkoly spoke with her disability analyst at Lincoln, who

documented the conversation as follows:

> [Ms. Turkoly] doesn't know what's wrong with her. She's been working for 30 years and this has never happened to her. [She] saw another opinion regard the

Plaintiff's Motion for Judgment
Page 8

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

cardiac markers. [She] has some autoimmune issues. So [she] saw [primary care physician] Dr. Smucker. He validated that 'it was real' (her feelings) [She] continued to cry. [She] states this isn't the first time that she's been through stress so she doesn't know what's going on.

AR 36-37.

Indeed, beginning in the spring of 2019 and continuing throughout that year, her treating psychiatrist, Dr. Bowen Parsons, MD, and treating therapist, Ms. Jackie Paris, LMFT, reached the conclusion that Ms. Turkoly's mental health symptoms were not primarily the product of stress, but rather were the product of a physical aliment characterized by chronic fatigue and widespread pain.

Dr. Parsons had begun mental health interventions on February 6, 2019, during his first encounter with Ms. Turkoly. At that time, he noted "[she is] mentally exhausted … and has been having frequent panic attacks.  Her mood is very depressed."  AR 395. Dr. Parsons diagnosed panic disorder and major depressive episode, recurrent.  *Id*.

Over the next several weeks, Dr. Parsons continued to document a "flat affect," "fatigued" appearance, frequent crying, and panic.  *Id*.  He prescribed Lexapro, an antidepressant, and Xanax, and antianxiety medication, noting that Ms. Turkoly had responded well to Lexapro in the past.  AR 395-96.

In April 2019, Dr. Parsons documented that Ms. Turkoly was taking increased Xanax, noting "which she states she does not like to do."  AR 396.  He also noted,

> Lincoln Financial recommended she move from short term disability over to long term disability. She eventually would like to go back to her job but is unable to work at this time.

*Id*.  In May 2019, Dr. Parsons documented ongoing fatigue,

Plaintiff's Motion for Judgment
Page 9

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

She feels tired and unmotivated.  Even going to the grocery store seems like too much.

*Id*.  On June 6, 2019, Dr. Parsons charted,

Tracey notes episodes of severe fatigue every 3 days or so. She has difficulty getting out of bed and is perplexed by it.

AR 397.  Around that time, Ms. Turkoly's treating therapist, Ms. Paris, began to suspect a physical etiology. As Ms. Paris summarized in a response to an inquiry from Lincoln in June 2019,

[Ms. Turkoly] did not respond as rapidly to my treatment recommendations as she has in the past,[3] so I was concerned that there may be organic factors contributing towards these symptoms - gave the client numerous referrals which she followed through upon to assess for and to rule out any organic factors that could be accounting for these symptoms.

AR 1625.

On June 7, 2019, Ms. Turkoly consulted with Dr. Katherine Walker, ND.[4]  Dr. Walker ordered labs, which showed positive for a recent infection with Epstein Barr

---

[3] At the time, Ms. Paris had been Ms. Turkoly's treating therapist for approximately 10 years. AR 1671.
[4] Dr. Walker is a Naturopathic Doctor or "ND."  Under Oregon's regulations,

[Naturopathic doctors] are primary care practitioners educated in conventional medical sciences and trained as specialist in natural medicine. A ND has a Doctorate of Naturopathic Medicine degree from a four-year graduate level naturopathic medical college. In addition to the standard medical curriculum, naturopathic students must do extensive coursework and clinical study in natural therapeutics.

[...]

[Naturopathic doctors] may prescribe medication from one of the most comprehensive formularies in the nation. Naturopathic physicians may perform minor surgery, practice natural childbirth, and administer injection therapies, giving Oregon N.D.'s an expansive scope of practice.

State of Oregon Website, Oregon Board of Naturopathic Medicine Homepage, available at https://www.oregon.gov/obnm/Pages/About-Us.aspx#:~:text=Oregon%20naturopathic%20physicians%20may%20prescribe,an%20expansive%20scope%20of%20practice

Plaintiff's Motion for Judgment
Page 10

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Virus ("EBV").  AR 1060; *see also* AR 91 (containing an acknowledgement of the

positive EBV labs from Lincoln's file review consultant, Dr. Trangle).  Dr. Walker

diagnosed "Chronic Fatigue, unspecified" and "Myalgia – unspecified site."  AR 1152.

On June 12, 2019, Ms. Turkoly sought a second opinion from Dr. Coffin, ND. Dr.

Coffin diagnosed "Chronic fatigue and immune dysfunction syndrome."  AR 1049.

On June 25, 2019, Dr. Parsons charted:

Tracey notes severe fatigue every 3-6 days where she cannot get out of bed and function. This usually follows some stressful event. She would like to return to work but states she cannot function in a work environment yet. She feels her disability is as much physical as psychiatric. She notes severe fatigue at times.

[…]

fatigue syndrome -? Etiology

AR 397. Dr. Coffin continued to note severe fatigue.  AR 1045. In July 2019, Dr.

Parsons charted:

Tracey feels exhausted after taking a short trip with her family.  She still has chronic fatigue, and painful joints. She saw her primary care physician who is referring her to an infectious disease specialist with knowledge about lyme disease. It is possible that her depression and anxiety is secondary to some chronic infection or perhaps an aggravating factor. Her joint problems and extreme fatigue have been severe. She clearly cannot return to work at this time.

AR 397. Dr. Parsons continued to document severe fatigue. In August 2019, Dr. Coffin

charted:

- She has been feeling much worse on the treatment. Sleeping about 11 hrs. Even sitting in a chair without a backrest is exhausting.
- Headaches every day.
- Dizziness
- Over stimulation where she cannot concentrate.
- Headache all the time.
- Dizziness and nausea as it is disorienting. Even before the antibiotics she was off balance.
- Fatigue is extreme.

Plaintiff's Motion for Judgment
Page 11

- Some days she has very bad brain fog. Talks in circles. Forgets things.
- When she does too much she feels like she has a bad hang over. Cant sleep but cant get out of bed either.
- Mood has been significant. Weepy.

AR 578.  The same month, August 2019, Dr. Parsons, charted:

She would like to recover so she could return to work.  She has cyclical bouts of extreme fatigue accompanied by arthralgias and unsteadiness.

AR 398.

In October 2019, Dr. Parsons concluded:

The severity of her psychiatric symptoms appears related to the severity of her physical symptoms.

*Id*.

In November 2019, Dr. Parsons charted:

Tracey continues to report fatigue, joint pain, unsteady gait and cognitive difficulties.  Her concentration has been poor.  She paid her mortgage from the wrong account. She also has confused our appointment times on more than one occasion. She has some ongoing depression and anxiety accompanying her medical problems.

*Id*.

In December 2019, Dr. Walker added a diagnosis of FM in the context of a post-viral fatigue syndrome.  AR 560.

In January 2020, Dr. Parsons responded to questions from, Dr. Cumberbatch, one of Lincoln's file review consultants as follows:

[Q]:   In your opinion, is Ms. Turkoly functionally impaired by any/all of her psychiatric conditions such that she is limited to not returning to her recent job/workplace?

[A]:   Her psychiatric conditions are related to and exacerbated by her medical issues.  I do not feel she is able to return to work at this time.

[…]

Plaintiff's Motion for Judgment
Page 12

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

[Q]:    If you think that Ms. Turkoly is functionally impaired and limited to not returning to work which diagnosis/es is/are functionally impairing Ms. Turkoly?

[A]:    Fibromyalgia, chronic fatigue syndrome and accompanying depression and anxiety.[5]

AR 828-829.

### d.  Ms. Turkoly's treating physicians diagnosed CFS and FM

#### i.    The consensus diagnostic criteria for CFS

The COVID-19 pandemic placed renewed attention on CFS and FM. In July 2021, the New England Journal of Medicine published an article discussing the relationship between Long-COVID and CFS[6] and FM. The article states,

> To understand why Long-Covid represents a looming catastrophe, we need look no further than the historical antecedents: similar post infection syndromes. Experience with conditions such as myalgic encephalomyelitis/chronic fatigue syndrome (ME/CFS), fibromyalgia, post-treatment Lyme disease syndrome, and chronic Epstein–Barr virus[.][7]

The article further discusses how post infection syndromes, including CFS, disproportionally affect women and how those who suffer from such conditions face

---

[5] Dr. Cumberbatch, Lincoln's file review consultant, agreed with Dr. Parsons' assessment of the etiology of Ms. Turkoly's symptoms, stating:

> Since approximately June [2019], Ms. Turkoly has quite consistently reported that her main problems are fatigue and various other physical problems (severe fatigue, joint pains, etc…) due to physical conditions.

AR 839.

[6] Chronic fatigue syndrome is also known as myalgic encephalomyelitis.  For consistency, Plaintiff refers to the condition as chronic fatigue syndrome throughout.
[7] Confronting Our Next National Health Disaster — Long-Haul Covid (https://www.nejm.org/doi/full/10.1056/NEJMp2109285)

Plaintiff's Motion for Judgment
Page 13

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

resistance among those who characterize their conditions as a psychogenic or mental illness.

Contrary to that position, the Centers for Disease Control recognizes the physical nature of CFS, rejecting "the misconception that [CFS] is a psychogenic illness."[8] Indeed, within its discussion of the causes of CFS, the CDC states:

> People with ME/CFS often have their illness begin in a way that reminds them of getting the flu. This has made researchers suspect an infection may trigger ME/CFS. In addition, about one in ten people who become infected with Epstein-Barr virus, Ross River virus, or Coxiella burnetti will develop a set of symptoms that meet the criteria for ME/CFS. People with these infections who had severe symptoms are more likely than those with mild symptoms to later develop ME/CFS symptoms. But not all people with ME/CFS have had these infections.[9]

The diagnostic criteria for CFS was evolving even before the onset of the COVID-19 pandemic. *See generally* Exhibit A ("Ex. A") (Beyond Myalgic Encephalomyelitis/Chronic Fatigue Syndrome) at 31-71. In 2015, the National Academies assembled a committee on the diagnostic criteria for CFS. *See generally* Ex. A. That committee produced a report and a proposed consensus diagnostic criteria, which is endorsed by the CDC. That criteria[10] requires:

(1) Substantial reduction or impairment in the ability to engage in pre-illness activity levels
(2) Post exertional malaise
(3) Unrefreshing sleep, and
    a. cognitive impairment, or
    b. orthostatic intolerance

---

[8] Ex A "Beyond Myalgic Encephalomyelitis/Chronic Fatigue Syndrome" at 2; https://www.cdc.gov/me-cfs/symptoms-diagnosis/diagnosis.html (CDC endorsement of EX A)
[9] Centers for Disease Control and Prevention website, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome, Possible Causes, available at https://www.cdc.gov/me-cfs/about/possible-causes.html
[10] Centers for Disease Control and Prevention website, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome, IOM 2015 Diagnostic Criteria, available at https://www.cdc.gov/me-cfs/healthcare-providers/diagnosis/iom-2015-diagnostic-criteria.html

Plaintiff's Motion for Judgment
Page 14

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Earlier criteria required ruling out other conditions, including FM; however, the

committee assembled by the National Academies rejected the rule out criterion stating,

> [I]t has become increasingly clear that many patients with ME/CFS have other
> disorders as well, some of which—including fibromyalgia, irritable bowel
> syndrome, metabolic syndrome, sleep disorders, and depression—may have
> symptoms that overlap with those of ME/CFS.

Ex. A at 224.

### ii.    The consensus diagnostic criteria for FM

In 2010, the American College of Rheumatology promulgated the most recent

consensus diagnostic criteria for FM.[11] Under the criteria, FM is diagnosed by means of

a widespread pain index score and a symptom severity scale. *Id*.

### iii.    In the Ninth Circuit, courts follow the consensus diagnostic criteria for CFS and FM.

Consistent with the broad medical consensus represented by the CDC CFS

criteria and the American College of Rheumatology FM criteria, the 9th Circuit Court of

Appeals has held and repeatedly reaffirmed that:

> [F]ibromyalgia and chronic fatigue syndrome are not established through
> objective tests or evidence.

*Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, 856 F.3d 686, 696
(9th Cir. 2017)*, citing a v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir.
2011), *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877 (9th
Cir. 2004), *overruled on other grounds, Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d
955 (9th Cir. 2006) (*en banc*)).

### iv.    Ms. Turkoly's treating physicians concluded that she meets the diagnostic criteria for CFS and FM.

---

[11] *Diagnostic Criteria for Fibromyalgia: Critical Review and Future Perspectives*, Journal of Clinical
medicine, April 2020.  National Institutes of health, National Library of medicine available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7230253/

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Ms. Turkoly meets the diagnostic criteria for both conditions and, consequently, her treating physicians diagnosed those conditions.  Each treating physician also independently concluded that her symptoms were so severe as to disable her.[12]

- Dr. Bowen Parsons, MD
  - Diagnosis (AR 829)
  - Conclusion that she disabled (AR 828)
- Dr. Connor Coffin, ND
  - Diagnosis (AR 1049)
  - Conclusion that she is disabled (AR 798)
- Dr. Katherine Walker, ND
  - Diagnosis (AR 560)
  - Conclusion that she is disabled (AR 579)
- Dr. Steven Rogoff, MD
  - Diagnosis (AR 524)
  - Conclusion that she is disabled (AR 648)

**e.  Ms. Turkoly's medical history after the diagnoses of CFS and FM continued to show disabling fatigue and widespread pain.**

In December 2019, Dr. Coffin ordered an MRI of Ms. Turkoly's brain to rule out neurodegenerative conditions such as multiple sclerosis.  AR 715.  The MRI ruled out such neurodegenerative conditions. *Id*.

In January 2020, Dr. Coffin offered a written response to a request from one of Lincoln's file review consultants. Among other things, Dr. Coffin stated:

> Symptoms for Ms. Turkoly persist with pain, fatigue and cognition concerns preventing her from performing her necessary job functions.

AR 716.  The same month, Dr. Coffin charted:

---

[12] The fact that "the healthcare professionals who have personally examined and treated a claimant support disability" … "alone is persuasive evidence that a claimant is totally disabled." *Dykman v. Life Ins. Co. of N. Am*., No. 3:20-cv-01547-IM, 2021 U.S. Dist. LEXIS 216616, at *22 (D. Or. Nov. 8, 2021) (*citing Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-79 (9th Cir. 2011)).

Plaintiff's Motion for Judgment
Page 16

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

> She still has significant ups and downs. Some days even with very little activity she has to recover for a couple days after. She can't get out of bed. She notices that when she pushes past or tries to it becomes a mess.

AR 714. Dr. Coffin also noted, "Tracy was CDC positive for Lyme Disease in June 2019." AR 716.

In March 2020, Ms. Turkoly traveled with her family from Portland, Oregon to Hawaii to stay at a resort for the spring break holiday. During the time she was in Hawaii, Oregon instituted COVID-19 lockdowns. Given the widespread lockdown orders, school closures, difficulty with air travel, and the relative scarcity of COVID-19 infections in Hawaii at the time. Ms. Turkoly's family decided to stay in Hawaii rather than attempt to return to Oregon.

The onset of the pandemic interrupted Ms. Turkoly's medical care. She stopped attending regular appointments with her treating therapist, Ms. Paris, and her treating psychiatrist, Dr. Parsons. She attempted to establish medical treatment remotely with Dr. Michael Feldman, MD, a physician in Bend, Oregon with expertise in chronic fatigue syndrome. However, it quickly became clear that remote treatment was not effective because Dr. Feldman could not take vital signs remotely.

In June 2020, Ms. Turkoly established care with Dr. Steven Rogoff, MD, in Kauai, Hawaii. AR 531. At his first encounter, Dr. Rogoff noted fatigue and joint pain. *Id*. He ordered extensive labs and, in July 2020, diagnosed CFS and FM. AR 524.

On July 21, 2020, Dr. Rogoff completed an Americans with Disabilities Act Certification Form for Ms. Turkoly's employer, DocuSign. In response to questions about her ability to perform essential job duties, he wrote:

Plaintiff's Motion for Judgment
Page 17

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Cannot think critically or be alert […] extreme fatigue.  Can't focus or be sharp at work. […] Cannot stay awake to do job.  Cannot wake early.  Sleeps 15 hours a day.  Cannot do phone meetings to sell products because she can't be alert.  Cannot type due to hand swelling and pain. Back pain difficult to sit prolonged period.  Must lie down.

AR 648.  Dr. Rogoff recommended leave lasting for at least one year.  *Id*.

Dr. Rogoff continued treatment and referred Ms. Turkoly for a neuropsychological evaluation to establish a cognitive baseline from which to measure any future improvement or decline in functioning.

**f. A four-day neuropsychological evaluation confirmed continuing cognitive dysfunction, diagnosing Mild Neurocognitive Disorder Due to Another Medical Condition.**

In September and October 2020, Ms. Turkoly underwent four days of neuropsychological testing with Dr. Shelly Ludolph, PsyD.  AR 400.  Over the course of four days, Dr Ludolph administered the following neuropsychological tests:

- Diagnostic interview with Tracey
- Wechsler Memory Scale -Third Edition (WMS-III)
- Wechsler Adult Intelligence Scale -Third Edition (Wais-III)
- Bender-Gestalt Visual-Motor Test Second Edition (Bender Gestalt II)
- Comprehensive Trail Making Test (CTMT)
- Delis Kaplan Executive Function System (D-KEFS) Verbal Fluency Task
- The Beery VMI Developmental Test of Visual Perception
- The Beery VMI Developmental Test of Visual-Motor Integration
- The Hooper Visual Organization Test

*Id*.

In November 2020, Dr. Ludolph produced a neuropsychological evaluation, based on Ms. Turkoly's test results and Dr. Ludolph's observations during testing,

Plaintiff's Motion for Judgment
Page 18

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

diagnosing Ms. Turkoly with Mild Neurocognitive Disorder Due to Another Medical

Condition.  AR 409.

Dr. Ludolph concluded the test results were valid, stating,

Tracey was evaluated as an outpatient at Lighthouse Therapy. She presented as appropriately groomed and casually dressed. She is a woman of average stature, appearing to be of average height. Her posture was appropriate. She did wear glasses for the evaluation. Tracey's attention was short and she requested instructions be repeated or explained to her on several occasions. Tracey appeared to put forth great effort attending to each assessment task. Orientation was x5. Memory was defective in Immediate/Short-Term. However, Tracey demonstrated good long-term memory.

During formal testing, Tracey was cooperative. Her eye contact and facial expressions were appropriate to the situation. Mood was anxious. Speech flow was normal, and thought content was appropriate to the situation. Her thinking was linear and logical. Tracey denied any experience of hallucinations or delusions or suicidal ideation. She is of High Average intelligence according to self-report, and her judgment and insight was good. Her effort and motivation were generally good; therefore, current test results are believed to represent a reasonably accurate estimate of her current cognitive functioning.

AR 401-02.

Among her findings, Dr. Ludolph concluded that Ms. Turkoly's full scale IQ was

95, which falls within the 37th percentile when compared to individuals in her age group.

Such a score likely represented a meaningful decline from Ms. Turkoly's full-scale IQ

before the onset of her illness.  AR 402.

Dr. Ludolph also concluded that, although Ms. Turkoly's IQ is relatively intact,

she has significant deficits in the realm of executive functioning:

Tracey scored 63 on the Working Memory Index (WMI) placing her in the 1st percentile with a 95% likelihood that her true score falls within the range of 58-72, the Deficient Range. This score indicates that Working Memory is a great weakness for Tracey. Tracey's Processing Speed Index (PSI) score of 60 places her in the 0.4th percentile with a 95% likelihood that her true score falls within the range of 56-74. **This score places Tracey in the Deficient range for**

Plaintiff's Motion for Judgment
Page 19

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

**Processing Speed. The WMI and PSI scores place Tracey in the Deficient Range, indicating that these functions are extremely difficult for her and she is experiencing a deficit in cognitive functioning in these areas**.

AR 403 (emphasis in original).

Dr. Ludolph also noted that Ms. Turkoly fell within the extremely low range for "working memory" and "immediate memory." As she explained in her evaluation,

The Working Memory Index is a measure of complex or high-level attentional tasks that stress the ability to attend to information, to hold and process that information in memory, and to formulate a response based on that information. Low scores relative to overall intellectual functioning may indicate a working memory weakness or impairment. Tracey performed in the Extremely Low range on Working Memory tasks.

[…]

The Immediate Memory Index score is considered the best global indicator of immediate memory functioning. Low scores, relative to intellectual functioning, attention, or delayed memory, may represent a weakness or deficit in learning or immediate memory. Tracey scored in the Extremely Low range for Immediate Memory.

AR 403; AR 407.

Ultimately, Dr. Ludolph stated:

Short term memory will be extremely difficult for Tracey and she will struggle to process information in a timely manner, requiring a longer amount of time to organize and comprehend information.

AR 408.

Following Dr. Ludolph's neuropsychological evaluation, Lincoln hired a file review consultant to review the evaluation.[13] Dr. Ludolph responded to the consultant's review, in part, as follows:

---

[13] The file consultant's review (Dr. Herzka) is discussed in detail below at Plaintiff's Motion for Judgment "Pl. Mot." at 41.

Plaintiff's Motion for Judgment
Page 20

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

As I noted at the outset, I performed this evaluation to establish a cognitive baseline to aid in treatment, not to assess Ms. Turkoly's ability to work. However, my evaluation does contain important medical facts related to her ability to work. Given that I took the time to review and respond to [the file review consultant's] report, I feel it worthwhile to offer a vocational interpretation of my evaluation. As I understand it, Ms. Turkoly worked in a high-level sales position in the technology industry. She is not presently capable of that work given the degree of impairment to her executive functioning and memory. I refer you to page 10 [AR 410] of my evaluation for a detailed interpretation of the tests results that support my opinion.

AR 219.

### g. Ms. Turkoly's symptoms of CFS and FM constitute a disability under the policy.

### i. Ms. Turkoly's symptoms

As discussed above, Ms. Turkoly's medical record contains extensive documentation of her symptoms of profound fatigue and widespread pain. Plaintiff's Motion for Judgment ("Pl. Mot.") at 8; 16; 18.

The administrative record also contains detailed statements from Ms. Turkoly given at various points over the last two years that describe her symptoms. For example, in December 2019, Ms. Turkoly completed a form at Lincoln's request. Her responses are as follows:

[Q:]    How long are you able to sit:

[A]:    Two hours with back and leg support

[…]

[Q]:    Do you nap during the day?

[A]:    Yes

[Q]:    If yes for how long?

[A]:    3 hours

Plaintiff's Motion for Judgment
Page 21

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

[Q]:     At what time of the day?

[A]:     Late morning or midafternoon depending on what time I wake up

[Q]:     How many hours a day do you spend in bed?

[A]:     15 to 17

[…]

[Q]:     [H]ow long are you able to drive?

[A]:     Depends on the day and how familiar I am with the road. 10 to 20 minutes. no long drives

[Q]:     How do you maintain contact with people or activities that matter most to you?

[A]:     Text, some phone, visits to my home, occasional restaurants, go to son's school

[…]

[Q]:     How many times a day do you leave the house during the week?

[A]:     5-7

[…]

[A]:     How often do you run errands?

[A]:     Occasionally, zero to three times a week to small places only, Walgreens school sons activities, small grocery, stores small stores and easy parking, doctors

[…]

[Q]:     When do you get outdoors?

[A]:     When I leave the house. Try to walk a little bit outside each day if only for a couple minutes.

[…]

[Q]:     How often do you take vacation?

[A]:     Travel is very difficult.

[Q]:     Where do you go?

Plaintiff's Motion for Judgment
Page 22

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

[A]:     My husband can drive and carry luggage and help me when I arrive. I have to sleep a lot. I have flown a couple of times in the last 10 months. Husband has driven places.

[…]

[Q]:     Describe in your own words what prevents you from engaging in any gainful employment?

[A]:     I cannot concentrate for very long. I cannot stand or walk for very long. Computer work is difficult because I get very confused and tired and forget how to spell words or remember things. I get very dizzy especially when tired.

AR 881-83.

In September 2020, Ms. Turkoly provided Lincoln with a sworn declaration, which

provides, in part:

There isn't much in my life that hasn't been affected by my illness. On many days, I often nap for three hours in the late morning or afternoon. If I overdo activities on good days, I am so tired and confused and dizzy the next day and sometimes for days afterwards, that I cannot function at all. Sometimes, on bad days, I cannot remember simple words and spellings of words I should know how to spell or remember names of people I should know because I am too exhausted. I keep detailed systems to remember to pay bills that are not automatically paid from my account. I cannot even manage bills and household tasks as I once did. My husband has to drive me to appointments on days when I am not doing well. One day earlier this year, I drove myself to the doctor about a mile away from my house. I left my car running with the doors wide open. The police discovered my car. They went to my house and got in touch with my husband who told them I had a health issue and was likely confused.
My husband has taken on most of managing the house, meals, care for our son, and now the education of our son due to the pandemic.  I have a community of friends who have also been helpful and have seen firsthand how drastically my life and health has change.

[…]

Currently, I cannot even do more than an hour of computer work. After about an hour, I must lay down. I cannot sit at a desk for more than an hour.  If I get over tired, the result is brain fog so thick, I lose all functioning.  I can focus on a complex subject for a short time only.  I am not able to multitask as I once could. I am not able to concentrate on complex tasks as I am required by my job. I am

Plaintiff's Motion for Judgment
Page 23

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

not able to stay awake for an entire workday. I am not able to travel or even drive a car for any significant distance. My life is very simple, and my functioning is low.

On a good day, my daily schedule looks like this:

- Sleep 10 Hours
- Wake up about 8 am
- Morning routine, teeth brushing, vitamins, medications, bathroom (1 hr)
- Read emails, texts, and phone messages and respond. Administrative work. (1hr)
- 15 Minutes of exercise and 15 minutes of stretching, meditation (1hr)
- Help my son with French work (20 mins)
- Eat lunch prepared by my husband (30 mins)
- Nap (3 Hours)
- Talk with family. Perhaps have a phone call with friends or have a friend over.
- Eat Dinner prepared by my husband. I can usually do dishes.
- Watch TV or Listen to audiobook

Some days I have doctor appointments. I try to schedule them for late morning or early afternoon. Other days, I run errands with my husband. If I am too active, I might be mostly in bed for a couple days afterwards. I can sometimes help with light housework but only if I manage my energy carefully. I can pay bills and manage finances if I do it in small increments. Any mental, emotional or physical activity beyond the base level above, will cause me to have to be in bed for days and, sometimes, I have bad days without warning.  On those days, I am in bed all day.

AR 653-56.

### ii.    The standards of disability

The Plan contains a shifting standard of disability. For the first 24 months after the end of elimination period, the Plan employs an "own occupation" standard of disability. During that period, which runs from May 17, 2019, through May 16, 2021, Ms. Turkoly is disabled if

Plaintiff's Motion for Judgment
Page 24

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

[she] is unable to perform with reasonable continuity the Substantial and Material
Acts necessary to pursue h[er] Own Occupation in the usual and customary way.

AR 1716 (containing date calculations); AR 2238 (containing the own occupation

definition of disability).

After the "own occupation" period, the "any occupation" period begins. During the

"any occupation" period, Ms. Turkoly is disabled if

[she] is unable to perform, with reasonable continuity, the Substantial and
Material Acts of any occupation, meaning that as a result of sickness or injury the
Covered Person is not able to engage with reasonable continuity in any
occupation in which he could reasonably be expected to perform satisfactorily in
light of his age, education, training, experience, station in life,[14] and physical and
mental capacity.

*Id*.

### 1. Ms. Turkoly's disability prevents her from performing her "own occupation": Global Accounts Manager.

Following vocational analysis, Lincoln concluded that Ms. Turkoly's occupation is

that of a Global Account Manager, consistent with DocuSign's job description.  AR

2197.  Lincoln concluded that Ms. Turkoly's occupation is best classified under the

Dictionary of Occupational Titles ("DOT") as "Manager, Professional Equipment Sales

and Service" (DOT: 185.167-042).

DocuSign's description of Ms. Turkoly's position states that a Global Account

Manager requires "willingness and ability to travel 25% - 35%."  AR 2198.  Additionally,

---

[14] Under ninth circuit case law, the phrase "station in life" used in the context of the definition of disability
means that the Plan must take into account factors such as the claimant's most recent salary and status
in her field when considering occupations that meet her "station in life."  *Pannebecker v. Liberty Life
Assurance Co.*, 542 F.3d 1213, 1220 (9th Cir. 2008) (discussing "station in life" in the context of a
definition of disability that does not include the phrase.)

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

a Global Account Manager must be capable of performing the following tasks, among

others:

- Manage a highly complex and strategic customer base
- Interact at all levels of an organization, including Executives, and provide strategic guidance relevant to each customer
- Expand the DocuSign solution beyond the functionality introduced during implementation process and consistently seek new business opportunities by presenting, recommending, and upselling new DocuSign products, services and partner solutions.
- Monitor customer usage and adoption, and make course corrections as needed
- Facilitate customer onboarding, training and professional services engagements
- Provide accurate, timely reports, and forecasts, as needed, for management
- Develop and maintain sophisticated knowledge of DocuSign's products and services
- Maintain current and accurate account information, pipeline data, forecasting and customer activity

DocuSign's job description is consistent with the high degree of mental acuity required

by the occupation as performed in the general economy and described under the DOT

number 185.167-042. Specifically, under the DOT, the occupation has a Reasoning

Level of 5[15] and requires that a worker be able to effectively influence the attitudes and

judgments of others.

In short, Lincoln agrees that Ms. Turkoly's occupation is an extremely demanding

one, requiring significant sustained mental acuity and endurance.

---

[15] Reasoning Level 5 requires the abilities to "Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables."

Plaintiff's Motion for Judgment
Page 26

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

The medical record, including the neuropsychological evaluation, demonstrates that Ms. Turkoly's conditions interfere with her concentration, attention to detail, interpersonal communication skills, and her ability to multitask and travel.  As Drs. Rogoff, Parsons, Walker, Coffin, and Ludolph observe she is incapable of such work. Pl. Mot. At 15. She "cannot think critically or be alert" at work. Moreover, she "cannot stay awake to do a job" due to hypersomnolence caused by chronic fatigue syndrome. Additionally, as the medical record documents, Ms. Turkoly experiences days of profound fatigue during which her husband performs all the family's activities of daily living. Indeed, Ms. Turkoly has been so absent-minded, that she has walked away from her car, leaving the doors open and prompting a police investigation.

Plainly, Ms. Turkoly's symptoms prevent her from performing the substantial and material acts of her own occupation.

### 2. Ms. Turkoly's disability prevents her from performing any occupation matching her "station in life."

In the 9th Circuit, a worker who will miss two or more days of work per month, or 16 hours per month, is unable to maintain any competitive employment. That standard derives from the universal testimony of diverse vocational experts contained in the 9th Circuit disability caselaw. *See e.g.* (examples of the standard in Oregon District Court) *Gonzales v. Berryhill*, 261 F. Supp. 3d 1085, 1092 (D. Or. 2017); *Brandon F. v. Berryhill*, No. 3:18-cv-00195-SB, 2019 U.S. Dist. LEXIS 64907, at *34 (D. Or. Feb. 27, 2019); *Robert Cody T. v. Saul*, No. 3:20-cv-00310-AC, 2021 U.S. Dist. LEXIS 120029, at *25

Plaintiff's Motion for Judgment
Page 27

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

(D. Or. June 28, 2021); *Derek M. v. Comm'r SSA,* No. 3:20-cv-01713-AC, 2022 U.S.

Dist. LEXIS 26322, at *32 (D. Or. Feb. 14, 2022).

Ms. Turkoly's medical record establishes that due to CFS and FM, she sleeps

three hours in the afternoon most days and spends multiple days in bed each month.

Consequently, she is disabled during the "any occupation" period, regardless of her

"station in life."

Additionally, under the terms of the Plan, Ms. Turkoly is disabled during the any

occupation period if there is no occupation which she could reasonably be expected to

perform given her "station in life."  At the time of her disability, Ms. Turkoly was at the

top of her field, working as one of the best performing salespeople for a successful

technology brand and earning a high salary.[16]  Any occupation that matches her "station

in life" at the onset of her disability requires cognitive abilities including exceptional

executive functioning. She is disabled from those occupations because she lacks

precisely those abilities due to her illness.

### 6. Evidence extrinsic to the medical record corroborates the medical evidence of disability.

As discussed above, the medical evidence in this case is overwhelming. It

includes diagnoses of CFS and FM made under the census medical criteria operative in

9th Circuit caselaw, consistent contemporaneous chart notes, detailed and consistent

subjective statements of symptoms, the universal consensus of disability from all

---

[16] In the 12 months prior to the onset of her disability, Ms. Turkoly earned just over $400,000.  AR 1716.

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

treating and examining physicians, and corroborating independent objective testing in the form of a four-day neurocognitive evaluation.

Additionally, evidence extrinsic to the medical record corroborates the medical evidence of disability. This extrinsic evidence includes covert surveillance of Ms. Turkoly, the independent conclusion of SSA and the independent conclusion of Ms. Turkoly's employer, DocuSign.

### a. Lincoln's surveillance shows that Ms. Turkoly did not leave her home for days on end.

Lincoln conducted extensive surveillance throughout the period at issue in this case. Lincoln hired investigators to surveil her use of pharmacies. Additionally, Lincoln hired investigators to surveil her internet and social media activity. Last, Lincoln hired investigators to conduct seven days of covert in-person surveillance of Ms. Turkoly and her family.

Lincoln's surveillance produced only evidence that corroborates her reported symptoms. The surveillance of her use of pharmacies showed nothing out of the ordinary. The surveillance of her social media showed no evidence of activities outside of those she reported to Lincoln and medical providers and, notably, the social media surveillance turned up a twitter post incidentally mentioning her illness. Last, the in-person covert surveillance of her home and family showed that she did not leave her home on four of the seven days when she was surveilled and, on the remaining three days, she engaged in small outings consistent with those she reported to Lincoln and her medical providers.

Plaintiff's Motion for Judgment
Page 29

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

### i.    In-person covert surveillance

As noted, Lincoln hired investigators to surveil Ms. Turkoly's home and family for

a total of seven days during three discrete periods. The results are as follows:

| Date of surveillance | Ms. Turkoly' s activities during surveillance | Citation |
|---|---|---|
| | | |
| Thursday, July 11, 2019 | Ms. Turkoly did not leave her home.[17] | AR 1587 |
| Friday, July 12, 2019 | Ms. Turkoly did not leave her home. | AR 1587 |
| Saturday, July 13, 2019 | Ms. Turkoly did not leave her home. | AR 1587 |
| | | |
| Friday December 6, 2019 | Ms. Turkoly drove a car with her son as a passenger for several minutes. | AR 864. |
| Saturday December 7, 2019 | At 10:03 am, Ms. Turkoly rode in a car as a passenger with her husband and son for 4 minutes.<br><br>Ms. Turkoly sat in a chair and watched son's basketball game for 72 minutes<br><br>Ms. Turkoly walked for 6 minutes.<br><br>Ms. Turkoly sat and ate in pizza ship with her husband, son, and others for about 48 minutes. | AR 865 – 868 |

---

[17] After learning of Lincoln surveillance, Ms. Turkoly reviewed her calendar and offered a sworn statement that she was at home on July 11, July 12, and July 13th, 2019.  As she stated in the declaration:

> I have seen some of the surveillance that Lincoln Financial conducted of me and I am aware that Lincoln Financial has said the surveillance shows that I am not sick. Frankly, it makes me very sad and a little upset. Lincoln Financial surveilled my home for three days in July 2019. During those three days I was sick in bed and surveillance showed that I didn't leave my house. But Lincoln Financial has ignored that up until this point. Rather, they waited until I had a few good days and photographed me eating out with friends and smiling and running some errands. Having lived with my illnesses for coming up on two years, I can tell you I honestly don't know how anyone could keep going if they didn't have an occasional good day. I look forward to my good days like nothing else. But that doesn't mean that I can go back to work. I wish it did.

Tr. 655.

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

|  | Ms. Turkoly rode a passenger in a car for about 10 minutes, stopped at Walgreens, then returned home at 1:05pm.  She then remained home after her husband and child left. |  |
|---|---|---|
| Sunday December 8, 2019 | At 9:50 am, Ms. Turkoly drove a car alone for 4 minutes<br><br>Ms. Turkoly walked half a block<br><br>Ms. Turkoly spent 1 minute in a Starbucks<br><br>Ms. Turkoly walked for 3 minutes<br><br>Ms. Turkoly sat for 57 minutes and received a manicure and a pedicure<br><br>Ms. Turkoly walked for 3 minutes and drove home, arriving at 11:40am<br><br>At 11:57am Ms. Turkoly drove for several minutes. | AR 869-72 |
|  |  |  |
| Friday November 6, 2020 | Ms. Turkoly did not leave her home. Her husband and son rode their bicycles together without her. | AR 432 |

In summary, Lincoln's surveillance did not show her walking for more than six minutes at a time. Lincoln's surveillance did not show her sitting for more than 72 minutes at a time. Lincoln's surveillance did not show her traveling to any location that was more than a few minutes from her home. Lincoln's surveillance did not show her leaving her home for more than approximately three hours in any day, and it showed that she did not leave her home at all on more than half of the days during which they surveilled her. Those findings align precisely with the statements Ms. Turkoly made to Lincoln – specifically, that most days she does not leave her house because she is too fatigued, but she does leave her house "zero to three times a week to small places only,

Walgreens, school, son's activities, small grocery, stores small stores and easy parking[.]" AR 882.

### ii.    Social media surveillance

As noted, Lincoln also surveilled Ms. Turkoly's social media. That surveillance showed that Ms. Turkoly did not engage in any activities that contradicted her statements to her doctors or to Lincoln. The posts did not show her engaging in physical activities, group outings, parties or other such things commonly seen in social media.

Notably, Lincoln's social media surveillance did uncover a social media post that touches on her illness. Specifically, on March 29, 2020, she posted a statement on Twitter incidentally describing the fact that she was homebound due to medical conditions for much of the preceding year. That tweet, is as follows:

> As I sit in quarantine, I have been meditating on something to say that will be helpful to others. […] **Because of my health journey I have already been forced to stay home for the past year.** Now all of us are forced to stay home. Many have asked me to predict how long this will last. I am sorry to say that this is not a short lived issue. What can we do? One. Focus on being in the moment. Are you safe? Are you healthy? Faith over fear. Stay in the moment of where you actually are. Two. Deep breathing and meditation. Ground ourselves. Three. For those of us that are fortunate to be healthy and safe send prayers to those who are not.

AR 450 (emphasis added).

### b.    SSA independently concluded that Ms. Turkoly is incapable of performing any occupation that exists in significant numbers in the national economy.

Plaintiff's Motion for Judgment
Page 32

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

SSA found Ms. Turkoly disabled on March 1, 2020.  AR 72.  Notably, SSA reached that conclusion following the initial claim review, rendering it unnecessary for her to engage in any administrative appeal with SSA.[18]

SSA's independent conclusion strongly corroborates Ms. Turkoly's disability under the Plan because the standard of disability employed by SSA is a substantially more demanding standard than the standard employed by the Plan during both the "own occupation" and "any occupation" period.

> SSA defines "disability" as the:
>
> inability to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment" that is of "such severity that [the claimant] . . . cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives.

42 U.S.C. § 423(d)(1)(A), (2)(A). In other words, SSA does not consider Ms. Turkoly's occupation, as the Plan must during the own occupation period, and SSA does not consider Ms. Turkoly's "station in life" as the Plan must during the "any occupation period."

Under the 9th Circuit caselaw, SSA's disability determination is important evidence that a Plan administrator must properly consider:

> Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied.

---

[18] That fact is notable because SSA routinely denies claims at the initial review that it ultimately awards through the appeals process. According to SSA's published data, SSA awards benefits at initial review in only 36% of cases, but ultimately awards disability in more than half of the claims denied after initial review.  Consequently, an award of disability at initial review allows the inference that the claim was a strong and relatively obvious claim for disability. *See* Exhibit B.

Plaintiff's Motion for Judgment
Page 33

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

*Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 636 (9th Cir. 2009). In this case, Lincoln engaged in significant fiduciary infidelities in an apparent effort to exclude SSA's analysis from the claim file. Those infidelities are discussed in greater detail at Pl. Mot. At 54.[19]

Despite Lincoln's actions, the administrative record does contain information about SSA's analysis – which Lincoln did not consider when analyzing SSA's findings – that shows that Ms. Turkoly's cognition and fatigue symptoms were the basis of SSA's award of disability. Specifically, Dr. Parsons reviewed SSA's analysis and discussed it in Ms. Turkoly's medical record, noting:

> I reviewed her independent medical reports for social security disability. She was noted to have depression with "brain fog." She was distractible with poor concentration and short-term memory. She still is so tired she stays in bed some days. She has joint pains particularly in her wrists and hands.

AR 399.

In sum, SSA swiftly and independently concluded that Ms. Turkoly is disabled from all occupations because of her impaired cognition and fatigue regardless of her occupation at the time of disability or "station in life," and that conclusion strongly corroborates her disability under the Plan.

### c. Ms. Turkoly's employer determined that her medical conditions were too severe to accommodate.

---

[19] In brief summary, Ms. Turkoly's counsel alerted Lincoln of SSA's determination of disability, noting that "AWARD DETAILS NOT YET KNOWN." AR 4. In response, Lincoln "CONFIRMED AWARD WILL BE CONSIDERED IN OUR APPEAL REVIEW." *Id*. Three business days after noting that the details were not yet know and assuring Ms. Turkoly that it would consider the SSA's award of benefits, Lincoln closed the claim and the administrative record, asserting that Ms. Turkoly had failed to provide details of the SSA determination, rendering Lincoln unable to "fully evaluate" SSA's finding of disability or add such information to the administrative record. AR 99.

Plaintiff's Motion for Judgment
Page 34

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

At the onset of her disability, Ms. Turkoly was one of the top performing salespeople at DocuSign, handling the company's most valuable accounts.  AR 653. As her coworkers noted, she was a valued, trusted, and high-performing member of the leadership team at DocuSign. AR 464. As others have noted, it was in DocuSign's best interest to keep her employed. AR 1671.

To that end, DocuSign allowed her 17 months of medical leave in an effort to keep her employed with the company.  AR 657.  However, after receiving a disability accommodation certification from Dr. Rogoff, in which he opined she would need at least another year to recover, DocuSign concluded that it could no longer accommodate Ms. Turkoly's illness.  *Id*.

DocuSign's conclusion that Ms. Turkoly's illness prevented her from performing the material duties of her job such that it was impossible to accommodate her strongly corroborates Ms. Turkoly's disability under the plan, during both the "own occupation" period and the "any occupation" period, in which any occupation must match to her "station in life."

7. **Lincoln erroneously denied Ms. Turkoly's claim and appeal, relying upon file reviews prepared by consultants who ignored and misstated the record and the nature of CFS and FM.**

   a. **Dr. Cumberbatch's review has little if any basis in the record.**

Lincoln commissioned Dr. Cumberbatch to review Ms. Turkoly's medical record in December 2019. Dr. Cumberbatch's review took place after Ms. Turkoly's treating

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

physicians had concluded that she suffered from CFS and FM and that her mental

health conditions were secondary to her physical health conditions.

Ultimately, Dr. Cumberbatch concluded:

The available records provide evidence that Ms. Turkoly was impaired due to
major depression and anxiety and panic attacks and limited to psychiatric
activities of daily living from 2/15/19 and reasonably lasting until 7/9/19.

AR 836.  Dr. Cumberbatch never examined nor spoke with Ms. Turkoly. Dr.

Cumberbatch did speak with Dr. Parsons. Dr. Cumberbatch's review broadly ignored

the medical and administrative record.

### i. Dr. Cumberbatch asserted that Ms. Turkoly's disability ended because of medical improvement on the exact date that Dr. Parsons charted "no improvement."

Dr. Cumberbatch's analysis has little, if any, basis in the medical record. Rather,

Dr. Cumberbatch relied on idiosyncratic assertions about the typical course of illness

and treatment.

As noted, Dr. Cumberbatch concluded that Ms. Turkoly was disabled but that her

disability ended on July 9, 2019. She selected that date stating,

[T]his date is chosen as it appears that her antidepressant (Lexapro) was
increased sometime in May 2019 (to 20mg QD), and it would be reasonable to
allow her two months to benefit from that increase.

AR 836.  On July 9, 2019 – the exact date identified by Dr. Cumberbatch – Dr. Parsons

noted:

Tracey feels exhausted after taking a short trip with her family. She still has
chronic fatigue and painful joints.  She saw her primary care physician who is
referring her to an infectious disease specialist with knowledge about lyme

Plaintiff's Motion for Judgment
Page 36

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

disease. It is possible that her depression and anxiety is secondary to some chronic infection or perhaps an aggravating factor.  Her joint problems and extreme fatigue have been severe.  She clearly cannot return to work at this time. **impressions- depression with panic attacks- no improvement**.

AR 397 (emphasis added).

Despite Dr. Cumberbatch's assertion otherwise, every patient does not recover with medication and, if they recover, they do not recover on a set timeline. Indeed, the medical record plainly shows that Ms. Turkoly's panic attacks continued despite the medication and that her depression had not improved.

It is unreasonable to credit the opinion of a file review consultant when the medical evidence plainly contradicts her opinion, and she has based her opinion on idiosyncratic assertions about the timeline of treatment and recovery.

> ### ii.   Dr. Cumberbatch asserted that disabled people may not leave their home for days on end but ignored evidence that Ms. Turkoly did not leave her home for days on end.

When responding to questions from Lincoln, Dr. Cumberbatch asserted that "someone with significant and impairing depression and/or anxiety and who is not functioning well may not leave their home at all."  Notably, the record that Dr. Cumberbatch reviewed included surveillance dates in July 2019[20] that showed that Ms. Turkoly did not leave her house for three consecutive days. It also included surveillance from December 2019 showing that Ms. Turkoly left her house for brief periods of time for three days. Confronted with that evidence, Dr. Cumberbatch ignored the July

---

[20] The July 2019 surveillance occurred on July 11, 12, 13. Dr. Cumberbatch concluded that Ms. Turkoly's disability had ended on July 9, 2019

Plaintiff's Motion for Judgment
Page 37

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

surveillance stating that it was "uninformative," but placed much stock in the December

2019 surveillance.  AR 842.

It is unreasonable to credit the opinion of a doctor who cherry-picked evidence to

support the interest of the insurance company that hired her but ignored evidence –

which she admitted was prohibited – when it contradicted those interests.

<blockquote>

iii.     **Dr. Cumberbatch asserted that Ms. Turkoly must have recovered from her conditions because she did not undergo extreme interventions including psychoactive medication not recommended by her treating psychiatrist and "electroconvulsive shock therapy."**

</blockquote>

During electroconvulsive therapy, electric currents are passed through the brain,

intentionally triggering a seizure. [21] Electroconvulsive therapy is not the standard of care

for depression, anxiety, or cognitive dysfunction secondary to CFS and FM. Rather,

electroconvulsive therapy is a treatment of last resort for people with depression-

induced psychosis, dementia, or catatonia.

Among the reasons Dr. Cumberbatch provided for her conclusion that Ms.

Turkoly recovered from her disability on July 9, 2019, was the fact that Dr. Parsons did

not continue to increase Ms. Turkoly's psychoactive medication and did not recommend

"electroconvulsive shock therapy."  AR 824

In response to questions from Dr. Cumberbatch, Dr. Parsons explained that Ms.

Turkoly was disabled by fibromyalgia and CFS and that depression and anxiety were

---

[21] Mayo Clinic website, Electroconvulsive Therapy (ECT), Overview, available at
https://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/about/pac-20393894

Plaintiff's Motion for Judgment
Page 38

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

secondary to those conditions. Consequently, he did not increase the psychoactive medication and did not recommend electroconvulsive shock therapy.[22]

In her report to Lincoln describing Dr. Parsons' rationale, Dr. Cumberbatch stated:

> [T]his is not an adequate justification of waiting and not assertively treating depression and/or anxiety if these are really contributing to impairments in addition to her medical conditions.

AR 824.

It is unreasonable to credit Dr. Cumberbatch's opinion considering Dr. Parsons' experience as Ms. Turkoly's treating physician, his rationale for not recommending

---

[22] In relevant part, Dr. Cumberbatch's questions and Dr. Parsons answers are as follow:

8) If you think that Ms. Turkoly is functionally impaired and limited to not returning to work which diagnosis/es is/are functionally impairing Ms. Turkoly?

Fibromyalgia, chronic fatigue syndrome and accompanying depression and anxiety.

[…]

13) If you think that Ms. Turkoly is still impaired by her psychiatric conditions and not able to return to work and you have not made any further psychiatric medication changes since May 2019, why have you not made further changes (such as switching/adding antidepressants or adding an adjunctive antidepressant or other possible anti-anxiety medication)?

She has responded well in the past to Lexapro and Alprazolam. She had a partial response this time. However, I feel her medical needs to stabilize and improve before further improvement can be expected.

[…]

15) If you think that Ms. Turkoly is still impaired by her psychiatric conditions and not able to return to work, but you have not made further psychiatric medication changes since May 2019 for the reason noted above, have you considered referring her for other medical interventions, such as Electroconvulsive Shock Therapy (ECT) or Transcranial Magnetic Stimulation (TMS), to treat any continuing depression?

No.  See answer to #13

AR 829-30; see also EX C (containing a typed copy of the handwritten test found at AR 829-30 prepared by Plaintiff's counsel).

Plaintiff's Motion for Judgment
Page 39

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

electroconvulsive shock therapy and increased psychoactive medication, and the standard of care for electroconvulsive shock therapy.

### b. Dr. Rosen's file review shows that Ms. Turkoly is disabled from her own occupation, despite his use of obsolete diagnostic criteria.

Lincoln commissioned Dr. Rosen to review Ms. Turkoly's medical record in January 2020. Dr. Rosen did not examine or speak with Ms. Turkoly. Dr. Rosen spoke with Dr. Coffin on the telephone and produced a concurrence letter that wrongly stated Dr. Coffin believed Ms. Turkoly was not disabled, which Dr. Coffin corrected.  AR 797. Dr. Rosen's inaccurate concurrence letter resulted in a complaint and investigation by the state of California's Department of Insurance.  AR 747.

In his written analysis, Dr. Rosen rejected the diagnosis of CFS. He did so using obsolete criteria, having failed to use the CDC-endorsed consensus criteria. AR 702. Ultimately, Dr. Rosen offered the opinion that Ms. Turkoly could perform light work, but could not engage in frequent air travel. Consequently, given that Ms. Turkoly's own occupation requires air travel 25-35% of the time, she is disabled from her own occupation based on Dr. Rosen's opinion.

### i. Dr. Rosen failed to use the CDC-endorsed consensus criteria for diagnosing CFS.

Dr. Rosen rejected the diagnosis of CFS and all symptoms resulting from CFS. Specifically, Dr. Rosen stated:

> For chronic fatigue syndrome, claimant has not had adequate evaluation to rule out rheumatologic causes for her symptoms with no standard laboratory testing or radiography for those diseases and no referral to a rheumatologist. In addition, this diagnosis is difficult to invoke in the face of depression and anxiety disorder.

Plaintiff's Motion for Judgment
Page 40

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

AR 702.

As noted, in 2015 the National Academies assembled a committee on the diagnostic criteria for CFS. *See generally* EX A. That committee produced a report and a proposed consensus diagnostic criteria, which the CDC endorsed. That criteria requires:

(1) Substantial reduction or impairment in the ability to engage in pre-illness activity levels
(2) Post-exertional malaise
(3) Unrefreshing sleep, and
    a. cognitive impairment, or
    b. orthostatic intolerance[23]

Earlier criteria required ruling out other conditions, including FM and depression; however, the committee assembled by the National Academies rejected the rule out criterion stating,

> [I]t has become increasingly clear that many patients with ME/CFS have other disorders as well, some of which—including fibromyalgia, irritable bowel syndrome, metabolic syndrome, sleep disorders, and depression—may have symptoms that overlap with those of ME/CFS.

Ex. A at 224.

Dr. Rosen rejected Ms. Turkoly's CFS diagnosis using obsolete criteria. It is unreasonable to credit a physician who has failed to apply the most recent medical consensus criteria.

    ii.    **Doctor Rosen opined that Ms. Turkoly cannot engage in frequent air travel; however, her occupation requires traveling 25-35% of the time. Consequently, under Dr.**

---

[23] Centers for Disease Control and Prevention website, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome, IOM 2015 Diagnostic Criteria, available at https://www.cdc.gov/me-cfs/healthcare-providers/diagnosis/iom-2015-diagnostic-criteria.html

Plaintiff's Motion for Judgment
Page 41

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

**Rosen's analysis she is disabled from her own occupation.**

In his written analysis, Dr. Rosen stated that due to Ms. Turkoly's illness, "she should have exemption from work that requires her to engage in frequent air travel."  AR 707.  According to DocuSign's job description, Ms. Turkoly's occupation requires her to travel "25% to 35%" of the time.  AR 2198.  Consequently, under Dr. Rosen's analysis, Ms. Turkoly is disabled from performing her own occupation.

**c.    Dr. Herzka's self-contradictory and error-filled reports concede that the medical evidence supports a diagnosis of a mild neurocognitive disorder, among other conditions, and that the neuropsychological evaluation utilized relevant markers of validity and was conducted consistent with the standard of care.**

After receiving the results of Dr. Ludolph's neuropsychological evaluation, Lincoln commissioned Dr. Herzka to review Ms. Turkoly's medical record (12/30/20), to review the raw data from Dr. Ludolph's evaluation (2/12/21), and to comment on Dr. Ludolph's written response to Dr. Herzka's first report (4/01/21). Consequently, Dr. Herzka issued three reports. Ultimately, Dr. Herzka concluded that Ms. Turkoly had no functional limitations because the neuropsychological evaluation did not contain his preferred markers of validity.

Throughout the series of reports, Dr. Herzka conceded that the medical evidence supported the diagnosis of mild cognitive disorder, among other conditions. He also explicitly conceded that the markers of validity utilized in Dr. Ludolph's neuropsychological evaluation were relevant to assessing the validity of the results, and he tacitly conceded that Dr. Ludolph conducted her neuropsychological evaluation using the appropriate standard of care.

Plaintiff's Motion for Judgment
Page 42

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Additionally, across his three reports, and within each report, Dr. Herzka made repeated self-contradictory and erroneous statements about important medical facts.

> **i. Dr. Herzka conceded that neuropsychological evaluation was conducted consistent with the standard of care and utilized relevant markers of validity, but asserted that Ms. Turkoly had no limitations because the neuropsychological evaluation did not have his preferred markers of validity.**

> **1. Dr. Ludolph's findings.**

As discussed in detail above, Ms. Turkoly underwent a four-day neuropsychological evaluation with Dr. Ludolph. Pl. Mot. at 18. AR 409. Among her findings, Dr. Ludolph concluded that Ms. Turkoly's full scale IQ was 95, which falls within the 37th percentile when compared to individuals in her age group. AR 402. Dr. Ludolph also concluded that, although Ms. Turkoly's IQ is relatively intact, she has significant deficits in the realm of executive functioning, noting that:

> [testing shows] Tracey in the Deficient range for Processing Speed. The WMI and PSI scores place Tracey in the Deficient Range, indicating that these functions are extremely difficult for her and she is experiencing a deficit in cognitive functioning in these areas.

AR 403.

> Ultimately, Dr. Ludolph stated:

> Short term memory will be extremely difficult for Tracey and she will struggle to process information in a timely manner, requiring a longer amount of time to organize and comprehend information.

AR 408.

> **2. Dr. Herzka's initial rejection of Dr. Ludolph's findings**

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

In his first report, dated December 30, 2020, Dr. Herzka asserted that Ms. Turkoly has no functional limitations, rejecting Dr. Ludolph's neuropsychological evaluation. When doing so he stated:

> Cognition was formally assessed. 12/20/2019, NeuroQuant report illegible. 11/10/2020, claimant saw Shelly Ludolph (PsyD) for neuropsychological evaluation. According to the provider, claimant performed in borderline range for visual immediate index, visual delayed index, and general memory index; in the extremely low range in working memory; and borderline range in general memory tasks. She demonstrated difficulties with executive functioning. Mild impairment noted in visuospatial, visuoperceptual, and visuocontructive abilities. However, no validity measures were utilized and therefore this assessment cannot be assumed to [be] accurate and cannot be interpreted for forensic reasons.

AR 226-27.

### 3. Dr. Ludolph's response to Dr. Herzka

Dr. Ludolph reviewed Dr. Herzka's analysis of her neuropsychological evaluation, and, in March 2021, she provided Lincoln with a written response extensively describing the markers of validity embedded in her evaluation. That response provides, in part:

> Preliminarily, I note that Ms. Turkoly's primary care physician referred her to me for evaluation and treatment because he was concerned about her cognition. I performed testing in order to establish a baseline to assess recovery and decline. My goal is to aid treatment. I have no stake in the outcome of her insurance application.

> Next, I'll discuss the markers of validity contained in my evaluation. To begin with, each of the tests that I administered are commonly used in neuropsychological evaluations. This battery of tests is the standard of care for practicing neuropsychologists seeking to establish a cognitive baseline. As such, each test has been rigorously validated through field testing and peer review. Second, the way Ms. Turkoly presented during the evaluation and the way she completed the tasks demonstrate that she understood the tasks and completed them to the best of her ability. As I note in the Behavior Observations section of my evaluation:

> Tracey's attention was short and she requested instructions be repeated or explained to her on several occasions. Tracey appeared to put forth great effort attending to each assessment task.
>
> *        *        *
>
> During formal testing, Tracey was cooperative. Her eye contact and facial expressions were appropriate to the situation. Mood was anxious. Speech flow was normal, and thought content was appropriate to the situation. Her thinking was linear and logical. Tracey denied any experience of hallucinations or delusions or suicidal ideation. She is of High Average intelligence according to self-report, and her judgment and insight was good. Her effort and motivation were generally good; therefore, current test results are believed to represent a reasonably accurate estimate of her current cognitive functioning.

Third, her test results are entirely consistent with her longitudinal medical history. Specifically, historic mental status examinations (MSE) note impaired concentration, impaired memory, anxious presentation and fatigue. My evaluation aligns with those MSEs because it shows impaired executive functioning, concentration, and impaired memory. Moreover, anxiety and fatigue, which are noted in the historic MSEs and elsewhere in her medical record, also contribute to impaired executive functioning and impaired memory. Fourth, her test results are not extreme and are internally consistent. For example, her full scale IQ is 95, which is average. Moreover, she did relatively well on some tasks and poorly on others, and the tasks that she did poorly on cluster around the same functional impairments. Invalid evaluations, in which a subject is inattentive or malingering, do not return these sorts of results because it is nearly impossible for a lay person to game these evaluations without producing extreme results. Moreover, a lay person seeking to the game the result would produce universally poor results, not results that cluster around particular functional limitations, as Ms. Turkoly's results do.

In short, we know that this is a valid evaluation because the battery of tests I performed are rigorously validated instruments and the results contain numerous markers of validity.

Dr. Hertza states that he is incapable of offering a forensic analysis of my evaluation. That strikes me as an odd position given the numerous markers of validity that I have discussed.

[…]

Plaintiff's Motion for Judgment
Page 45

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

As I noted at the outset, I performed this evaluation to establish a cognitive baseline to aid in treatment, not to assess Ms. Turkoly's ability to work. However, my evaluation does contain important medical facts related to her ability to work. Given that I took the time to review and respond to Dr. Hertza's report, I feel it worthwhile to offer a vocational interpretation of my evaluation. As I understand it, Ms. Turkoly worked in a high-level sales position in the technology industry. She is not presently capable of that work given the degree of impairment to her executive functioning and memory. I refer you to page 10 of my evaluation for a detailed interpretation of the tests results that support my opinion.

AR 218-219.

### 4. Dr. Herzka explicitly conceded that Dr. Ludolph's markers of validity were relevant and tacitly conceded that she conducted the evaluation using the proper standard of care.

#### a. Markers of validity

After receiving Dr. Ludolph's raw data and her written response, Lincoln forwarded several questions to Dr. Herzka. When answering those questions, Dr. Herzka conceded that the markers of validity that Dr. Ludolph identified were relevant to analyzing the validity of the neuropsychological results:

1. Please review the letter from Shelly Ludolph, PsyD, signed 03/10/2021 and respond to the various assertions regarding your 12/30/2020 and 02/12/2021 reviews of her neuropsychological report and raw data, particularly the assertion that the neuropsychological report contains "numerous markers of validity."

[A:] My opinion is unchanged from RRS case 58526 dated 12/30/2020 and RRS case 59021 dated 02/12/2021. While **the information is relevant**, the newly provided information does not provide any details not previously considered.

AR 180 (emphasis added).

#### b. Standard of care

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

In her written response, Dr. Ludolph described how her evaluation followed the standard of care:

> I performed testing in order to establish a baseline to assess recovery and decline.
>
> […]
>
> Each of the tests that I administered are commonly used in neuropsychological evaluations. This battery of tests is the standard of care for practicing neuropsychologists seeking to establish a cognitive baseline.

AR 218-19.

When Lincoln questioned Dr. Herzka about the standard of care exercised in Dr. Ludolph's evaluation, Dr. Herzka demurred and refused to assert Dr. Ludolph's evaluation failed to meet professional standards, tacitly conceding that it met the standard of care.

> 7.     Was this evaluation completed within accepted professional standards? Are the results valid?
>
> [A:]    I reviewed the raw data, which confirmed validity measures were not utilized.

AR 270.

Ultimately, despite explicitly conceding that Dr. Ludolph's markers of validity were relevant and tacitly conceding that she conducted the neuropsychological evaluation consistent with the standard of care, Dr. Herzka continued to maintain that Ms. Turkoly had no functional limitations because the neuropsychological evaluation did not contain his preferred markers of validity. Setting Dr. Herzka's preferences aside, Dr. Ludolph's detailed analysis and Dr. Herzka's concessions demonstrate that the

Plaintiff's Motion for Judgment
Page 47

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

neuropsychological evaluation was a valid assessment of Ms. Turkoly's cognitive limitations.

### ii. Dr. Herzka's reports are filled with errors and self-contradictions

As Dr. Ludolph stated in her written response to Dr. Herzka's first report, "Dr. Hertza's report contains several factual errors. Obviously, an accurate grasp of the medical facts is important in formulating an accurate medical opinion."  AR 219.  In light of his significant errors and self-contradictions, it is unreasonable to credit Dr. Herzka's conclusion about disability.

### 1. Dr. Herzka contradicted himself and erred on the issue of whether the mental status examinations showed functional limitations.

In Dr. Herzka's first report, dated December 2019, he stated,

Mental status/behavioral observations **include short attention** and anxious mood, with no report of functional impairment.

AR 226. (emphasis added).  Dr. Herzka repeated that statement through each of his reports. Dr. Herzka also stated that the results of the mental status examinations "support" the diagnoses of panic disorder without agoraphobia and mild neurocognitive disorder.  *Id*.

Later in the same report, and throughout other reports, Dr. Herzka opined that Ms. Turkoly had no functional limitations because of "generally unremarkable mental health examinations," among other reasons.  AR 227.

Plaintiff's Motion for Judgment
Page 48

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

In his final report, after Dr. Ludulph addressed the issue of mental status

examinations,[24] Dr. Herzka stated,

> I agree that mental status exams capture only a moment in the office, however, presentation should match the claimant's complaints, which it does not.[25] **Further, mental status exams often show impairment, such as in** self-care, **attention** etc. Questions being asked are directly tied to vocation and analysis on employability is appropriate.

AR 180.

In summary:

- Dr. Herzka noted that Ms. Turkoly's mental status examinations showed impaired attention but asserted that the mental status examinations showed no functional limitation.  AR 224.

- He then conceded that one of the ways mental status examinations may show functional impairment is by documenting impaired attention, as Ms. Turkoly's did.  AR 180.

- Despite noting that Ms. Turkoly's mental status examinations showed impaired attention and conceding that impaired attention is a functional limitation that mental status examinations show, he continued to assert Ms. Turkoly's mental status examinations showed that she had no functional limitations.  AR 180.

> **2. Dr. Herzka contradicted himself and erred on the issue of whether Ms. Turkoly received psychotherapy.**

---

[24] Dr. Ludolph wrote:

> The oddities in Dr. Hertza's report continue: he states that Ms. Turkoly has "generally unremarkable mental status exams," but that is not true. As Dr. Hertza himself notes, Ms. Turkoly's MSEs are remarkable for short attention and anxiety, among other things. As I have already noted, those are precisely the sorts of MSE findings one would expect given the results of my evaluation.  AR 219.

[25] Contrary to Dr. Herzka's assertion, Ms. Turkoly's physicians regularly noted that her presentation was anxious with a short attention span.

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

In Dr. Herzka's first report, dated December 2019, he repeatedly stated that the medical record contained "no indication of psychotherapy." AR 227. Dr. Herzka asserted that the lack of psychotherapy was evidence that she has no functional limitations.

However, attached as an appendix to that report is a list of "documents sent for review," which includes Ms. Turkoly's psychotherapy charts notes from treatment with Dr. Parsons and Ms. Paris.[26] AR 229-233.

In her response letter, dated March 10, 2021, Dr. Ludolph noted that Dr. Herzka's assertion that Ms. Turkoly had not engaged is psychotherapy was factually incorrect. AR 219. After reviewing Dr. Ludolph's observation, Dr. Herzka continued to wrongly maintain that there was "no indication of psychotherapy." AR 181.

### 3. Dr. Herzka contradicted himself and erred on the issue of whether the medical record supports Ms. Turkoly's diagnosis.

In Dr. Herzka's first report, dated December 2019, he responds to a question posed by Lincoln as follows:

2.    What diagnoses are supported by the medical evidence please be sure to comment on both mental nervous illnesses and cognitive complaints?

[A:]   **Diagnoses include panic disorder without agoraphobia and mild neurocognitive disorder**. Reported symptoms include fatigue, feeling overwhelmed, anxiety, depression, poor memory, difficulty processing information, and poor focus. Mental status/behavioral observations include short attention and anxious mood, with no report of functional impairment.

---

[26] During the period at issue in the case, Ms. Paris had been Ms. Turkoly's treating psychotherapist for approximately 10 years. AR 1671.

Plaintiff's Motion for Judgment
Page 50

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Treatment included medical management. **Thus, diagnoses are supported by claimant report, provider report, mental status exams, and treatment**. Additional diagnoses outside of this reviewers area of expertise include Lyme disease (diagnosed 2019), amyotrophic lateral sclerosis, mitochondria encephalitic, and fibromyalgia.

AR 226. (emphasis added).  Despite stating that medical records support several diagnoses, later in the same report, Dr. Herzka stated:

Based on the medical evidence, **there is no support of any diagnoses** causing functional impairment from 03/25/2020 through the present and ongoing. Therefore, the claimant has ability to sustain full time capacity (8 hours/day, 5 days/ week) unrestricted.

AR 227 (emphasis added).

> **d.     Dr. Trangle's review ignored all relevant medical evidence and asserted that only objective medical signs can diagnosis CFS and FM, rejecting the consensus, CDC-endorsed criteria and 9th Circuit caselaw.**

Lincoln commissioned Dr. Trangle to review Ms. Turkoly's medical record in February 2021. Dr. Trangle did not examine or speak with Ms. Turkoly. Dr. Trangle did speak with Dr. Rogoff. Ultimately, Dr. Trangle offered the opinion that Ms. Turkoly had no functional limitations.

> **i.     Dr. Trangle rejected the consensus, CDC-endorsed criteria for CFS and 9th Circuit caselaw which holds that "Fibromyalgia and chronic fatigue syndrome are not established through objective tests or evidence."**

In his report, Dr. Trangle concluded that Ms. Turkoly had no limitations, stating:

The claimant's subjective complaints have been far disproportionate to **the measurable clinical findings**. This is very typical in patients with fibromyalgia and/or chronic fatigue syndrome. Despite the presence of diffuse physical complaints, patients like the claimant lack clinical findings to support any significant functional impairment.

Plaintiff's Motion for Judgment
Page 51

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

AR 269. (emphasis added).  CFS and fibromyalgia cannot be diagnosed by objective medical findings because, as medical consensus holds and as the 9th Circuit Court of Appeals had repeatedly held and reaffirmed,

> [F]ibromyalgia and chronic fatigue syndrome are not established through objective tests or evidence.

*Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, 856 F.3d 686, 696 (9th Cir. 2017)*, citing Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011), *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004), *overruled on other grounds, Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) (*en banc*)).

> **ii.   Dr. Trangle acknowledges a "plethora" of complaints of fatigue and myalgia and a "multitude of physical complaints including diffuse muscle and joint pain/stiffness, severe fatigue, headaches and irritable bowels, among others."  Yet, he ignores those medical signs in his analysis.**

The diagnosis of CFS is established by:

(1) Substantial reduction or impairment in the ability to engage in pre-illness activity levels
(2) Post-exertional malaise
(3) Unrefreshing sleep, and
       a.  cognitive impairment, or
       b.  orthostatic intolerance[27]

The diagnosis of FM is established by widespread diffuse muscle and joint pain.

Pl. Mot. at 13; 15.

---

[27] Centers for Disease Control and Prevention website, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome, IOM 2015 Diagnostic Criteria, available at https://www.cdc.gov/me-cfs/healthcare-providers/diagnosis/iom-2015-diagnostic-criteria.html

Plaintiff's Motion for Judgment
Page 52

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Dr. Trangle conceded that Ms. Turkoly's medical record contains a "plethora" of complaints of fatigue and myalgia and a "multitude of physical complaints including diffuse muscle and joint pain/stiffness, severe fatigue, headaches and irritable bowels, among others."  AR. 254; AR 255.  In other words, the medical record contains exactly the medical findings required to diagnose CFS and fibromyalgia and to assess the severity of those conditions. Yet, Dr. Trangle dismissed that evidence out of hand.

It would be unreasonable to credit Dr. Trangle's opinion given how radically it differs from the accepted medical consensus represented by the CDC-endorsed diagnostic criteria.

> **iii.    Dr. Trangle conceded that Ms. Turkoly had positive markers for EBV, but dismissed the significance of EBV infection despite the CDC's finding that 10% of people with EBV infections develop CFS.**

Dr. Trangle acknowledged that Ms. Turkoly had positive markers for an EBV infection. But in his report, Dr. Trangle dismissed the clinical significance of positive EBV in a person diagnosed with CFS.

According to the CDC,

People with ME/CFS often have their illness begin in a way that reminds them of getting the flu. This has made researchers suspect an infection may trigger ME/CFS. In addition, **about one in ten people who become infected with Epstein-Barr virus**, Ross River virus, or Coxiella burnetti **will develop a set of symptoms that meet the criteria for ME/CFS**. People with these infections who had severe symptoms are more likely than those with mild symptoms to later develop ME/CFS symptoms. But not all people with ME/CFS have had these infections.[28] (Emphasis added).

---

[28] Centers for Disease Control and Prevention website, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome, Possible Causes, available at https://www.cdc.gov/me-cfs/about/possible-causes.html

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Consequently, a positive EBV infection is highly relevant to the question of whether Ms. Turkoly developed CFS given that, according to the CDC, approximately 10% of all people infected with EBV develop CFS. Dr. Trangle, however, dismissed this evidence out of hand stating:

> The claimant's **laboratory testing does show evidence of a past EBV infection**, but not a current active infection. This is an extremely common finding among normal individuals without any diseases. Similarly, she has evidence of a past Coxsackievirus B infection. **Neither of these test results are of any current clinical significance and they do not establish a cause for her symptoms.**

AR 257. (emphasis added).

Given that Dr. Trangle's opinion radically differs from the medical consensus represented by the CDC, it would be unreasonable to credit his analysis.

8. **Lincoln did not behave as a fiduciary in this claim and did not provide a full and fair review, as required by the law.**

ERISA makes Lincoln, acting in its role as Plan administrator, a fiduciary, thereby imposing fiduciary duties.  29 USCS § 1002. Black's Law Dictionary defines a "fiduciary duty" as: "A duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person."  ERISA imposes a further duty to conduct a "full and fair review" of a claim. 29 USCS § 1133.

Lincoln did not behave as a fiduciary in this claim and did not provide a full and fair review, as required by the law.

a. **The history of this case shows that Lincoln engaged in a pattern of deceptive and unfair behavior designed to exclude facts that favored disability, refusing to develop the record, and rejecting valid evidence once Ms. Turkoly obtained it.**

Plaintiff's Motion for Judgment
Page 54

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

####        i.    The neuropsychological evaluation

####            1.  In December 2019, Lincoln's file review consultant noted that a neuropsychological evaluation was the proper tool for assessing cognitive impairment, but Lincoln did not obtain one.

In December 2019, Lincoln's file review consultant, Dr. Cumberbatch, stated that the appropriate diagnostic tool to establish Ms. Turkoly's cognitive functioning was a neuropsychological evaluation.  AR 823; AR 839; AR 842.

Under the Plan, Lincoln had the ability to request a neuropsychological evaluation. Yet, Lincoln did not request a neuropsychological evaluation. As the 9th Circuit Court of Appeals and other appeals courts have held, on these facts, this court may draw the inference that Lincoln decided not to pursue the neuropsychological evaluation because it feared that that evaluation would produce evidence that showed disability.  *See Salomaa*, 642 F.3d 666 at 676 ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits."); *see also Montour v. Hartford Life & Accident Ins. Co.,* 588 F.3d 623 at 630 ("Other factors that frequently arise in the ERISA context include . . . whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records."); *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 295 (6th Cir. 2005) ("We find that the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.").

Plaintiff's Motion for Judgment
Page 55

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

2. **After Ms. Turkoly obtained a neuropsychological evaluation based on a referral for treatment from her primary care physician, Lincoln rejected the neuropsychological evaluation asserting that it lacked evidence of validity.**

*See,* Pl. Mot. at 55.

3. **After the evaluating neuropsychologist provided a detailed analysis of the markers of validity contained in the evaluation, Lincoln's file review consultant expressly conceded that those markers of validity were relevant and tacitly conceded that the neuropsychological evaluation was performed consistent with the standard of care, yet still rejected the report.**

*See,* Pl. Mot. at 55.

ii.    **SSA's disability analysis**

1. **SSA independently concluded that Ms. Turkoly is incapable of performing any occupation that exists in significant numbers in the national economy.**

*See,* Pl. Mot. at 32.

2. **Ms. Turkoly's attorney alerted Lincoln of SSA's disability determination on May 20, 2021, stating that the details were not yet known and requesting that Lincoln withhold final decision. Lincoln confirmed that it would do that.**

Lincoln's claim analyst kept a running log of activities performed on the claim. That log shows that on May 20th, 2021, Ms. Turkoly's attorney contacted Lincoln, alerted the analyst of the award of Social Security disability benefits, noted that the details of the award were not yet known, and requested that Lincoln withhold final decision until it received details of the SSA decision.

The log states:

05/20/2021 1:20 PM - PHONE Note 55

Plaintiff's Motion for Judgment
Page 56

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Claim/Event/Leave: 8919146

Note Subject : Other Called

Other Subject : ATTY

Text: [05/20/2021 – [Ms. Turkoly's attorney] ADVISED THEY RECENTLY REC'D NOTICE OF SSDI AWARD. ARC ACKN ND CONFIRMED INFO WILL BE SHARED WITH DCM PER PROCEDURE AND HE WILL LIKELY BE CONTACTED BY RECOVERY DEPT IN THE EVENT ANY OVERPAYMENT EXISTS ASA RESULT OF LUMP SUM FUNDS PAID BY SSA. ATTY ACKN. **CONFIRMED AWARD WILL BE CONSIDERED IN OUR APPEAL REVIEW**. NO OTHER QUESTIONS. CALL CONCLUDED.

AR 4. (emphasis added)

05/20/2021 8:52 PM - CLAIM Note 194

Claim/Event/Leave: 8919146

NoteSubject : Ref to Other

Other Subject : FRS

Text: FOR SOCIAL SECURITY DISABILITY INCOME (SSDI).WITH A REASON OF .COMMENTS: **RECEIVED VERBAL NOTICE FROM CLMTS ATTORNEY THAT SHES BEEN AWARDED SSDB, AWARD DETAILS NOT YET KNOWN**.

*Id*. (emphasis added).

Notably, SSA concluded that Ms. Turkoly was disabled following the initial review of her application for disability benefits. Consequently, SSA did not produce an administrative law judge's decision or other formal documents outside of the notice of award, which Ms. Turkoly's counsel provided to Lincoln on May 21, 2021.  AR 4.  Social Security claimants who are awarded during the initial review may request a copy of their complete Social Security file; however, SSA takes well more than three days to process such a request.

Plaintiff's Motion for Judgment
Page 57

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

3. **Three business days after assuring Ms. Turkoly's counsel that it would consider the details of SSA's disability determination, Lincoln closed the claim asserting that it would not consider the details of SSA's disability determination and would not add those details to the administrative record.**

On May 25, 2021, the claim analyst's log notes the following:

05/25/2021 5:24 PM - CLAIM Note 198

Claim/Event/Leave: 8919146

NoteSubject : Appeal

Other Subject : OUT

Text: [05/25/2021 - PAINE, JANELLE] APPEAL UPHOLD----- THE REVIEW OF THE FILE AND THE INFORMATION RECEIVED ON APPEAL DOES NOT ALTER THE PREVIOUS CLAIM DETERMINATION. THE DETERMINATION TO DENY BENEFITS BEYOND 3/24/20 IS BEING MAINTAINED ON APPEAL. UPHOLDLETTER SENT TO CLAIMANT'S ATTORNEY.

AR 4.

In the final letter, dated May 25, 2021, denying Ms. Turkoly's claim, Lincoln

informed Ms. Turkoly through her counsel that it would not consider details of SSA's

disability determination.

In our review of Ms. Turkoly's claim, Lincoln Life Assurance Company of Boston (Lincoln) has fully considered the Social Security Administration's (SSA) ruling to approve Social Security Disability (SSD) benefits, as reported by you in a telephone conversation on May 20, 2021. […] Furthermore, you have failed to provide anything beyond verbal notification the SSD award, such an Administrative Law Judge's (ALJ) opinion on the case, SSA file, SSA ordered examinations, etc. In the absence of information from Ms. Turkoly's SSD claim file, the award of these benefits cannot be fully evaluated as part of our appeal review.

AR 124.

Plaintiff's Motion for Judgment
Page 58

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

## V.    Conclusion

The medical record establishes disability under the Plan's own occupation and any occupation definitions of disability. The evidence extrinsic to the medical record corroborates disability. Every physician who has treated or examined Ms. Turkoly has concluded that she is disabled. The file review consultants that Lincoln commissioned and relied upon ignored and misstated the record and the nature of CFS and fibromyalgia. Throughout the history of this case, Lincoln failed to act as a fiduciary. Rather, it engaged in a pattern of behavior designed to unfairly exclude evidence that showed disability.

On *de novo* review, the preponderance of the evidence overwhelmingly shows that Ms. Turkoly has been continuously disabled under the plan and remains disabled.

Dated this 20th day of May, 2022.

Respectfully Submitted,

**THOMAS, COON, NEWTON & FROST**

By: /s/ Scott A. Sell
Scott A. Sell, OSB #144297
The Thomas Mann Building
820 SW 2nd Avenue, Suite 200
Portland, OR  97204
Telephone:  (503) 228-5222
Facsimile:  (503) 273-9175
Email:  ssell@tcnf.legal

*Attorney for Plaintiff*

Plaintiff's Motion for Judgment
Page 59

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

## CERTIFICATE OF FILING

I certify that on May 20, 2022, I filed the original **Motion for Judgment** with the Clerk of the Court at the following address:

Clerk of Court, Mark O. Hatfield U.S. Courthouse

1000 S.W. Third Ave.

Portland, OR, 97204

by the following method of filing: **eFile**.

## CERTIFICATE OF SERVICE

I certify that on May 20, 2022, participants in this case who are registered eFilers will be served via the electronic mail function of the eFiling system as follows:

**Russell S. Buhite,** OSB #142529
Ogletree, Deakins, Nash, Smoak & Stewart PC
1201 Third Avenue, Suite 5150
Seattle, WA 98101
206-693-7052; 206-693-7058 (fax)
russell.buhite@ogletree.com

**Scott Pomeroy,** admitted *pro hac vice*
Ogletree Deakins
One Boston Place, Suite 3500
Boston, MA 02108
207-387-2961; 207-387-2986 (fax)
scott.pomeroy@ogletree.com

*Attorneys for Defendant*
*The Lincoln National Life Insurance Company*

Dated this 20th day of May, 2022.

**THOMAS, COON, NEWTON & FROST**

 */s/ Scott A. Sell*
Scott A. Sell, OSB#: 144297
820 SW 2nd Avenue, Suite 200
Portland, OR  97204
Telephone: (503) 228-5222
 Email:  ssell@tcnf.legal