Scott A. Sell
OSB#: 144297
THOMAS, COON, NEWTON & FROST
The Thomas Mann Building
820 SW 2nd Avenue, Suite 200
Portland, OR  97204
Telephone: (503) 228-5222
Facsimile: (503) 273-9175
Email:  ssell@tcnf.legal

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| TRACY K. TURKOLY,<br><br>Plaintiff,<br><br>v.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. 3:21-cv-01019-SI<br><br><br>PLAINTIFF'S REPLY AND RESPONSE TO CROSS-MOTION |

i

# **TABLE OF CONTENTS**

I.    LR 7-1(a) Certification .................................................................1

II.   Ms. Turkoly has proven by a preponderance of the evidence that she is disabled from her own occupation as a Global Account Manager and from any occupation under the terms of the plan.......................................1

a. Ms. Turkoly's theory of the case.........................................................1

    i. The medical evidence proves Ms. Turkoly's theory of the case .................................................................................................2

        1. A brief summary of Ms. Turkoly's medical record..........4

    ii. The facts established by the medical record in this case align precisely with the medical facts about chronic fatigue syndrome established by the United States Centers for Disease Control....6

    iii. Lincoln's surveillance confirms Ms. Turkoly's theory of the case ..................................................................................8

    iv. The Social Security Administration (SSA)'s analysis confirms Ms. Turkoly's theory of the case ................................................9

b. Lincoln's theory of the case ...............................................................9

    i. Lincoln's argument is based on multiple demonstrably incorrect statements of material fact .......................................................11

        1. Contrary to Lincoln's erroneous assertion otherwise, the record shows that Ms. Turkoly was not under threat of losing employment at the time her disability began.......11

        2. Contrary to Lincoln's erroneous assertion otherwise, the record shows that Ms. Turkoly did not travel to New Zealand, New York, or Carmel Beach during her

disability ....................................................................13

3. Contrary to Lincoln's erroneous assertion otherwise, the record shows that Ms. Turkoly has not worked since the start of her disability ......................................................15

4. Contrary to Lincoln's erroneous assertion otherwise, the record does not show that Ms. Turkoly was away from home for several hours on December 6, 2019................16

5. Contrary to Lincoln's erroneous assertion that Dr. Coffin "recanted his statement," the record shows that Lincoln's expert produced an inaccurate summary of Dr. Coffin's opinion, promoting an investigation by the State of California ......................................................................17

6. Contrary to Lincoln's erroneous assertion otherwise, the record and Social Security Administration regulations establish that Ms. Turkoly did not have access to her Social Security medical file and, therefore, did not withhold Social Security records from Lincoln .............18

ii. Lincoln asks this court to contradict 9th Circuit caselaw and medical consensus, which state that chronic fatigue syndrome and fibromyalgia do not produce objective medical signs .......20

1. CFS and FM and objective medical signs ......................20

iii. Lincoln asks this court to ignore significant evidence probative of disability ..........................................................................24

1. Lincoln asks this court to ignore objective markers of validity contained in Dr. Ludolph's report.....................24

2. Lincoln asks this court to ignore seven days of covert

surveillance that showed Ms. Turkoly home-bound for four days and minimally functional for three days.........29

3. Lincoln asks this court to ignore the Social Security Administration's conclusion that Ms. Turkoly has a relatively obvious claim for disability from any occupation....................................................................32

iv.  Lincoln asks this court to credit flawed evidence over weighty evidence ...............................................................34

1. Lincoln asks this court to favor mental status examinations from Ms. Turkoly's chiropractor over the mental status examinations of her physicians and mental health providers, consistent documentation of symptoms contained in her medical record, the opinion of her several treating physicians, detailed surveillance evidence, the independent assessment of SSA, and the results of a four-day neuropsychological evaluation......34

a. Lincoln's own experts acknowledge that mental status examinations recorded by Ms. Turkoly's physicians and mental health providers were abnormal...........................................................35

b. Lincoln's expert, Dr. Cumberbatch, acknowledged the importance of a neuropsychological evaluation relative to mental status examination...................36

2. Lincoln asks this court to credit the flawed opinions of the medical experts it hired for this case .......................37

a. Dr. Rosen...........................................................37

iv

b.  Dr. Cumberbatch ....................................................37

c.  Dr. Hertza ...............................................................38

d.  Dr. Trangle ............................................................38

III.    Conclusion ........................................................................39

# TABLE OF AUTHORITIES

## Cases

*Abatie v. Alta Health & Life Ins. Co.*, 458 F3d 955 (9th Cir 2006) ........................21

*Black & Decker Disability Plan v. Nord*, 538 US 973, 123 S Ct 1781, 155 LEd2d 661 (2003) ......................................................................................................25, 37

*Calvert v. Firstar Fin., Inc.*, 409 F3d 286 (6th Cir 2005) ......................................28

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 266 F3d 1130, 370 F3d 869 (9th Cir 2004).......................................................................................21, 23

*Montour v. Hartford Life & Accident Ins. Co.*, 588 F3d 623 (9th Cir 2009) ....28, 34

*Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, 856 F3d 686 (9th Cir 2017).........................................................................................21, 23

*Rabbat v. Standard Ins. Co.*, 894 F Supp 2d 1311 (D Or 2012) .............................31

*Salomaa v. Honda Long Term Disability Plan*, 642 F3d 666 (9th Cir 2011) ..*passim*

## Statutes, Regulations, and Rulings

LR 7-1(a)..............................................................................................................1

1

## I.     LR 7-1(a) Certification

The undersigned certifies that the parties have made a good faith through

telephone conferences and correspondence to dispute but have been able to do so.

## II.     Ms. Turkoly has proven by a preponderance of the evidence that she is disabled from her own occupation as a Global Account Manager and from any occupation under the terms of the plan.

### a.  Ms. Turkoly's theory of the case

In her opening motion, Ms. Turkoly presented her theory of the case.

Specifically, she proved that she is unable to meet the high demands of a Global

Account Manager – a position that requires "manage[ment of] a highly complex

and strategic customer base" and DOT level 5 reasoning skills[1] – because her

medical conditions limit her concentration, attention to detail, interpersonal

communication skills, and her ability to multitask and travel.  Moreover, she

cannot perform "any occupation" because Ms. Turkoly regularly experiences days

of profound fatigue during which she must remain in bed or rest throughout the

day. Because she is incapable of her "own occupation" and "any occupation," she

---

[1] See Plaintiff's Motion for Judgment ("Pl. Mot") at 25-27 for a detailed analysis of the requirements of a Global Account Manager

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

is disabled for the first 24 months of the plan and remains disabled after the first 24 months.

### i. The medical evidence proves Ms. Turkoly's theory of the case

The medical record proves Ms. Turkoly's theory. Specifically, the medical record shows that Ms. Turkoly experienced a significant flu-like infection in January 2018. Administrative Record ("AR") 1047. After she recovered from the acute illness, she began to develop fatigue, widespread pain, depression, and anxiety. *Id*. Later testing (performed in June 2019) showed that Ms. Turkoly had recently been infected with the Epstein Barr Virus (EBV). AR 1060; *see also* AR 91 (containing an acknowledgement of the positive EBV labs from Lincoln's file review consultant, Dr. Trangle).

Ultimately, due to increasing symptoms of fatigue, widespread pain, depression, and anxiety Ms. Turkoly's disability began on February 15, 2019. As Lincoln's disability analyst noted at the time,

> [Ms. Turkoly] doesn't know what's wrong with her. She's been working for 30 years and this has never happened to her. […] [She] continued to cry. [She] states this isn't the first time that she's been through stress so she doesn't know what's going on.

AR 36-37.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

At the start of her disability, Ms. Turkoly's providers documented her symptoms of extreme fatigue *See, e.g.*, AR 397. (noting in June 2019, "Tracey notes episodes of severe fatigue every 3 days or so. She has difficulty getting out of bed and is perplexed by it.") see also Pl. Mot. at 9-17 (containing detailed discussion of Ms. Turkoly's medical record).  However, because she had experienced depression and anxiety in the past, her providers treated her fatigue as a symptom of depression and anxiety using mental health medications and talk therapy.  When she did not respond to mental health interventions as she had in the past, her providers began to suspect that her symptoms had a physical etiology. *See* Pl. Mot. 10-12. After investigating the physical etiology of her symptoms, her several treating physicians independently diagnosed Ms. Turkoly's conditions as chronic fatigue syndrome (CFS) and fibromyalgia (FM). *See* Pl. Mot. at 16 (detailing the independent diagnoses of CFS from Drs. Parsons, Coffin, Walker, and Rogoff).

When Ms. Turkoly began treatment with Dr. Rogoff, her most recent treating physician, he ordered a neuropsychological evaluation "to establish a cognitive baseline to aid in treatment."  AR 219. In September and October 2020, Ms. Turkoly underwent four days of neuropsychological testing with Dr. Shelly

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

4

Ludolph, PsyD. AR 400. Following testing, Dr. Ludolph diagnosed Ms. Turkoly with Mild Neurocognitive Disorder Due to Another Medical Condition, concluding that she had "significant deficits" in the realm of executive functioning and "extremely low" "working memory" and "immediate memory." AR 403, 407; 409; *see also* Pl. Mot. at 18-21 (containing a detailed discussion of Dr. Ludolph's evaluation). Ultimately responding to a report by one of Lincoln's experts, Dr Ludolph opined:

> As I understand it, Ms. Turkoly worked in a high-level sales position in the technology industry. She is not presently capable of that work given the degree of impairment to her executive functioning and memory.

AR 219.

### 1. A brief summary of Ms. Turkoly's medical record.

Throughout the period of disability, Ms. Turkoly's physicians consistently documented her symptoms. *See, e.g.:*

- "[She is] mentally exhausted … and has been having frequent panic attacks. Her mood is very depressed." AR 395 (February 2019).

- Flat affect, fatigued appearance, frequent crying, and panic. *Id*. (February – April 2019).

- "She feels tired and unmotivated. Even going to the grocery store seems like too much." AR 397 (May 2019).

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

- "Tracey notes episodes of severe fatigue every 3 days or so. She has difficulty getting out of bed and is perplexed by it."  AR 397 (June 2019).

- "Tracey notes severe fatigue every 3-6 days where she cannot get out of bed and function. This usually follows some stressful event. She would like to return to work but states she cannot function in a work environment yet. She feels her disability is as much physical as psychiatric. She notes severe fatigue at times." *Id*. (June 2019).

- "Tracey feels exhausted after taking a short trip with her family.  She still has chronic fatigue, and painful joints. […] Her joint problems and extreme fatigue have been severe. She clearly cannot return to work at this time." AR *Id.* (July 2019).

- "Fatigue is extreme. Some days she has very bad brain fog. Talks in circles. Forgets things. When she does too much she feels like she has a bad hang over. Can't sleep but can't get out of bed either. Mood has been significant. Weepy." AR 578 (August 2019).

- "She would like to recover so she could return to work.  She has cyclical bouts of extreme fatigue accompanied by arthralgias and unsteadiness." AR 398 (August 2019).

- "Tracey continues to report fatigue, joint pain, unsteady gait and cognitive difficulties.  Her concentration has been poor.  She paid her mortgage from the wrong account. She also has confused our appointment times on more than one occasion." *Id*. (November 2019).

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

6

- "Symptoms for Ms. Turkoly persist with pain, fatigue and cognition concerns preventing her from performing her necessary job functions." AR 716 (January 2020).

- MARCH 2020 – Covid disrupts continuity of care.

- "[F]atigue and joint pain" June 2020.

- "Cannot think critically or be alert […] extreme fatigue.  Can't focus or be sharp at work. […] Cannot stay awake to do job.  Cannot wake early.  Sleeps 15 hours a day.  Cannot do phone meetings to sell products because she can't be alert. Cannot type due to hand swelling and pain. Back pain difficult to sit prolonged period.  Must lie down." AR 648 (July 2020).

- Neuropsychological testing showing "significant deficits" in the realm of executive functioning and "extremely low" "working memory" and "immediate memory." AR 403, 407; 409 (September and October 2020).

> ii.    **The facts established by the medical record in this case align precisely with the medical facts about chronic fatigue syndrome established by the United States Centers for Disease Control.**

The United States Centers for Disease Control (CDC) states that, although

CFS is not a mental illness, the symptoms of CFS are often initially

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

7

symptoms of a mental illness.[2] Moreover, the CDC states:

> People with ME/CFS often have their illness begin in a way that reminds them of getting the flu. This has made researchers suspect an infection may trigger ME/CFS. In addition, about one in ten people who become infected with Epstein-Barr virus, Ross River virus, or Coxiella burnetti will develop a set of symptoms that meet the criteria for ME/CFS. People with these infections who had severe symptoms are more likely than those with mild symptoms to later develop ME/CFS symptoms. But not all people with ME/CFS have had these infections.[3]

The CDC's analysis aligns precisely with the facts established by the medical record in this case.  Ms. Turkoly's symptoms began after a flu-like infection; later testing showed that she had recently been infected with EBV, which according to the CDC causes CFS in approximately 1 out of 10 infections; her doctors initially treated her symptoms as those of a mental illness; when psychogenic treatment failed, her doctors investigated a physical etiology and noted that the medical signs established a diagnosis of CFS; last, a neuropsychological evaluation documented cognitive limitations consistent with

---

[2] Ex A "Beyond Myalgic Encephalomyelitis/Chronic Fatigue Syndrome" at 2; https://www.cdc.gov/me-cfs/symptoms-diagnosis/diagnosis.html (CDC endorsement of Ex A)

[3] Centers for Disease Control and Prevention website, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome, Possible Causes, available at https://www.cdc.gov/me-cfs/about/possible-causes.html

Ms. Turkoly's well-documented fatigue and other symptoms. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 672 (9th Cir. 2011) (stating that, although CFS and FM do not directly produce objective medical signs, a neuropsychological evaluation can corroborate the symptoms of pain and fatigue caused by CFS by showing impaired executive functioning and impaired memory, which are "hallmark cognitive symptoms of chronic fatigue syndrome.").

### iii.   Lincoln's surveillance confirms Ms. Turkoly's theory of the case.

On seven days during three discreet intervals chosen at Lincoln's discretion, Lincoln documented Ms. Turkoly's life as she lived it unaware that her insurer was watching her. On four of those seven days she was home-bound, and her family's life went on – her husband and son riding bikes and playing– while she rested. On the remaining three days, she did leave her home, but she was only minimally functional: she did not walk for more than six minutes at a time; she did not sit for more than 72 minutes at a time; she did not travel to any location that was more than a few minutes from her home; she was never away from home for more than three hours; and – on at least one occasion – her  family dropped her off at home to rest before they continued their outings. *See* Pl. Mot. at 30-32.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

The surveillance evidence confirms Ms. Turkoly's theory of the case.

> **iv.  The Social Security Administration (SSA)'s independent analysis confirms Ms. Turkoly's theory of the case.**

SSA found Ms. Turkoly disabled on March 1, 2020.  AR 72.  Notably, SSA reached that conclusion following the initial claim review, rendering it unnecessary for her to engage in any administrative appeal with SSA.[4]

SSA's independent conclusion strongly corroborates Ms. Turkoly's disability under the Plan because the standard of disability employed by SSA is a substantially more demanding standard than the standard employed by the Plan during both the "own occupation" and "any occupation" period.  *See* Pl. Mot. at 32-33.

> **b.  Lincoln's theory of the case**

Lincoln presents a very different theory of the case.  Lincoln argues that at the height of a 30-year career, which began as one of a handful of trail-blazing

---

[4] That fact is notable because SSA routinely denies claims at the initial review that it ultimately awards through the appeals process. According to SSA's published data, SSA awards benefits at initial review in only 36% of cases, but ultimately awards disability in more than half of the claims denied after initial review. Consequently, an award of disability at initial review allows the inference that the claim was a strong and relatively obvious claim for disability. *See* Exhibit B.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

women in the 1990s technology industry and ended as Global Account Manager earning a substantial salary plus commissions, Ms. Turkoly ended her working life to live without earned income while engaging in a multi-year charade in which she pretended to be disabled.  During this charade, Lincoln's theory goes, she attended dozens of medical appointments over a period of years seeking treatment for symptoms of fatigue and pain; she took medications for those symptoms; she duped her several treating physicians into concluding she is disabled; she created a fabricated social media posts about her limitations (posted during the period when Lincoln was paying her claim);[5] she eluded seven days of covert surveillance; she managed to game a four-day-long neuropsychological evaluation that contained multiple relevant markers of validity, and she tricked the Social Security Administration, which independently concluded that she had a relatively obvious claim for disability from any occupation.

As detailed below, Lincoln advances this flawed theory in an opening motion that contains significant errors of fact and reasoning. Regarding

---

[5] *See* AR 450 and Pl. Mot. at 31 (discussing a social media post posted at the start of the COVID-19 pandemic in which Ms. Turkoly stated "As I sit in quarantine, I have been meditating on something to say that will be helpful to others […] because of my health journey I have already had to stay home for the past year.")

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

errors of fact:

- Lincoln's argument is based on multiple demonstrably incorrect statements of material fact.

Regarding errors of reasoning:

- Lincoln asks this court to contradict 9th circuit caselaw and medical consensus, which states that chronic fatigue syndrome and fibromyalgia do not produce objective medical signs.

- Lincoln asks this court to ignore significant evidence probative of disability.

- Lincoln asks this court to credit flawed evidence over weighty evidence.

### i. Lincoln's argument is based on multiple demonstrably incorrect statements of material fact.

#### 1. Contrary to Lincoln's erroneous assertion otherwise, the record shows that Ms. Turkoly was not under threat of losing employment at the time her disability began.

Throughout its opening brief, Lincoln argues that Ms. Turkoly participated in a years-long unpaid charade in which she pretended to be disabled. Given her

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

unfaltering work history[6] and significant career achievements, Lincoln is hard-pressed to come up with a reason why, at the height of her career, Ms. Turkoly would give up her career and 100% of her commissions to garner a fraction of her salary while perpetuating such a charade.  Lincoln invents a motive from an out-of-context statement, falsely asserting that Ms. Turkoly was under threat of losing employment at the time her disability began. Lincoln's assertion does not stand up to scrutiny.

Lincoln's assertion is based on portion of a sentence recorded by Dr. Parsons. One must simply read the entire sentence to learn that she was not under threat of losing employment because, although her position was reorganized, "**she can stay with the same company**." AR 395 (emphasis added).

Contrary to Lincoln's assertion, the record shows that Ms. Turkoly's employer greatly valued her at the time of her disability and went to great lengths to retain her.  Lincoln's own medical expert, Dr. Brown, documented as much, recording in June 2019 (four months after her disability began):

---

[6] Ms. Turkoly's work history is unfaltering.  For example, in the years just prior to disability, the record shows she continued to work while on bed-rest while pregnant and she did not take meaningful time away from work following the birth of her child. AR 652.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

13

[T]he insured was well liked and valued by her employer. The insured is extremely intelligent, socially effective, and it is in the employer's best interest to facilitate the insured's return to work.

AR 1663.

Consistent with Lincoln's expert's observation, Ms. Turkoly received high public praise from fellow executives for her work in the year prior to her disability.[7] AR 464.  Moreover, her employer continued to employ her and pay for her health insurance and other benefits for an additional 17 months after the start of her disability in the hopes that she would recover and return to work.  AR 663. Only after Ms. Turkoly's treating physician, Dr. Rogoff, informed the employer that Ms. Turkoly was unlikely to be able to return to work within an additional 12 months – beyond the 17 months that had already elapsed – did the employer conclude that it could no longer hold her position.  *Id*.

**2. Contrary to Lincoln's erroneous assertion otherwise, the record shows that Ms. Turkoly did not travel to**

---

[7] In another example of Lincoln's loose use of the facts in this case, Lincoln erroneously argues that this praise came just prior to disability, asserting that if she was so praised just before her disability, then her disability must be a charade. Defendant's Response in Opposition to Plaintiff's Motion for Judgment ("Def. Resp.") at 7.  The problem with Lincoln's argument is that this praise occurred in March and August of 2018 – that is, respectively, one year before her disability and six months before the start of her disability.  AR 464.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

14

**New Zealand, New York, or Carmel Beach during her disability.**

At multiple points in its opening motion, Lincoln argues that Ms. Turkoly is not disabled because she traveled to New Zealand, New York, and Carmel Beach, California during her disability. Defendant's Response in Opposition to Plaintiff's Def. Resp. 7; 9; 38; 43; 59. However, the record plainly shows that Ms. Turkoly did not travel to those locations during her disability.'

Regarding New Zealand and New York, the record shows that Ms. Turkoly traveled to those locations in 2018. Her disability did not begin until 2019.

Regarding California, Defendant argues that Ms. Turkoly was at Carmel Beach on March 25, 2019, because, on that date, she posted a photo of herself and her husband at Carmel Beach on Facebook. The problem with Defendant's assertion is that the record shows that on the exact same date – March 25, 2019 – Ms. Turkoly was not in California because she was at an in-person psychotherapy appointment in Portland, Oregon. AR 975. It should go without saying that the fact that a person posts a photo on a particular date does not mean the photo was taken on that date. Indeed, people often post images of happier times from the past on social media.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

15

### 3. Contrary to Lincoln's erroneous assertion otherwise, the record shows that Ms. Turkoly has not worked since the start of her disability.

At several points in its opening brief, Lincoln argues that Ms. Turkoly "embarked on a new career" after her disability began. *See, e.g.,* Def. Resp. at 2. Contrary to Defendant's assertion, the record shows that Ms. Turkoly attempted to return to the workforce but was unable to do that. Specifically, she took a real estate brokers' examination, but she never performed work as a realtor.

Moreover, while preparing for the examination, the record shows that she was able to perform far less than 40 hours of work per week. Indeed, she was capable of sedentary self-study no more than 25 hours a week. AR 702. Her inability to perform sedentary self-study at the equivalent of fulltime hours is evidence that she could not have performed 40-plus hours a week at her highly demanding occupation or, for that matter, any full-time occupation.

Additionally, the fact that Ms. Turkoly attempted to mitigate her losses by looking for other work that she could perform is evidence that contradicts Lincoln's disability-charade theory because, if she was miming disability, she would have no motive to attempt alternative employment.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

16

**4. Contrary to Lincoln's erroneous assertion otherwise, the record does not show that Ms. Turkoly was away from home for several hours on December 6, 2019.**

Throughout its opening motion, Lincoln argues that Ms. Turkoly is not disabled because she spent several hours away from home on December 6, 2019. To be sure that argument ignores the six other days on which Lincoln's surveillance showed Ms. Turkoly home-bound (four of the six days) or only minimally functional (two to the six days). Setting aside the six days of surveillance that Lincoln ignores, the claim Lincoln makes about the remaining day is not established by the record.

As the record states, on Friday December 6, 2019, Ms. Turkoly got into her car with her son at 8:17 a.m. and drove in the direction of Ms. Turkoly's son's school, Le Monde, located 2.4 miles from Ms. Turkoly's home. AR 864-65. The investigator lost track of Ms. Turkoly, then drove to several schools that her son did not attend and returned to her residence at 8:36 a.m. to find the garage door closed. The investigator did not observe any other activity and left at 12:15 p.m. According to Google Maps, it takes 8 minutes to travel from Ms. Turkoly's home to Le Monde.

17

Plainly, the record does not establish that Ms. Turkoly was away from home for several hours on December 6, 2019.  Rather, the most likely inference is that when Ms. Turkoly left her home on a weekday at 8:17 a.m. with her son driving in the direction of his school, she dropped him at school and returned home, parking the car in the garage and closing the door sometime before 8:36 a.m..  Indeed, had the investigator thought otherwise he surely would have stayed longer to catch Ms. Turkoly "returning home."

     **5.   Contrary to Lincoln's erroneous assertion that Dr. Coffin "recanted his statement," the record shows that Lincoln's expert produced an inaccurate summary of Dr. Coffin's opinion, promoting an investigation by the State of California.**

On January 15, 2020, one of Lincoln's experts provided a "summary" of a telephone conversation with Ms. Turkoly's physician, Dr. Coffin, asking Dr. Coffin to review it for "accuracy."  AR 797.  Dr. Coffin promptly did so, striking a statement inserted by Lincoln's expert claiming that Dr. Coffin believed Ms. Turkoly capable of light work and informing the expert that the summary contained errors. AR 797-8.

In its opening motion, Lincoln claims that this exchange proves that Dr. Coffin "recanted" a statement about Ms. Turkoly. Def. Resp. at 18.  Plainly, the

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

18

record does establish that Dr. Coffin changed his position.  If anything, the record more strongly supports the inference that the Lincoln expert attempted to pass off a false summary of Dr. Coffin's opinion. Indeed, in January 2019, the State of California opened an investigation into Lincoln's experts' behavior in this claim based on Ms. Turkoly's statement:

> The doctor from the insurance company who has all my medical records but has not physically examined me phoned one of my physicians and attempted to bully him into changing his mind on my ability to return to work. The person insisted his assessment is not correct. They told him I was under surveillance and seen walking up stairs. I am not on leave due to an inability to walk upstairs. Some days I have great difficulty doing something like this but my main issues are fatigue, roving pain and cognitive issues. The insurance company knows tanks [*sic*]. It is not ethical for an insurance company doctor to work to undermine my treatment and contradict my physician'' diagnosis. They did this to one of my other doctors previously and then misrepresented in writing what he said.

AR 811.

> **6. Contrary to Lincoln's erroneous assertion otherwise, the record and Social Security Administration regulations establish that Ms. Turkoly did not have access to her Social Security medical file and, therefore, did not withhold Social Security records from Lincoln.**

In its opening motion, Lincoln demonstrates that it is ignorant of SSA's disability procedures and regulations and, due to that ignorance, falsely asserts that

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Ms. Turkoly withheld Social Security's medical analysis from Lincoln. Specifically, Lincoln asserts that Ms. Turkoly had access to her SSA medical file because, in February 2020, Dr. Parsons reviewed the opinion of SSA's independent expert and agreed with the expert's opinion that Ms. Turkoly is disabled. Def. Resp. at 57; AR 399. Lincoln's assumption is that, if Dr. Parsons had the SSA expert opinion, it must be because Ms. Turkoly gave it to him. Based on that incorrect assumption, Lincoln spends several pages conjuring a bizarre false-narrative in which – for no apparent reason and against her own interests – Ms. Turkoly withheld evidence from Lincoln showing that she is disabled. *Id*. at 57-58.

Contrary to Lincoln's erroneous assumption, SSA regulations obligate its analysts to communicate with treating physicians, like Dr. Parsons, but (until a rule change that became operative after the final denial in this case) SSA denied claimants' access to SSA's experts' opinions during initial claim adjudication.

Under SSA's rules, claimants had no ability to access SSA's medical records, including SSA's experts' opinions, during an initial claim adjudication until well into 2021. In September 2020, SSA made a decision to change its long-standing policy barring claimant's access to medical records during an initial

20

adjudication.[8]   However, SSA did not create a procedure for implementing that policy until February 19, 2021.[9]   SSA operates more than 50 respective Disability Determination Services centers and each of those centers had to individually adopt and implement the record request policy and procedure, which they did not do until well into 2021 – that is, after Lincoln issued its final denial in this case.

### ii.   Lincoln asks this court to contradict 9th Circuit caselaw and medical consensus, which states that chronic fatigue syndrome and fibromyalgia do not produce objective medical signs.

### 1.  CFS and FM and objective medical signs

Consistent with the broad medical consensus represented by the CDC's CFS criteria and the American College of Rheumatology FM criteria,[10] the 9th Circuit Court of Appeals has held and repeatedly reaffirmed that:

> [F]ibromyalgia and chronic fatigue syndrome are not established through objective tests or evidence.

---

[8] "Expanded Access to the Electronic File at the Initial and Reconsideration Levels" SSA website, available at https://www.ssa.gov/representation/

[9] "SSA Emergency Message EM-21010" available at https://secure.ssa.gov/apps10/reference.nsf/links/02192021111417AM

[10] See Pl. Mot. at 13-15 for a detailed discussion of those criteria

PLAINTIFF'S REPLY AND RESPONSE            THOMAS, COON, NEWTON & FROST
TO CROSS-MOTION                           820 SW SECOND AVE., SUITE 200
Case No. 3:21-cv-01019-SI                 PORTLAND, OR 97204
                                          503-228-5222

*Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, 856 F.3d 686, 696 (9th Cir. 2017)*, citing Salomaa*, 642 F.3d 666, 678 (9th Cir. 2011), *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004), *overruled on other grounds, Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) (*en banc*)).

Courts established that rule because CFS and FM do no produce objective medical signs and, therefore,

> [A] disability insurer [cannot] condition coverage on proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible.

*Salomaa*, 642 F.3d at 666, 678 (9th Cir. 2011).

In establishing and repeatedly reaffirming this rule, courts acknowledge that insurers are under no obligation to "assume the risk" that an insured person develop CFS or FM because insurers can exclude any condition from the terms of a policy, including CFS and FM. *Id*. at 679. However, when an insurer sells a policy that covers CFS and FM, the insurer and must fairly adjudicate a claim for those covered conditions under the law. *Id*.

In this case, Lincoln sold a policy that covers CFS and FM but, throughout the administrative adjudication of the claim, Lincoln argued that Ms. Turkoly

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

22

cannot prove her claim unless she produced objective medical signs.  Indeed, in its

final denial letter, Lincoln explicitly stated that it would not approve her claim

unless she produced objective medical evidence that corroborated her subjective

symptoms:

> Any restrictions and limitations would depend upon the presence of
> sufficiently frequent and severe symptoms **along with corroborating**
> **medical evidence** such as physical examinations, mental status
> examinations, valid neuropsychological testing, diagnostic test results,
> consultation reports, etc.

AR 98 (emphasis added).[11]

Moreover, Lincoln hired medical experts who repeated Lincoln's unlawful

requirements, directly contradicting the established medical facts about CFS and

FM.  For example, Dr. Trangle conceded that Ms. Turkoly's medical record

contains a "plethora" of complaints of fatigue and myalgia and a "multitude of

physical complaints including diffuse muscle and joint pain/stiffness, severe

fatigue, headaches and irritable bowels, among others."  AR. 254-55.  In other

words, the medical record contained exactly the evidence required to diagnose CFS

---

[11] In its opening motion, Defendant argues "at no point did Lincoln or any of its consulting physicians purport to condition coverage on proof by objective indicators."  Def. Resp. 55 FN 13.  That is plainly not true. Lincoln's denial letter explicitly conditions coverage on objective indicators.

and FM and to assess the severity of those conditions under the law. Yet, Dr. Trangle dismissed that evidence out of hand, asserting that such evidence is worthless without objective medical findings.

> As Dr. Trangle explicated:
>
> The claimant's subjective complaints have been far disproportionate **to the measurable clinical findings**. This is very typical in patients with fibromyalgia and/or chronic fatigue syndrome. Despite the presence of diffuse physical complaints, patients like the claimant lack clinical findings to support any significant functional impairment.

AR 260. (emphasis added). Of course, Ms. Turkoly (and all other patients who suffer from CFS and FM) lack "measurable clinical findings" because CFS and FM do not produce measurable clinical findings. *Orzechowski*, 856 F.3d at 696, *citing Salomaa*, 642 at 678, *Jordan,* 370 F.3d at 877.

On review before this court citing a case outside of the 9th Circuit, Lincoln argues that it "did not demand that CFS be diagnosed through objective tests" rather it simply demands objective medical evidence of "functional limitations." Def. Resp. at 55. Under our caselaw, Lincoln's distinction makes no difference because, as medical consensus and the caselaw establish, pain and fatigue – the primary symptoms of CFS and FM – do not directly produce objective medical signs and insurers cannot condition coverage on such evidence. *Id*. Moreover, even

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

24

if that distinction was meaningful under 9th Circuit law, which it is not, Ms. Turkoly's claim does contain precisely the sort of corroborating objective evidence of disability that Lincoln insists is required.  Specifically, the record contains a corroborating neuropsychological evaluation, frequent mental status examinations (MSEs) noting fatigue, impaired concentration, impaired memory, and impaired attention, and seven days of covert surveillance showing Ms. Turkoly home-bound (on four of the seven days) and minimally functional (on three of the seven days).

### iii.    Lincoln asks this court to ignore significant evidence probative of disability.

#### 1.    Lincoln asks this court to ignore objective markers of validity contained in Dr. Ludolph's report.

Although CFS and FM do not directly produce objective medical signs, a neuropsychological evaluation can corroborate the symptoms of pain and fatigue caused by CFS by showing impaired executive functioning and impaired memory, which are "hallmark cognitive symptoms of chronic fatigue syndrome."  *Salomaa*, 642 F.3d 666, 672 (9th Cir. 2011) (internal brackets omitted).

In this case, Ms. Turkoly's physician, Dr. Rogoff, referred her to the neuropsychologist, Dr. Ludolph, to "to establish a cognitive baseline to aid in treatment."  AR 219.  Following four days of testing, Dr. Ludolph diagnosed Ms.

PLAINTIFF'S REPLY AND RESPONSE                    THOMAS, COON, NEWTON & FROST
TO CROSS-MOTION                                   820 SW SECOND AVE., SUITE 200
Case No. 3:21-cv-01019-SI                         PORTLAND, OR 97204
                                                  503-228-5222

25

Turkoly with Mild Neurocognitive Disorder Due to Another Medical Condition, concluding that she had "significant deficits" in the realm of executive functioning and "extremely low" "working memory" and "immediate memory." AR 409, 403; 407; see also Pl. Mot. at 18-21 (containing a detailed discussion of Dr. Ludolph's evaluation).

Based on the opinion of Dr. Hertza, an expert hired by Lincoln, Lincoln rejected Dr. Ludolph's evaluation because it did not contain Dr. Herzta's preferred markers of validity. AR 95.  Notably, unlike Lincoln's hired expert,[12] Dr. Ludolph had "no stake in the outcome of [Ms. Turkoly's] insurance application." Ultimately, Dr. Hertza conceded that Dr. Ludolph's evaluation was conducted within the standard of care and utilized relevant markers of validity. AR 180; *see also* Pl. Mot. 43-44.

When discussing the markers of validity contained in her evaluation, Dr. Ludolph described in detail four markers of validity:

---

[12] As the United States Supreme Court stated, "[We do not question the] concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements.'" *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S. Ct. 1965, 1971 (2003)

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

- Ms. Turkoly did relatively well on some tasks and poorly on others, and the tasks that she did poorly on clustered around the same functional impairments. Moreover, she did not produce extreme results.[13]

- Ms. Turkoly's presentation during the evaluation demonstrated she understood the tasks and put forth good effort.[14]

---

[13] As Dr. Ludolph noted:

Invalid evaluations, in which a subject is inattentive or malingering, do not return these sorts of results because it is nearly impossible for a lay person to game these evaluations without producing extreme results, Moreover, a lay person seeking to the game the result would produce universally poor results, not results that cluster around particular functional limitations, as Ms. Turkoly's results do.

AR 219.

[14] As Dr. Ludolph noted in her report:

Tracey's attention was short and she requested instructions be repeated or explained to her on
several occasions. Tracey appeared to put forth great effort attending to each assessment task.

* * *

During formal testing, Tracey was cooperative. Her eye contact and facial expressions were appropriate to the situation. Mood was anxious. Speech flow was normal, and thought content was appropriate to the situation. Her thinking was linear and logical. Tracey denied any experience of hallucinations or delusions or suicidal ideation. She is of High Average intelligence according to self-report, and her judgment and insight was good. Her effort and motivation were generally

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

- The tests administered were each peer-reviewed and rigorously validated through field testing.

- Ms. Turkoly's test results were "entirely consistent with her longitudinal medical history." Specifically, historic mental status examinations (MSE) note impaired concentration, impaired memory, anxious presentation and fatigue.[15]

AR 218.

In its opening motion, Lincoln does not dispute the fact that Dr. Ludolph conducted her evaluation consistent with standard of care. Rather, Lincoln argues that the validity markers contained in the standard-of-care evaluation are all "subjective." Def. Resp. at 32. Plainly, that is not true. The clustering of results around particular impairments is not subjective. The failure to produce extreme results is not subjective. An impartial observer's assessment of a test-taker's

---

good; therefore, current test results are believed to represent a reasonably accurate estimate of her current cognitive functioning.

AR 218.

[15] In its opening motion, Lincoln wrongly asserts that Dr. Ludolph did not indicate that she had reviewed the longitudinal record. Def. Resp. at 23. That is inaccurate because, as noted here, Dr. Ludolph discussed the longitudinal record. AR 218.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

28

presentation is not subjective.[16]  Peer review and field validity testing are not

subjective.

Throughout this claim, Lincoln has attempted to game the neuropsycho-

logical evaluation process.  In December 2019, Lincoln's file review consultant,

Dr. Cumberbatch, stated that the appropriate diagnostic tool to establish Ms.

Turkoly's cognitive functioning was a neuropsychological evaluation.  AR 823; AR

839; AR 842. Under the Plan, Lincoln had the ability to request a neuropsycho-

logical evaluation. Yet, Lincoln did not request a neuropsychological evaluation.[17]

When she received a neuropsychological evaluation during the course of her

---

[16] Indeed, MSEs, which Lincoln touts in its motion, are likewise simply the outside observations of an observing physician.

[17] As the 9th Circuit Court of Appeals and other appeals courts have held, on these facts, this court may draw the inference that Lincoln decided not to pursue the neuropsychological evaluation because it feared that that evaluation would produce evidence that showed disability.  *See Salomaa*, 642 F.3d 666 at 676 ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits."); see also *Montour v. Hartford Life & Accident Ins. Co*., 588 F.3d 623 at 630 ("Other factors that frequently arise in the ERISA context include . . . whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records."); *Calvert v. Firstar Fin., Inc*., 409 F.3d 286, 295 (6th Cir. 2005) ("We find that the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.").

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

29

treatment, Lincoln rejected it arguing that Dr. Ludolph should have included Dr. Hertza's preferred validity makers. Of course, Dr. Hertza did not announce his preferences until after the testing was completed and a new test containing Herzta's preferred validity markers would be de facto invalid because a subject must wait one year between neuropsychological evaluations. AR 98.

Ultimately, Dr. Hertza conceded that Dr. Ludolph's report contained relevant markers of validity. AR 180; *see also* Pl. Mot. 43-44. Those markers of validity are objective. The court should not ignore this evidence of disability. *Salomaa*, 642 F.3d 666, 672 (9th Cir. 2011) ("impaired executive functioning and impaired memory […] are the 'hallmark cognitive symptoms of chronic fatigue syndrome.'").

**2. Lincoln asks this court to ignore seven days of covert surveillance that showed Ms. Turkoly home-bound for four days and minimally functional for three days.**

In her opening brief, Ms. Turkoly provided a detailed analysis of Lincoln's seven days of covert surveillance, summarized as follows:

| Date of surveillance | Ms. Turkoly' s activities during surveillance | Citation |
|---|---|---|
| Thursday, July 11, 2019 | Ms. Turkoly did not leave her home. | AR 1587 |
| Friday, July 12, 2019 | Ms. Turkoly did not leave her home. | AR 1587 |

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

30

| Saturday, July 13, 2019 | Ms. Turkoly did not leave her home. | AR 1588 |
|---|---|---|
| Friday, December 6, 2019 | Ms. Turkoly drove a car with her son as a passenger for several minutes. | AR 864 |
| Saturday, December 7, 2019 | At 10:03 am, Ms. Turkoly rode in a car as a passenger with her husband and son for 4 minutes.<br><br>Ms. Turkoly sat in a chair and watched son's basketball game for 72 minutes<br><br>Ms. Turkoly walked for 6 minutes.<br><br>Ms. Turkoly sat and ate in pizza ship with her husband, son, and others for about 48 minutes.<br><br>Ms. Turkoly rode a passenger in a car for about 10 minutes, stopped at Walgreens, then returned home at 1:05pm.  She then remained home after her husband and child left. | AR 865 – 868 |
| Sunday, December 8, 2019 | At 9:50 am, Ms. Turkoly drove a car alone for 4 minutes<br><br>Ms. Turkoly walked half a block<br><br>Ms. Turkoly spent 1 minute in a Starbucks<br><br>Ms. Turkoly walked for 3 minutes<br><br>Ms. Turkoly sat for 57 minutes and received a manicure and a pedicure<br><br>Ms. Turkoly walked for 3 minutes and drove home, arriving at 11:40am | AR 869-72 |

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

31

| | At 11:57am Ms. Turkoly drove for several minutes. | |
|---|---|---|
| Friday November 6, 2020 | Ms. Turkoly did not leave her home. Her husband and son rode their bicycles together without her. | AR 432 |

Pl. Mot. 30-31.

Lincoln argues that the court should ignore this evidence because Plaintiff

bears the burden of proof and Lincoln – not Ms. Turkoly – created the surveillance

evidence. Def. Resp. at 46. Lincoln's argument[18] makes little sense because it

makes no difference that Lincoln created the evidence.  The court -- and an

insurance company acting as a fiduciary, for that matter – must consider all the

evidence. *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1314 (D. Or. 2012).

In the end, it seems Lincoln asks this court to ignore the surveillance

evidence because it so strongly supports Ms. Turkoly's claim.  On seven days

during three discreet intervals chosen at Lincoln's discretion, Lincoln documented

---

[18] Lincoln's argument is hard to construe but, apparently, Lincoln asserts that Plaintiff asserts that Lincoln has the burden of proof.  Def. Resp. at 46.  It is unclear where Lincoln gets that notion.  *See* Pl. Mot. at 6 (noting Plaintiff has the burden of proof). Regardless, Ms. Turkoly agrees she has the burden of proof. However, in this case, the surveillance evidence that Lincoln produced is among many pieces of evidence that meet Plaintiff's burden of proving disability under the Plan.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Ms. Turkoly's life as she lived it unaware that her insurer was watching her. On four of those seven days she was home-bound, and her family's life went on – her husband and son riding bikes and playing– while she rested. On the remaining three days, she did leave her home, but she was only minimally functional: she did not walk for more than six minutes at a time; she did not sit for more than 72 minutes at a time; she did not travel to any location that was more than a few minutes from her home; she was never away from home for more than three hours; and – on at least one occasion – her  family dropped her off at home to rest before they continued their outings.

This evidence precisely aligns with the symptoms Ms. Turkoly's doctors documented, and it precisely aligns with the statements she made to Lincoln and her physicians – specifically, that most days she does not leave her house because she is too fatigued, but she does leave her house "zero to three times a week to small places only, Walgreens, school, son's activities, small grocery, stores small stores and easy parking[.]" AR 882.

> **3.  Lincoln asks this court to ignore SSA's conclusion that Ms. Turkoly has a relatively obvious claim for disability from any occupation.**

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

SSA found Ms. Turkoly disabled on March 1, 2020. AR 72. Notably, SSA reached that conclusion following the initial claim review, rendering it unnecessary for her to engage in any administrative appeal with SSA.[19]

SSA's independent conclusion strongly corroborates Ms. Turkoly's disability under the Plan because the standard of disability employed by SSA is a substantially more demanding standard than the standard employed by the Plan during both the "own occupation" and "any occupation" period.

Three business days after Plaintiff alerted Lincoln of SSA's decision, Lincoln closed the claim, excluding SSA's analysis from its review and this court's review.[20] Pl. Mot. at 56-58. Despite Lincoln's actions, the record in this case does include evidence of SSA's rationale. Specifically, SSA forwarded its analysis to

---

[19] That fact is notable because SSA routinely denies claims at the initial review that it ultimately awards through the appeals process. According to SSA's published data, SSA awards benefits at initial review in only 36% of cases, but ultimately awards disability in more than half of the claims denied after initial review. Consequently, an award of disability at initial review allows the inference that the claim was a strong and relatively obvious claim for disability. *See* Exhibit B.

[20] In its opening motion, Lincoln argued that "Lincoln did in fact consider the [SSA] award in making its final decision." Def. Resp. at 57. That is not true. As Lincoln plainly states in its final denial letter "the award of these benefits cannot be fully evaluated as part of our appeal review." AR 99.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Dr. Parsons, who reviewed it and discussed it in Ms. Turkoly's medical record,

noting:

> I reviewed her independent medical reports for social security disability. She
> was noted to have depression with "brain fog." She was distractible with
> poor concentration and short-term memory.  She still is so tired she stays in
> bed some days.  She has joint pains particularly in her wrists and hands.

AR 399.

This court should not ignore SSA's independent conclusion that the medical

record shows that Ms. Turkoly is disabled from any occupation. *Montour*, 588 F.3d

623, 636 (9th Cir. 2009) (holding that SSA's independent conclusion is weighty

evidence that must be properly considered).

> **iv.     Lincoln asks this court to credit flawed evidence over
> weighty evidence.**
>
> > **1.    Lincoln asks this court to favor mental status
> > examinations from Ms. Turkoly's chiropractor over
> > the mental status examinations of her physicians and
> > mental health providers, consistent documentation of
> > symptoms contained in her medical record, the
> > opinion of her several treating physicians, detailed
> > surveillance evidence, the independent assessment of
> > SSA, and the results of a four-day neuropsychological
> > evaluation.**

Lincoln argues that this court should reject the consistent documentation of

symptoms contained in her medical record, the opinion of her four treating

35

physicians, the independent conclusion of neuropsychological evaluator, detailed surveillance evidence, and the independent assessment of the SSA because – although her physicians and mental health providers noted abnormal MSEs – her chiropractors do not. Def. Resp. 16-21 (citing five instances in which chiropractors recorded MSE "within normal limits").

An MSE is not a formal "examination;" rather, it is a brief general observation that, as Lincoln's expert Dr. Hertza acknowledged, "capture only a moment in the office." AR 180. Some practitioners, such as physicians and mental health providers, are understandably more focused on a patient's cognition and fatigue, whereas others, such chiropractors, are more focused on posture and gait.

> a. **Lincoln's own experts acknowledge that mental status examinations recorded by Ms. Turkoly's physicians and mental health providers were abnormal.**

Contrary to the argument that Lincoln advances to this court, Lincoln's own experts acknowledged that Ms. Turkoly's MSEs document longitudinal abnormalities, including impaired attention, fatigued appearance, and diminished concentration. AR 823. (Dr. Cumberbatch: "On mental status exam, she does have

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

36

some impairment in short-term memory and concentration"); AR 312 (Dr. Trangle noting diminished concentration in MSE); AR 225 (Dr. Hertza: "Mental status/behavioral observations include short attention and anxious mood").  As Dr. Ludolph observed, "those are precisely the sorts of MSE findings one would expect given the results of my evaluation." AR 219.

### b. Lincoln's expert, Dr. Cumberbatch, acknowledged the importance of a neuropsychological evaluation relative to mental status examinations

The best tool for assessing cognitive stamina and capacity is a neuropsychological evaluation because, while an MSE "capture[s] only a moment in the office," a neuropsychological evaluation involves multiple days of rigorous, objective peer-reviewed and validated testing.  AR 180.  Indeed, Lincoln's own expert, Dr. Cumberbatch, acknowledged the importance of a neuropsychological evaluation relative to MSEs.  AR 823; AR 839; AR 842.

In this case, the results of the of the neuropsychological evaluation showed significant cognitive limitations consistent with CFS and FM, including impaired executive functioning and memory.  Those findings are consistent with the longitudinal MSEs from Ms. Turkoly's physicians and mental health providers that

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

show fatigue and impaired concentration, short-term memory, and attention. AR 219.

### 2. Lincoln asks this court to credit the flawed opinions of the medical experts it hired for this case.

Lincoln makes little attempt to defend the errors of fact, self-contradictions, and medical aberrations contained in the opinions of its several hired experts. Def. Resp. 53-55. The court should not give weight to these flawed opinions.[21]

### a. Dr. Rosen

Dr. Rosen's opinion is flawed because he failed to use the CDC-endorsed consensus criteria for diagnosing CFS. Additionally, he opined that Ms. Turkoly cannot engage in frequent air travel; however, her own occupation requires traveling 25-35% of the time. Consequently, under Dr. Rosen's analysis and despite his contrary conclusion, she is disabled from her own occupation. Pl. Mot. 40-41.

### b. Dr. Cumberbatch

---

[21] As the United States Supreme Court has stated, a long-term disability insurer's hired experts have an incentive to offer opinions supportive of the insurer's interests. *Black & Decker Disability Plan*, 538 U.S. at 832 ("[We do not question the] concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements.'").

38

Dr. Cumberbatch's opinion is flawed because she ignored substantial evidence of disability; she cherry-picked evidence that supported the interests of the insurance company that hired her while ignoring similar evidence that contradicted those interests; she based her opinion on idiosyncratic assertions about the timeline of treatment and recovery even when the medical record plainly contradicted her assertions; and she opined that Ms. Turkoly had no limitations because she did not undergo extreme interventions including psychoactive medication not recommended for her conditions and "electroconvulsive shock therapy." Pl. Mot. 35-39.

### c. Dr. Hertza

Dr. Hertza's opinion is flawed because it contains significant errors of medical fact, which Dr. Hertza failed to correct even after learning of them. Additionally, Dr. Hertza's report is self-contradictory on the issue of whether the medical record supports diagnoses (stating in one instance that it does, and in other that is does not) and whether MSEs show functional limitations (stating in one instance that they do and in other that they do not). Pl. Mot. 47-50.

### d. Dr. Trangle

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

Dr. Trangle's report is flawed because Dr. Trangle conceded that Ms. Turkoly's medical record contains a "plethora" of complaints of fatigue and myalgia and a "multitude of physical complaints including diffuse muscle and joint pain/stiffness, severe fatigue, headaches and irritable bowels, among others" yet, contrary to medical consensus and the law governing this case, he dismissed that insisting that only objective medical signs could demonstrate impairment.  AR 254-55.  Dr. Trangle also contradicted the medical consensus with regard to the significance of Ms. Turkoly's EBV infection, stating it had no clinical significance when medical consensus represented by the CDC holds that EBV leads to CFS in 10% of infections. Pl. Mot. 50-52.

## III.    Conclusion

The medical record, which consistently documents symptoms of pain, extreme fatigue, impaired attention, cognition, and memory, proves by a preponderance of the evidence that Ms. Turkoly is disabled under the Plan. Additional evidence corroborates that proof.  A neuropsychological evaluation objectively documents cognitive symptoms consistent with the disability limitations contained in her medical record.   Seven days of covert surveillance document her disabling limitations.  The independent conclusion of SSA that she

has a relatively obvious claim for disability for any occupation confirms her disability.

Consequently, this court should hold that Ms. Turkoly is disabled under the Plan. In support of that holding, this court should find that Ms. Turkoly's medical conditions prevent her from performing the demands of her own occupation, Global Account Manager, and would cause her to have multiple unproductive or absent days each month while performing any occupation.

DATED this 15th day of November, 2022.

Respectfully Submitted,

**THOMAS, COON, NEWTON & FROST**

By: /s/ Scott A. Sell
Scott A. Sell, OSB #144297
The Thomas Mann Building
820 SW 2nd Avenue, Suite 200
Portland, OR  97204
Telephone: (503) 228-5222
Facsimile: (503) 273-9175
Email:  ssell@tcnf.legal

*Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Brief length:

I certify that (1) the Plaintiff's Reply and Response to Cross-Motion filed complies with the word-count limitation in LR 7-2(b), and (2) the word-count of this brief is 9,315 words.

## CERTIFICATE OF FILING

I certify that on November 15, 2022, I filed the original Motion for Judgment with the Clerk of the Court at the following address:

Clerk of Court, Mark O. Hatfield U.S. Courthouse
1000 S.W. Third Ave.
Portland, OR, 97204
by the following method of filing: **eFile**.

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 15, 2022, participants in this case who are registered eFilers will be served via the electronic mail function of the eFiling system as follows:

Russell S. Buhite, OSB #142529
Ogletree, Deakins, Nash, Smoak &
Stewart PC
1201 Third Avenue, Suite 5150
Seattle, WA 98101
206-693-7052; 206-693-7058 (fax)
russell.buhite@ogletree.com

Scott Pomeroy, admitted pro hac vice
Ogletree Deakins
One Boston Place, Suite 3500
Boston, MA 02108
207-387-2961; 207-387-2986 (fax)
scott.pomeroy@ogletree.com

Attorneys for Defendant
The Lincoln National Life Insurance Company

Dated this 15th day of November, 2022.

THOMAS, COON, NEWTON & FROST

 /s/ Scott A. Sell
Scott A. Sell, OSB#: 144297
820 SW 2nd Avenue, Suite 200
Portland, OR  97204
Telephone: (503) 228-5222
Email:  ssell@tcnf.legal

PLAINTIFF'S REPLY AND RESPONSE
TO CROSS-MOTION
Case No. 3:21-cv-01019-SI

THOMAS, COON, NEWTON & FROST
820 SW SECOND AVE., SUITE 200
PORTLAND, OR 97204
503-228-5222