Russell S. Buhite, OSB #142529
OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART, P.C.
1201 Third Avenue, Suite 5150
Seattle, WA  98101
Telephone:   (206) 693-7052
Facsimile:    (206) 693-7058
Email:  russell.buhite@ogletree.com

Byrne J. Decker, ME Bar #008312
(admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART. P.C.
Two Monument Square, Suite 703
Portland, ME  04101
Telephone:   (207) 387-2963
Facsimile:    (207) 387-2986
Email:  byrne.decker@ogletree.com

Attorneys for Defendant THE LINCOLN NATIONAL
LIFE INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| TRACEY K. TURKOLY,<br><br>        Plaintiff,<br><br>   v.<br><br>THE LINCOLN NATIONAL LIFE<br>INSURANCE COMPANY,<br><br>        Defendant. | Case No. 3:21-cv-01019-SI<br><br>**DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS RULE 52 CROSS-MOTION FOR JUDGMENT** |

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     LEGAL ARGUMENT........................................................................................... 1

    A.  It was at all times Plaintiff's burden to submit proof of her claim. The very concept of "proof" presupposes that evidence submitted be reliable and probative of a claimant's alleged impairments. ........................................ 1

    B.  The regulations require administrators to explain how to procedurally complete a claim, not how to substantively establish an entitlement to benefits. ......................................................................................................... 3

        1.  It was not Lincoln's burden to show Plaintiff how to succeed in proving her claim. .............................................................................. 3

        2.  Unlike the administrator in the *Mason* case, Lincoln fully complied with the regulations by providing every opportunity for Plaintiff to present and explain the evidence that she, her lawyer, and her treating physicians chose to provide. ................................................................... 5

    C.  Particularly where, as here, there are potential motives of secondary gain, the inclusion of robust validity measures is well-understood to be an essential safeguard to ensure accurate and reliable neuropsychological test results. Absent such validity measures, purported neuropsychological test results are simply not reliable evidence. ................................................... 8

    D.  Dr. Ludolph's un-validated neuropsychological testing results conflict with substantial and reliable evidence found elsewhere throughout the record, the history of Plaintiff's ever-shifting rationale for her claim, and Plaintiff's commencement of another, similarly demanding, occupation. ..................................................................................................... 11

III.    CONCLUSION ................................................................................................... 17

CERTIFICATE OF LOCAL RULE COMPLIANCE ........................................................ 19

CERTIFICATE OF SERVICE ......................................................................................... 20

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - i
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Anderson v. Life Ins. Co. of N. America*, 2017 WL 4326384 (9th Cir. Sept. 18, 2017) ........... 15

*Anyanwu v. Ascension Health*, 2019 WL 2211057 (E.D. Mo. May 22, 2019)......................... 10

*Beltman v. Sun Life Assurance Co.*, 2019 WL 16145894 (Mar. 29, 2019) ............................. 17

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)......................................... 2, 3, 8

*Calcagno v. Unum Life Ins. Co.*, 2019 WL 2488716 (D. Or. Feb. 19, 2019)............................ 1

*Carder-Cowin v. Unum Life Ins. Co.*, 560 F. Supp. 2d 1006 (W.D. Wash. 2008)................... 15

*Concrete Pipe & Prods of Cal., Inc. v. Costr. Laborers Pension Trust of S. Cal.*,
    508 U.S. 602 (1993)................................................................................................. 2

*Easter v. Hartford Life & Accident Ins. Co.*, 2023 WL 3994383 (10th Cir.
    June 14, 2023)..................................................................................................... 4, 5

*Gorbacheva v. Abbott Labs. Ext. Disability Plan*, 309 F. Supp. 3d 756 (N.D. Cal.
    2018), *aff'd*, 794 F. App'x 590 (9th Cir. 2019) ................................................... 10

*Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99 (2013)................................... 2

*Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75 (2nd Cir. 2009) ...................................... 4

*Hornback v. New York Times Co. LTD Plan*, 2006 WL 496050 (N.D. Cal.
    Mar. 1, 2006)........................................................................................................ 15

*Hulbert v. Hartford Life & Accident Ins. Co.*, 2021 WL 3291888 (N.D. Cal.
    Aug. 2, 2021) ................................................................................................... 10, 11

*Johnson v. Commerce Bancshares, Inc.*, 276 F. Supp. 3d 926 (W.D. Mo. 2017)................... 10

*Kearny v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999)............................................... 3, 4

*Mason v. Federal Express Corp.*, 165 F. Supp. 3d 832 (D. Alaska 2016) ....................... *passim*

*Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290 (9th Cir. 2006) .................................... 1, 3

*Seleine v. Fluor Corp. LTD Plan*, 598 F. Supp. 2d 1090 (C.D. Cal. 2009), *aff'd*,
    409 Fed. App'x 99 (9th Cir. 2010) ....................................................................... 8

*Terry v. Bayer Corp.*, 145 F.3d 28 (1st Cir. 1998) .................................................... 3

*Wilkins v. Unum Life Ins. Co. of N. America*, 2013 WL 5340512 (N.D. Cal.
    Sept. 24, 2013) ................................................................................................. 15

## Statutes, Rules, and Other Authorities

**Page**

Employee Retirement Income Security Act of 1974 ("ERISA"),
    29 U.S.C. § 1001, *et seq*........................................................................... *passim*

29 C.F.R. § 2560-1................................................................................................ 3

Federal Rule of Evidence 201................................................................................. 9

Local Rules 7-2, 26-3, 54-1, and 54-3 ................................................................. 19

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - iii
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

## I.    INTRODUCTION

As permitted by the Court's order of June 29, 2023 (Doc. 45), Defendant Lincoln submits this Supplemental Memorandum in response to Plaintiff's new arguments concerning *Mason v. Federal Express Corp.*, 165 F. Supp. 3d 832 (D. Alaska 2016).  According to Plaintiff, that case requires ERISA claim administrators to tell claimants how to "perfect" their claims, and specifically, to instruct claimants, prior to any neuropsychological evaluation, that such evaluations "must contain specific validity markers."  *See* Pl.'s Memo. Add'l Auth. at 1–2 (Doc. 44).  In making this argument, Plaintiff has improperly reversed her burden to prove functional impairment by reliable evidence, misinterpreted well-settled authority on what it means to "perfect" a claim, and, like her own treating psychologist, wholly ignored established medical standards that require the use of robust validity measures for neuropsychological testing—even in cases that do not involve possible motives of secondary gain—so as to assure the accuracy of diagnoses and appropriateness of treatments recommended on the basis of such testing.

## II.    LEGAL ARGUMENT

**A.    It was at all times Plaintiff's burden to submit proof of her claim.  The very concept of "proof" presupposes that evidence submitted be reliable and probative of a claimant's alleged impairments.**

As an initial matter, it was at all times the Plaintiff's burden to prove her entitlement to benefits.  *See*, *e.g*., *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1296 (9th Cir. 2006).  "To meet this burden, [Plaintiff] must establish by a preponderance of the evidence that [she] was disabled under the terms of the plan during the claim period."  *Calcagno v. Unum Life Ins. Co.*, 2019 WL 2488716 at *1 (D. Or. Feb. 19, 2019).  "A fact is proven by a preponderance of the evidence when the trier of fact is persuaded 'that the existence of [the] fact is more probable than

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 1
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

its nonexistence.'"  *Id.* (quoting *Concrete Pipe & Prods of Cal., Inc. v. Costr. Laborers Pension Trust of S. Cal.*, 508 U.S. 602, 622 (1993)).

As should be self-evident, it was the Plaintiff who, having the best knowledge of her own alleged impairments, is ordinarily the one responsible for selecting reliable and probative evidence to prove her claim.  Here, the Group Policy requires claimants to submit "written proof covering the occurrence, the character and the extent of the loss for which the claim is made."  LIN2297; *see also*, *e.g*., LIN2297 (conditioning disability benefits on Lincoln's receipt of "Proof that you are Disabled").  Such "Proof" must be submitted by the claimant and at the claimant's own expense.  LIN2297; *see also*, *e.g*., *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013) ("The plan, in short, is at the center of ERISA.").

In order to assure accurate claim determinations, administrators and Courts alike must, *inter alia*, evaluate the reliability of a claimant's proffered evidence.  While reliable evidence should be credited, evidence that is unreliable—particularly where it is in conflict with reliable evidence elsewhere in the record—may be discounted and given little weight, even though it might come from a claimant's own treating physician.  *See*, *e.g.*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 2
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

> **B.**     **The regulations require administrators to explain how to procedurally complete a claim, not how to substantively establish an entitlement to benefits.**
>
> > **1.**     **It was not Lincoln's burden to show Plaintiff how to succeed in proving her claim.**

It was at no time Lincoln's burden, or that of its consulting physicians, to establish that Plaintiff was unimpaired or able to work. *See*, *e.g*., *Muniz*, 623 F.3d at 1296. Nor was it Lincoln's burden to anticipate, in advance of Plaintiff's submission, that she might submit unreliable evidence and suggest more-reliable or more-persuasive alternative evidence. *See*, *e.g*., *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (holding that administrators have no "discrete burden of explanation" when they give more weight to reliable evidence and less weight to unreliable evidence).

Plaintiff cites *Mason* for a contrary proposition and construes the Department of Labor's regulations to require just such anticipatory assistance. Plaintiff is wrong. The applicable regulatory provision requires that in rendering an adverse determination, the administrator provide, *inter alia*, a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560-1(g)(1)(iii). But it is well-established that this regulatory requirement to inform claimants how to "perfect the claim" does not mean that administrators must show claimants how to "win the appeal." *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998). Rather, the term "perfect," as used in the regulations, simply means to "bring to completion," and "even a complete claim may be denied" where the reliable evidence submitted does not establish disability. *Id*. at 39.

Indeed, Plaintiff's interpretation of *Mason* is contrary to the Ninth Circuit's *en banc* holding in *Kearny v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999). There, as here, the claimant argued that an administrator failed to comply "because it did not tell him what additional material

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 3
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

he needed to submit in order to perfect his claim." *Id.* at 1091. The Ninth Circuit found the claimant's argument to be "without force" because the administrator had not denied the claim based on claimant's failure to complete his claim. *Id.* Rather, the claimant had completed his claim by submitting the medical evidence he wanted the administrator to consider. *Id.* The regulations did not require the administrator, upon reviewing the claimant's evidence, to provide further guidance or instruction upon determining that it was insufficient to prove disability. *Id.*

Similarly, in *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75 (2nd Cir. 2009), a claimant argued that the administrator violated the regulations by "not notifying her of what additional information she needed to 'perfect her claim.'" *Id.* at 86. The Second Circuit disagreed with her and ultimately upheld the administrator's determination that her evidence was insufficient. As to the regulations, the Second Circuit explained, "the purpose of ERISA's notice requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *Id.* at 87 (internal quotation omitted). In finding no violation, the Court observed that in response to an earlier benefit denial, the claimant submitted additional medical information, which led to three separate benefit extensions. *Id.* Thus, "[the claimant's] ability to perfect her claim three times supports our conclusion that she was fairly apprised of how she could 'prepare adequately' for subsequent appeals of earlier benefit denials." *Id.* at 88.

Most recently, the Tenth Circuit also rejected this same argument. *See Easter v. Hartford Life & Accident Ins. Co.*, 2023 WL 3994383 (10th Cir. June 14, 2023). There, the claimant specifically argued that the administrator should have told her about the concerns it had with the "credibility" of certain evidence she submitted and suggested that she submit other evidence instead. *Id.* at *7. The Tenth Circuit rejected this argument because the administrator properly determined the claim based on the weight and reliability of the evidence submitted, rather than on

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 4
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

any failure by the claimant to "perfect" her claim.  As the Court explained, the claim was not denied "for failing to comply with a specific procedural requirement."  *Id.*  Rather, the claim was denied because, upon assessing the claimant's proffered proof, the administrator properly found it to be "unconvincing."  *Id.*

> **2.    Unlike the administrator in the *Mason* case, Lincoln fully complied with the regulations by providing every opportunity for Plaintiff to present and explain the evidence that she, her lawyer, and her treating physicians chose to provide.**

A review of the facts presented in the *Mason* case confirms that the Court's concern there was with the administrator's many egregious procedural failures—not any alleged failure by the administrator to tell the claimant how to substantively win benefits.  Such a comparison also confirms that Lincoln here afforded a full and fair review process in accordance with the applicable regulations.

Although the *Mason* claim involved a discretionary grant, the Court found that the administrator's determination was "entitled to little deference" on account of "significant conflict of interest and procedural irregularities" present in the record.  *Id.* at 849.  For example, the denial letter in that case "analyze[d] hundreds of pages of [claimant's] medical records in one paragraph containing a series of disjointed sentences."  *Id.* at 853.  In addition, the administrator provided none of its consulting physician's reports to the claimant or to his treating doctors "at any point during the administrative process," *Id.* at 854, thus depriving him of any opportunity to respond to their opinions.  Indeed, the administrator never even provided claimant with its reviewers' names, ensuring that there was no way for the treating doctors to confer with the consulting doctors or address any misconceptions or misunderstandings.  *Id.* at 854.  The administrator in *Mason* also

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 5
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

wholly failed to provide its reviewers with a treating psychologist's records—records which the Court found to contain clinical observations that were highly relevant to the claim. *Id.* at 855.

In stark contrast to such procedural defects in *Mason*, the record here shows extensive direct communications between consulting and treating doctors throughout the administrative process. *See*, *e.g*., LIN828 (letter confirming conversation between Dr. Cumberbatch and Dr. Parsons); LIN797 (letter confirming conversation between Dr. Rosen and Dr. Coffin); LIN264 (letter confirming conversation between Dr. Trangle and Dr. Rogoff). Lincoln's lengthy and detailed March 25, 2020 termination letter fully explained the basis of its determination. *See* LIN0681–688. Notably, Plaintiff's claim up to that point had been based on her psychological and physical complaints, and that is what that letter addressed. *See* LIN0681–688. Only after Lincoln's decision to terminate benefits did Plaintiff first assert the cognitive impairment she now claims. Plaintiff first submitted Dr. Ludolph's report on December 3, 2020, following the commencement of the administrative appeal and Lincoln's agreement to allow her attorney additional time to furnish additional proof. *See*, *e.g*., LIN0393; LIN0400.

Upon his evaluation of Dr. Ludolph's report, Dr. Hertza immediately raised questions as to the report's failure to mention recognized validity measures, *see*, *e.g*., LIN0378, but Dr. Ludolph did not return his calls. *See* LIN0376. Thereafter, Lincoln repeatedly requested Dr. Ludolph's raw data to confirm whether she employed any validity measures in her testing. *See*, *e.g*., LIN0371; LIN0329; LIN0327; LIN0360. When she eventually provided her raw data to Dr. Hertza, but still refused to speak with him, he confirmed that Dr. Ludolph had chosen not to include any such measures in her testing regime. LIN0277.

Given the significance of this omission on Dr. Ludolph's part, Lincoln provided her with yet another an opportunity to respond to Dr. Hertza's criticism. Dr. Ludolph took that opportunity,

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 6
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

writing on March 10, 2021, to defend her decision to exclude standard validity measures. *See* LIN0218. Rather than justify her inexplicable decision to omit such measures, she instead argued around the point, citing the peer-reviewed nature of the tests themselves, her own subjective observations that Plaintiff "appeared to put forth great effort," and an alleged consistency with Plaintiff's "longitudinal medical history." *See* LIN218.

But, the validity of the specific tests administered was never in question. Rather, it was the validity of the Plaintiff's performance efforts that Dr. Ludolph chose not to measure, except by outward appearances. As discussed in the next section, below, formal validity measures are the standard of care because such outward appearances are not reliable indicia of test engagement. As for the test results' alleged consistency with the balance of the medical evidence, as also further discussed below, Dr. Ludolph appears to have relied on Plaintiff's self-reported medical history and made no real effort to examine or reconcile the overwhelming medical evidence of entirely normal cognitive function that appears throughout the record and leading up to the date Lincoln terminated benefits.[1]

Thus, there is no question that Plaintiff here had a full and fair opportunity to respond, and to submit any additional evidence she, her lawyer, and her treating physicians thought might bear on her claim. Given the importance of validity measures in this context and Dr. Ludolph's evasive response as to why she neglected to include such measures among her battery of tests, one must consider the extent of Dr. Ludolph's natural bias in favor of assisting her patient and appropriately

---

[1] For a detailed tabular presentation of the contemporaneous medical evidence during the relevant time period, please *see* the Table of Medical Evidence (Doc. 38-1) which Lincoln submitted as an exhibit to its amended opposition memorandum. *See also* Dr. Trangle's February 8, 2021 report, LIN0291–319, which summarizes each and every medical record in appropriate, chronological order.

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 7
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

discount her opinions, as they are unsupported, unreliable, and more resemble advocacy than evidence.[2]

**C.  Particularly where, as here, there are potential motives of secondary gain, the inclusion of robust validity measures is well-understood to be an essential safeguard to ensure accurate and reliable neuropsychological test results. Absent such validity measures, purported neuropsychological test results are simply not reliable evidence.**

Neuropsychological testing can encompass a wide variety of specific tests each designed to assess a patient's functional ability across one or more cognitive domains. However, for most neuropsychological disorders, there is no blood test or imaging procedure, for example, that can definitively prove or disprove a patient's subjectively-reported symptoms. As such, neuropsychological testing is highly susceptible to manipulation by the test-taker by giving sub-optimal effort. Thus, it is well-established in the medical literature, that such testing should include stand-alone and embedded validity measures so that the patient's test-taking efforts can be evaluated along with his or her objective scores. *See*, *e.g*., Rayna B. Hirst *et al*., Adherence to Validity Testing Recommendations in Neuropsychological Assessment, 32 Archives of Clinical Neuropsychology 456–471 (June 2017) ("Validity testing is critical for any neuropsychological assessment, as the utility of an evaluation depends on the legitimacy of test results. Invalid

---

[2] As the Supreme Court explained in *Black & Decker Disability Plan v. Nord*, 538 U.S. at 834, for example, one of the reasons administrators and Courts have no duty to defer to the opinions of treating physicians is because it is well-understood that they "may favor a finding of disability" in benefits cases. While treating physicians "are more or less required to accept the representations of their patients" for purposes of treatment, ERISA administrators, who have a fiduciary duty to render accurate benefits determinations, are "not obligated" to do the same. *See*, *e.g*., *Seleine v. Fluor Corp. LTD Plan*, 598 F. Supp. 2d 1090, 1102 (C.D. Cal. 2009), *aff'd*, 409 Fed. App'x 99 (9th Cir. 2010).

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 8
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

neuropsychological performance cannot be reliably interpreted; therefore, it is important to employ methods to determine test response validity in every evaluation.").[3]

Indeed, both the National Academy of Neuropsychology and the American Academy of Clinical Neuropsychology have each published validity testing practice recommendations and both regard the inclusion of validity measures in neuropsychological testing to be a medical necessity. *See*, *e.g*., Shane S. Bush *et al*., Symptom Validity Assessment: Practice Issues and Medical Necessity, 20 Archives of Clinical Neuropsychology 419–426 (June 2005); Robert L. Heilbronner *et al*., American Academy of Clinical Neuropsychology Consensus Conference Statement of the Neuropsychological Assessment of Effort, Response Bias, and Malingering, 23 The Clinical Neuropsychologist 1093–1129 (2009).[4]

Particularly in light of the potential motives for secondary gain that exist in the disability benefits context, practitioner reliance upon mere observation and "clinical judgment" to determine a patient's effort level is inadequate because, *inter alia*, "experts have pointed out that examinees who purposefully do poorly on testing may be exerting a high level of effort towards making their test results invalid yet believable." Hirst, *supra*, at 456 (citing numerous studies).[5]  Thus, a

---

[3] For the Court's convenience, a reprint of this article is attached hereto as Exhibit A.  Federal Rule of Evidence 201 allows the Court to take judicial notice of facts that are not subject to reasonable dispute because they are either "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Here, Lincoln askes the Court to take judicial notice of the professional consensus concerning the nature, purpose, and need for validity measures in neuropsychological testing, as reflected in the peer-reviewed articles cited here, all of which were published in reputable medical journals.

[4] Reprints are attached hereto as Exhibit B and Exhibit C, respectively.

[5] *See* Exhibit A at 1.  This point illustrates the unreliability of Dr. Ludolph's counter-intuitive contention that one would expect lack of effort to be revealed by uniformly poor results across all testing domains.  *Compare*, *e.g*., LIN0291 (where Dr. Ludolph asserts that "a lay person seeking to game the system would produce universally poor results").

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 9
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

patient's mere outward appearance of exertion does not necessarily allow any conclusion that test results are valid.

For such reasons, Courts have likewise held that where practitioners conduct neuropsychological testing without using accepted validity measures, the test results have no assurance of reliability and, thus, are entitled to little, if any, weight. *See*, *e.g.*, *Hulbert v. Hartford Life & Accident Ins. Co.*, 2021 WL 3291888 at *10–11 (N.D. Cal. Aug. 2, 2021); *see also*, *e.g.*, *Anyanwu v. Ascension Health*, 2019 WL 2211057 at *19 (E.D. Mo. May 22, 2019) (affirming administrator's determination where "[m]ultiple reviewers also discounted [a treating physician's] findings on cognitive dysfunction because he admittedly failed to perform any validity testing to corroborate his results"); *Johnson v. Commerce Bancshares, Inc.*, 276 F. Supp. 3d 926, 939 (W.D. Mo. 2017) ("Further, [the consulting physician's] conclusion that without valid test results there was no neuropsychological evidence to properly diagnose [claimant] with either a mild or major cognitive disorder is practically unassailable.").[6]

In *Hulbert*, for example, one of the Plaintiff's treating physicians administered neuropsychological testing that purportedly showed certain cognitive impairments suggestive of left hemisphere dysfunction. *Id.*, 2021 WL 3291888 at *5. However, the treating doctor failed to include standard performance validity testing, and instead relied on his own so-called "professional judgment" to ensure the claimant's engagement with the testing. *Id.* at *10. As the Court

---

[6] The same rationale compels use of recognized validity measures for any kind of functional testing that is susceptible to claimant manipulation. *See*, *e.g.*, *Gorbacheva v. Abbott Labs. Ext. Disability Plan*, 309 F. Supp. 3d 756, 771 (N.D. Cal. 2018), *aff'd*, 794 F. App'x 590 (9th Cir. 2019). There is no reason to believe that the Ninth Circuit, having endorsed validity measures for physical functional capacity examinations, would dispense with such safeguards in the realm of neuropsychological testing.

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 10
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

explained, the treating physician's failure to use validity testing was "especially problematic" and made his report "less credible" than other evidence in the record which contradicted the claimant's alleged impairments and suggested his tendency to exaggerate symptoms. *Id.* at \*10–11. Indeed, the treating physician's failure to employ validity measures may have been a way to assist claimant manipulation, as validity measures administered by a different physician as part of an earlier round of testing had cast doubt on those earlier results and suggested symptom exaggeration. *See id.* at \*4.

**D.      Dr. Ludolph's un-validated neuropsychological testing results conflict with substantial and reliable evidence found elsewhere throughout the record, the history of Plaintiff's ever-shifting rationale for her claim, and Plaintiff's commencement of another, similarly demanding, occupation.**

While Plaintiff offers Dr. Ludolph's report as objective evidence of cognitive limitations, it is clear that she did not use any standard validity measures as part of her testing. Instead, like the treating physician in *Hulbert*, 2021 WL 3291888, Dr. Ludolph relied solely on her own subjective assessment of Plaintiff's motivation during the examination. *See*, *e.g*., LIN0218 (asserting "the way [Plaintiff] presented during the evaluation and the way she completed the tasks demonstrate that she understood the tasks and completed them to the best of her ability").

Asked to identify the validity measures "commonly considered reasonable" for neuropsychological testing, Dr. Hertza—an independent and board-certified neuropsychologist—explained that there are a "variety" of such measures, listed three that are widely-accepted, and observed that "typically at least 2 should be used." LIN0202. Lincoln's concern was not that Dr. Ludolph had used some flavor of validity assessment that Dr. Hertza personally disfavored; rather, Lincoln's concern was that Dr. Ludolph had used none at all. Having inexplicably failed to employ

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 11
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

any validity measures, Dr. Ludolph's report is simply not reliable evidence of Plaintiff's cognitive capacity or of anything else.  The Court should not credit it.

Even if the Court were to credit Dr. Ludolph's report, her opinions starkly conflict with the overwhelming weight of reliable evidence contained elsewhere throughout the record.  According to Dr. Ludolph, for example, Plaintiff's performance on working memory and executive function tasks placed her in the bottom 1% of the population, scores that would indicate a severely diminished capacity.  LIN0403; LIN0407.  Yet, there is no evidence for such profound dysfunction in the examination records from Plaintiff's other treating practitioners.  To the contrary, according to MSEs conducted by Ms. Paris, Plaintiff's psychotherapist in September and October of 2019, Plaintiff's "thought process" and "thought content" were consistently observed to be within normal limits.  LIN0964; LIN0962.  Dr. Walker, Plaintiff's long-standing naturopath, also repeatedly found, on examination, that Plaintiff's "memory," "mood and affect," "attention," "concentration," and "thought content" were all within normal limits.  LIN0557; LIN0560.  Such observations are further corroborated by the clinical observations recorded by Plaintiff's chiropractors, Drs. Agosta and Means, approximately every two weeks from October 2019 through March 2020.  Their examinations show that Plaintiff consistently presented as "[a]lert" and "cooperative" and that her "[s]peech and mentation [were] clear and coherent." *See*, *e.g.*, LIN0550; LIN0552; LIN0554; LIN0565; LIN0573.[7]  Surely, if Plaintiff's short-term memory and executive functions were so

---

[7] For a detailed tabular presentation of the contemporaneous medical evidence during the relevant time period, please *also see* Lincoln's Table of Medical Evidence (Doc. 38-1).

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 12
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

impaired as to place her in the bottom percentile of the population, all of her other treating physicians—even her chiropractors—would have noted such significant impairments.[8]

Dr. Ludolph's opinions are also in conflict with the whole progression of Plaintiff's claim and the evolution of her self-reported limitations. Prior to stopping work, the contemporaneous notes of Plaintiff's medical visits show no reports of cognitive decline at all. *See*, *e.g.*, LIN0546; LIN1235. Rather, Plaintiff's complaints were limited to various minor aches and pains associated with "excessive travel." LIN0546. On January 18, 2019, Dr. Walker recorded that Plaintiff's "[j]udgment and insight, memory, mood and affect are within normal limits." LIN1236. Plaintiff even self-described her own stress level as merely "moderate." LIN1235.

But then, after learning that her position was going to be eliminated, Plaintiff initially claimed disability due to a "perfect storm of stress," LIN0037, resulting from changes at work (without disclosing the pending elimination of her position), a variety of family issues, long hours, and her long weekly commute between her home in Portland and her office in Seattle. LIN0036–37; *see also*, *e.g.*, LIN1179; LIN176.

After being informed that benefits for psychological conditions would be limited to 24 months, Plaintiff tried to shift the basis of her claim and proceeded from specialist to specialist and test to test, in search of a diagnosis of some physical ailment—any physical ailment—that might plausibly support her claim. After a multitude of medical tests ruled-out a long list of

---

[8] Rather than attempt to reconcile these inconsistencies, Dr. Ludolph claimed that MSEs are essentially irrelevant to occupational functionality because each one represents only a "snapshot" in time and they are not specifically designed to elicit such information. LIN0219. As Dr. Hertza noted in response, while MSEs "capture only a moment in the office," the "presentation should match the claimant's complaints, which [here] it does not." LIN0202. "Further, mental status exams often show impairment, such as in self-care, attention[,] etc." LIN0202. Thus, the "[q]uestions being asked are directly tied to vocation and analysis on employability is appropriate." LIN0202.

DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS RULE 52 CROSS-MOTION FOR JUDGMENT - 13
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

investigated conditions, and surveillance demonstrated that Plaintiff's self-reported physical limitations were untrue, *compare* LIN0881–882 *with* LIN0859–872, she shifted the basis of her claim once again to assert the cognitive limitations purportedly found by Dr. Ludolph. Notably, all of the psychological examinations contemporaneously recorded by Plaintiff's other treating practitioners leading up to and following the March 24, 2020 termination of benefits, uniformly show normal cognitive function. *See* LIN0964 (9/16/2019: thought process and content, speech, and judgment all "WNL," meaning within normal limits); LIN1175 (10/1/2019: "Speech and mentation clear and coherent."); LIN0962 (10/7/2019: thought process and content, speech, and judgment all "WNL"); LIN0548 (10/15/2019: "Speech and mentation clear and coherent."); LIN0550 (10/28/2019: same); LIN0720 (11/1/2019: "PSYCH: Normal affect, appropriate hygiene. Oriented to time, place and person."); LIN0552 (11/15/2019: "Speech and mentation clear and coherent."); LIN0554 (12/9/2019: same); LIN0557 (12/13/2019: "PSYCH: Judgement and insight, memory, mood and affect are within normal limits."); LIN0560 (12/30/2019: same); LIN0565 (2/4/2020: "Speech and mentation clear and coherent."); LIN0571 (3/2/2020: same); LIN0573 (3/12/2020: same).[9] To credit Dr. Ludolph's report, one would have to ignore the entire progression of the claim and all of the evidence in the record before the date of Plaintiff's belated neuropsychological testing.

---

[9] *Also see* Lincoln's Table of Medical Evidence (Doc. 38-1). The evidence (or rather lack thereof) after March 2020—*i.e.*, the time period in which Plaintiff had to prove a continuing disability in order to receive further benefits—is particularly sparse. From the termination of Plaintiff's benefits through the date of Dr. Ludolph's testing, Plaintiff had one telehealth visit with Dr. Feldman, LIN0498–500 (6/29/2020: no MSE; unremarkable physical exam), one telehealth visit with Dr. Parsons, LIN0399 (7/2/2020: no MSE or physical exam; Plaintiff self-reports "memory and concentration is marginally better"), and three visits with Dr. Rogoff. LIN0511 (6/2/2020: no MSE; unremarkable physical exam); LIN0505 (7/13/2020: no MSE or physical exam); LIN0504 (7/16/2020: no MSE or physical exam).

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 14
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

Plaintiff relies on Dr. Ludolph's testing to show that she would be unable to perform the cognitive requirements of her own former occupation as a marketing manager. At oral arguments, for example, Plaintiff's counsel argued that the cognitive requirements of Plaintiff's former occupation were beyond her current capacity based on that occupation's Specific Vocational Preparation ("SVP") level. An occupational analysis performed by Lincoln at the outset of the claim, that is undisputed in the record, shows that Plaintiff's marketing manager occupation, as it exists in the national economy,[10] corresponds to an SVP level of 7, *see* LIN1752, which indicates an occupation that typically requires two or more years of vocational preparation.[11] But Plaintiff's arguments about the cognitive demands of her former occupation, based on its SVP level, ignore the ample record evidence that Plaintiff studied for, took, and passed her real estate licensing examination, before securing work in that new occupation. *See*, *e.g*., LIN1147; LIN2103; LIN2154. According to O*Net OnLine, a current database of occupational titles, the occupation of Real Estate Broker also has an SVP level of 7 and also requires at least two years of preparation

---

[10] It is important to note that while the Group Policy pays short term benefits on the basis of disability measured against a claimant's "Own Job," as performed for his or her employer, long-term benefits are evaluated with respect to the claimant's "Own Occupation," as it exists in the national economy, without regard to whatever unique demands the claimant's specific employer might impose. *See*, *e.g*., LIN2290; LIN2291; *see also*, *e.g*., *Anderson v. Life Ins. Co. of N. America*, 2017 WL 4326384 at *1 (9th Cir. Sept. 18, 2017) (holding that the district court properly "considered the duties of the occupation as it is normally performed in the general labor market"); *Wilkins v. Unum Life Ins. Co. of N. America*, 2013 WL 5340512 at *5 (N.D. Cal. Sept. 24, 2013) (holding that the test is the insured's "occupation in the national economy"); *Carder-Cowin v. Unum Life Ins. Co.*, 560 F. Supp. 2d 1006, 1018 (W.D. Wash. 2008) (administrator correctly applied duties of occupation as performed in the national economy, not claimant's specific job duties); *Hornback v. New York Times Co. LTD Plan*, 2006 WL 496050 at *7 (N.D. Cal. Mar. 1, 2006) (permissible to "define occupation generally, and not to limit it to the position [claimant] had with her employer").

[11] *See*, *e.g*., https://www.onetonline.org/help/online/svp (last visited July 6, 2023). The Court may take judicial notice of the contents of the O*Net online database as well. *See*, *e.g*., Fed. R. Evid. 201(b).

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 15
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

(not to mention a licensure examination).[12]    Based on identical SVP levels, the cognitive requirements of Plaintiff's current occupation are no less than those of her former occupation.

Specifically, the essential duties of Plaintiff's former occupation were to "direct and coordinate sales activities for professional equipment/supplies and provide customer service." LIN1751.  Nothing in Dr. Ludolph's report explains how Plaintiff's inconsistent test performance (even if it were valid) shows that she would be unable to perform those former work duties, while still being able to work as a real estate broker and run her own business.  Dr. Ludolph nowhere attempts to reconcile her opinion with the record evidence of Plaintiff's new alternative careers.[13]

Dr. Ludolph also attributed Plaintiff's allegedly impaired performance to the lingering effects of Plaintiff's self-reported Lyme infection.  LIN0401.  However, Plaintiff's self-report (to others) of her superlative job performance up to and through the end of calendar year 2018, runs completely contrary to the infection and cognitive symptom timeline that she reported to Dr. Ludolph.  *Compare*, *e.g*., LIN0401 ("[Plaintiff] reported she began experiencing problems with her memory since 2005.") *with* LIN0653 ("Over the next 5 years, I did the best work of my life.  I exceeded my sales and renewal goals year after year.  I was number one in Enterprise Account Management more than once. . . .   I ended 2018 number one in Enterprise.") *and* LIN0464 (coworker endorsements of Plaintiff's superior work skills).  Moreover, as the balance of the record also makes clear, Plaintiff never actually had Lyme disease at all.  *See*, *e.g*., LIN0703;

---

[12]  *See*, *e.g*., https://www.onetonline.org/link/summary/41-9021.00 (last visited July 6, 2023).

[13]  Separate from her real estate brokerage business, Plaintiff also runs an astrology and tarot business where she offers spiritual divination services and "intuitive art."  *See*, *e.g*., LIN0440; LIN0475; *see also* https://www.venusrisinginsights.com (last visited July 6, 2023).

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 16
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

LIN0314–16.  And absent any such infection, Dr. Ludolph's opinion lacks any plausible etiology for Plaintiff's alleged cognitive dysfunction.

Again, Dr. Ludolph made no effort in her report to reconcile her test results with the mountain of contrary evidence elsewhere in the record—evidence which she apparently never bothered to review.  For this reason too, her report is unreliable and entitled to little weight against the thorough, comprehensive, and far more accurate assessments by Drs. Cumberbatch, Rosen, Hertza, and Trangle, each of whom took the time to review and analyze all of the medical evidence. *See*, *e.g*., LIN0835–43; LIN0822–25; LIN0702–07; LIN0375–84; LIN0276–84; LIN0201–08; LIN0291–319; LIN0138–42; *see also Beltman v. Sun Life Assurance Co.*, 2019 WL 16145894 at *8 (Mar. 29, 2019) ("The Court also gives greater weight to [the administrator's] experts as they are the only practitioners in the case to have reviewed the whole of [claimant's] medical records before offering their assessments.").

Finally, Plaintiff argued at the hearing that Dr. Hertza also found the record to support Dr. Ludolph's "mild neurocognitive disorder" diagnosis.  *Compare* LIN0409 *with* LIN0377.  But as his report makes clear, Dr. Hertza made no such diagnosis himself.  Rather, he observed that Plaintiff's own doctors had made that diagnosis before stating unequivocally, "the medical evidence does not support any diagnoses causing functional impairment from 03/25/2020 through the present and ongoing."  LIN0377.

### III.    CONCLUSION

For the forgoing reasons, and those set forth at oral argument and in Lincoln's prior memoranda, the Court should uphold Lincoln's determination, grant judgment in favor of Lincoln, and dismiss Plaintiff's claim for benefits with prejudice.

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 17
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

Respectfully submitted this 7th day of July, 2023.

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

By: */s/ Russell S. Buhite*
 Russell S. Buhite, OSB #142529
 1201 Third Avenue, Suite 5150
 Seattle, WA  98101
 Telephone:  (206) 693-7052
 Facsimile:  (206) 693-7058
 Email:  russell.buhite@ogletree.com

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

By: */s/ Byrne J. Decker*
 Byrne J. Decker, ME Bar #008312
 (admitted *pro hac vice*)
 OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART. P.C.
 Two Monument Square, Suite 703
 Portland, ME  04101
 Telephone:  (207) 387-2963
 Facsimile:  (207) 387-2986
 Email:  byrne.decker@ogletree.com

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

By: */s/ Scott K. Pomeroy*
 Scott K. Pomeroy, MA Bar #665110
 (admitted *pro hac vice*)
 One Boston Place, Suite 3500
 Boston, MA  02108
 Telephone:  (207) 387-2961
 Facsimile:  (207) 387-2986
 Email:  scott.pomeroy@ogletree.com

*Attorneys for Defendant The Lincoln National
Life Insurance Company*

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 18
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

**CERTIFICATE OF LOCAL RULE COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 4,422 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

By: */s/ Russell S. Buhite*
    Russell S. Buhite, OSB #142529

By: */s/ Byrne J. Decker*
    Byrne J. Decker, ME Bar #008312
    (admitted *pro hac vice*)

By: */s/ Scott K. Pomeroy*
    Scott K. Pomeroy, MA Bar #665110
    (admitted *pro hac vice*)

DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS RULE 52 CROSS-MOTION FOR JUDGMENT - 19
Case No. 3:21-cv-01019-SI

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of July, 2023, I filed the foregoing DEFENDANT'S

SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS RULE 52 CROSS-MOTION FOR

JUDGMENT with the Clerk of the Court via CM/ECF, who sent notification to the following:

Scott A. Sell, OSB #144297
THOMAS, COON, NEWTON & FROST
The Thomas Mann Building
820 SW 2nd Avenue, Suite 200
Portland, OR  97204
Telephone:  (503) 228-5222
Facsimile:  (503) 273-9175
Email:  ssell@tcnf.legal

*Attorneys for Plaintiff Tracey K. Turkoly*

SIGNED THIS 7th day of July, 2023 at Seattle, Washington.

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

By: */s/ Cheryl L. Kelley*
Cheryl L. Kelley, Practice Assistant
cheryl.kelley@ogletree.com

DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS
RULE 52 CROSS-MOTION FOR
JUDGMENT - 20
Case No. 3:21-cv-01019-SI
57180700.v5-OGLETREE

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1201 Third Avenue, Suite 5150 | Seattle, WA 98101
Phone: (206) 693-7052 | Fax: (206) 693-7058