IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TRACEY K. TURKOLY**, | Case No. 3:21-cv-1019-SI |
| Plaintiff, | **FINDINGS OF FACTS AND CONCLUSIONS OF LAW** |
| v. | |
| **LINCOLN NATIONAL LIFE INSURANCE COMPANY**, | |
| Defendant. | |

Scott A. Sell, THOMAS, COON, NEWTON & FROST, 820 SW Second Avenue, Suite 200, Portland, Oregon 97204. Of Attorneys for Plaintiff.

Russell S. Buhite, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, 1201 Third Avenue, Suite 5150, Seattle, WA 98101; Scott K. Pomeroy, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, One Boston Place, Suite 3500, Boston, MA 02108. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Defendant Lincoln National Life Insurance Company (Lincoln) originally concluded that Plaintiff Tracey K. Turkoly (Turkoly) was disabled and eligible for long term disability (LTD) benefits, with the expectation that she would return to work or continue to prove ongoing disability. After paying benefits for nearly 10 months, Lincoln terminated Turkoly's LTD benefits, concluding that Turkoly could perform the work of her current profession. Turkoly brings this suit, seeking reinstatement of her LTD benefits for the remainder of the initial 24-

PAGE 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

month "own occupation" benefit period. Although Turkoly originally contended that she could not perform the work of "any" profession and thus is entitled to LTD benefits beyond the first 24 months, at oral argument Turkoly conceded that the "any" profession portion of her claim should be remanded.[1] Thus, the only portion of Turkoly's claim remaining before the Court is whether she could perform the work of her current profession or was disabled for the full 24 months for which she contends she is entitled to benefits.

Under 29 U.S.C. § 1132(a)(1)(B) and Rule 52 of the Federal Rules of Civil Procedure, Turkoly moves for judgment on the administrative record (AR). ECF 17. Lincoln opposes Turkoly's Motion for Judgment on the Record and cross-moves for judgment on the record. ECF 35. After a bench trial on the administrative record, the Court concludes that Turkoly has met her burden of showing that she is entitled to LTD benefits during the "own occupation" period, grants her motion, and denies Lincoln's cross-motion.

## STANDARDS AND PROCEDURE

The Employee Retirement Income Security Act (ERISA) provides that an ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) ("[ERISA] permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."). An ERISA plan that does not contain text conferring discretion on the plan administrator is subject to a *de novo* standard of review. *Metro. Life Ins.*, 554 U.S. at 111 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

---

[1] Lincoln had argued that whether Turkoly could perform any profession has not been exhausted administratively and is not ripe for adjudication by this Court.

(1989)). The Plan at issue in this lawsuit does not confer discretion on the Plan administrator. Further, the parties have agreed that a *de novo* standard of review applies. ECF 13 at 2; ECF 17 at 15; ECF 38 at 12. The Court accepts the parties' stipulation and thus reviews the record *de novo*. *See Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009) (court may accept parties stipulation to *de novo* review).

Under *de novo* review, a trial court does not give deference to the Plan administrator's rationale or determination. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943 (9th Cir. 1995). Instead, the trial court performs an "independent and thorough inspection" of the Plan administrator's decision to determine whether the Plan administrator correctly or incorrectly denied benefits. *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006). *De novo* review permits the trial court to "evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc).

"A claimant may bear the burden of proving entitlement to ERISA benefits. This rule makes sense in cases where the claimant has better—or at least equal—access to the evidence needed to prove entitlement." *Est. of Barton v. ADT Sec. Servs. Pension Plan*, 820 F.3d 1060, 1065-66 (9th Cir. 2016) (distinguishing cases in which the claimant has at least equal access to the necessary evidence from "other contexts, [where] the defending entity solely controls the information that determines entitlement, leaving the claimant with no meaningful way to meet his burden of proof" (citation omitted)); *cf. Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010) (holding that where a court reviews a plan administrator's decision *de novo*, the claimant has the burden of proof); *see also* 2 ERISA Practice and Litigation § 11:68 ("Because the outcome of ERISA actions commonly turns on discovery, it is well for litigants to

be mindful of the principle set forth in 2 McCormick on Evidence (4th ed.) § 337: 'Where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party has the burden of proving the issue.'").

ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). The Supreme Court has held that an administrator's "fiduciary responsibility under ERISA is simply stated." *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000). "[F]iduciaries shall discharge their duties with respect to a plan 'solely in the interest of the participants and beneficiaries,' that is, "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." *Id*. at 223-24 (quoting 29 U.S.C. § 1104(a)(1)(A) (citation omitted)). The administrator's duty is "to see that the plan is 'maintained pursuant to [that] written instrument.'" *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) (brackets in original) (quoting 29 U.S.C. § 1102(a)(1)). "This focus on the written terms of the plan is the linchpin of 'a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.'" *Id*. (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) (brackets in original)).

"ERISA and its regulations require plans to provide certain presuit procedures for reviewing claims after participants submit proof of loss (internal review)." *Heimeshoff*, 571 U.S. at 105. Although ERISA does not require a participant or beneficiary to exhaust administrative remedies to bring an action, "courts of appeal have uniformly required that participants exhaust internal review before bringing a claim for judicial review." *Id.* This includes the Ninth Circuit, which "long ago concluded that 'federal courts have the authority to enforce the exhaustion requirement in suits under ERISA, and that as a matter of sound policy they should usually do

so.'" *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008) (quoting *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980)). Accordingly, courts in this circuit consistently hold that before bringing suit under § 502, an ERISA plaintiff claiming a denial of benefits "must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court." *Id.* (quoting *Diaz v. United Agric. Emp. Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995)). Thus a claimant's cause of action under ERISA "does not accrue until the plan issues a final denial." *Heimeshoff*, 571 U.S. at 105.

## PROCEDURE

The appropriate procedure to resolve this dispute is through a bench trial on an administrative record. *See Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1032 n.2 (N.D. Cal. 2011) ("*De novo* review on ERISA benefits claims is typically conducted as a bench trial under Rule 52."). Further, in a trial on an administrative record:

> The district judge will be asking a different question as [the judge] reads the evidence, not whether there is a genuine issue of material fact . . . . In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

*Kearney*, 175 F.3d at 1095.

The Court has reviewed the administrative record and has made factual findings under a preponderance of the evidence standard. Under Rule 52(a), the Court issues the following findings of fact and conclusions of law based on the administrative record and the parties' arguments.

## FINDINGS OF FACT

1. In 2018 Turkoly worked as a Global Account Manager for the technology company Docusign, Inc. She was a highly paid employee, making more than $400,000 per year.

For purposes of her disability claim, Lincoln considered Turkoly's salary to be $21,820 per month.

2.    The duties of Turkoly's occupation as performed in the national economy, under the Dictionary of Occupational Titles (DOT) and per an expert retained by Lincoln, required: significant interaction and collaboration with coworkers, customers, and vendors in a fast-paced, high-stress environment, including influencing their opinions and changing tasks frequently; directing and coordinating activities to sell products and services; monitoring customer usage and making course corrections as needed for fast and efficient customer service; facilitating customer training and services; and providing and maintaining accurate account information, forecasting, and activity.

3.    The qualifications of Turkoly's occupation as performed in the national economy required: reasoning level 5 ("Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. . . . Deal with several abstract and concrete variables." DOT 185.167-042); a high degree of aptitude for general learning (67-89th percentile), and a high degree of aptitude (67-89th percentile) for verbal aptitude, *id.*; and occasional travel.

4.    At some point in 2018, Turkoly developed flu-like symptoms. After about a month, she recovered.

5.    On February 6, 2019, Turkoly began treatment with Dr. Bowen Parsons, MD, for psychological symptoms. She reported a history of depression and anxiety with panic attacks. She noted that her position at work was being eliminated but that she could stay by taking a non-challenging job or by working under a manager in a challenging job. She was living in Portland, Oregon, staying part of the time in Toledo, Washington. Her husband and children remained in

Portland. She noted that she travels a lot for work, works long hours, and is anxious, depressed, cannot sleep, and has been having panic attacks. She reported being on psychological medication for seven years. Dr. Parsons diagnosed Turkoly with panic disorder and major depression episode, recurrent.

6.      On February 13, 2019, Turkoly again saw Dr. Parsons. Turkoly reported her psychological symptoms and stated that she needed to start short-term disability for 13 weeks, beginning February 19, 2019. Dr. Parsons wrote Turkoly a medical note excusing her from work from February 19-May 14, 2019.

7.      Turkoly's last day of work was February 14, 2019.

8.      Turkoly had a long-term treating relationship with Jackie Paris, LMFT, for psychological symptoms. Turkoly had been seeing Ms. Paris on and off since 2009. In the past Ms. Paris had found that Turkoly required treatment for only a brief period and responded well to treatment.

9.      In April and May 2019 Turkoly tried psychological medications that had worked for her in the past, but they failed to treat her current psychological condition. Ms. Paris referred Turkoly to other providers "to assess for and to rule out any organic factors" that could be causing Turkoly's symptoms.

10.      On April 22, 2019, Turkoly reported to Ms. Paris that she is affected by "ongoing brain fog."

11.      On April 25, 2019, Turkoly reported to Dr. Parsons that her naturopath had found "high inflammatory markers." She conveyed that she planned to move from short term disability to LTD.

12.     On May 2, 2019, Turkoly spoke with Lincoln. She discussed physical conditions, including "autoimmune markers" and that she had changed her diet and was taking supplements to help "get her body back on track." She described having pain, inflammation, stomach issues, and headaches. She conveyed having some symptoms that she had since September the year before but had thought they were due to her move from Chicago to Portland, except they persisted. She described laboratory tests that her naturopath had done that showed inflammation. Turkoly also detailed her mental condition, describing her panic attacks, stress, periods of crying, and inability to sleep. She noted that she has "been working for 30 years and this has never happened to her." She cried on the telephone and stated that she has been under stress before so she does not understand what is happening this time. She commented that she needs to return to work to earn her high salary for her family.

13.     On May 6, 2019, Ms. Paris noted that Turkoly was getting headaches and had impaired memory and described that Turkoly had two concussions in the past five years. Ms. Paris referred Turkoly to a neurologist and an ophthalmologist.

14.     On May 9, 2019, Turkoly reported to Dr. Parsons that she was feeling tired and unmotivated. On that date she also spoke with Lincoln about her claim. She described the reorganization at her work and need for travel and explained that her psychological providers believed she would "slide back health-wise" if she returned to work as originally planned on May 20, 2019. In this conversation it was also discussed that Lincoln would review Turkoly's "physical conditions."

15.     On May 22, 2019, Turkoly had another conversation with Lincoln in which she discussed possibly having Lyme disease. She conveyed that she had joint pain and inflammation. She explained that she was adjusting her diet and following up with her naturopath.

16.     On May 27, 2019, Turkoly reported to Ms. Paris that Turkoly may have Lyme disease and started a highly restrictive diet. She stated that she planned to explore treatment for Lyme disease.

17.     On June 3, 2019, Turkoly emailed Lincoln, in which she complained that Lincoln was delaying the evaluation of Turkoly's claim for benefits and that Lincoln had contacted only one of Turkoly's "many medical providers."

18.     On June 4, 2019, Turkoly again complained to Lincoln about its delay and that it had only contacted Dr. Parsons in evaluating her claim.

19.     On June 5, 2019, Dr. Andrew O. Brown, MD, a consulting psychiatrist for Lincoln, issued a memorandum on Turkoly's psychiatric condition. Dr. Brown concluded that the records supported a diagnosis of "Major Depressive Disorder, recurrent, in partial remission." He also concluded that Turkoly had functional limitations that "precluded her capacity to perform the duties of her occupation from 02/15/19 through the present." Dr. Brown noted that Turkoly had begun discussing physical ailments with her practitioners, including "inflammation" and "brain fog" and that Turkoly's conduct appeared to demonstrate "[a]n intent to frame her period of separation from the workplace in terms of a physically-based impairment."

20.     On June 5, 2019, Lincoln mailed a letter approving Turkoly's claim. Lincoln approved the claim with an expectation that Turkoly would return to work in July or August 2019, or another medical review would be required. Lincoln left Turkoly a voicemail to that effect at 1pm. Lincoln based its approval on Turkoly's psychological symptoms, primarily her treatment with Dr. Parsons and his anticipation that Turkoly should be able to return to work in July or August, 2019.

21.    The same day, Turkoly reported to Dr. Parsons that she was suffering from severe fatigue.

22.    On June 6, 2019, at Turkoly's request, Lincoln emailed her the June 5th approval letter. This letter also explained that Turkoly's approval was subject to the "mental illness" limitation of the policy. As a result, her benefits could not exceed a combined period of 24 months.

23.    After June 6, 2019, Turkoly's medical appointments primarily focused on her physical conditions and that her psychological conditions were secondary to a physical condition. Turkoly reported fatigue, joint and muscle pain, and memory and concentration problems. Turkoly was diagnosed by various practitioners with Lyme disease, chronic fatigue syndrome (CFS), fibromyalgia, immune dysfunction syndrome, cognitive impairment, insomnia, photophobia, and headaches, among others. Her focus in this lawsuit is fibromyalgia and post-viral CFS.

24.    Turkoly's belief that her symptoms causing her impairment may have a physical, and not purely psychological, origin, started before she was informed on June 6, 2019, that benefits based on psychological conditions were limited to 24 months. She repeatedly discussed physical concerns with Lincoln before that date, informed Ms. Paris on May 27th that she was shifting focus to treating Lyme disease, transformed her diet to address inflammation before that date, and raised extreme fatigue with Dr. Parsons on June 5, 2019.

25.    In July 2019, Lincoln conducted surveillance of Turkoly's residence for three days. The surveillance team did not see Turkoly engage in activity.

26.    On September 13, 2019, a Nurse Disability Consultant for Lincoln issued a letter concluding that based on the medical evidence, a finding of "less than sedentary" is reasonable

and supported through December 13, 2019. After that date, the nurse consultant recommended obtaining updated medical records.

27.     In December 2019 Lincoln conducted surveillance of Turkoly's residence for three days. The surveillance personnel witnessed Turkoly leave her residence with her son in the morning of December 6, 2019. On Saturday, December 7, 2019, the investigator followed Turkoly and her husband as they sat and watched their son's basketball game for one hour and twelve minutes. The family then walked six minutes to a pizza parlor, stood for several minutes, then sat and ate, for a total of an hour in the pizza parlor. Turkoly's husband retrieved the car and picked her and their son up at the pizza restaurant and they went home where Turkoly remained and her husband and son left for another hour. On Sunday, December 8, 2019, the surveillance investigator witnessed Turkoly drive a few minutes to Starbucks, walk three minutes to a nail salon, and spend one hour getting a manicure and a pedicure. The investigator then saw Turkoly return home and leave soon after, after which the investigator lost her in traffic.

28.     On December 31, 2019, Dr. Evelyn Cumberbatch, MD, MPH, Board Certified in Psychiatry, issued a report on Turkoly's psychiatric conditions. Dr. Cumberbatch noted that Turkoly's medical complaints were "outside the scope of this psychiatric review." Dr. Cumberbatch concluded that the records reasonably supported that Turkoly was impaired and unable to work because of major depression, anxiety, and panic attacks as of February 15, 2019. Dr. Cumberbatch found that Turkoly's disability "reasonably" lasted only until July 9, 2019. Dr. Cumberbatch noted that the evidence was conflicting whether Turkoly remained disabled after July 9, 2019. She nonetheless selected July 9th as the end date of disability because Dr. Parsons had increased Turkoly's prescription for Lexapro in May 2019 and Dr. Cumberbatch believed "it would be reasonable to allow [Turkoly] two months to benefit from

that increase." In seeming contrast to that rationale, Dr. Cumberbatch also highlighted that one

chart note from Turkoly's primary care physician states that Turkoly's Lexapro dose was 5 mcg,

and thus Dr. Cumberbatch found it unclear whether Turkoly ever increased her dose.

Dr. Parsons' chart notes, however, reflected the increased dose, as did Ms. Paris's chart notes.

Dr. Parsons also stated in his ongoing treatment notes that Turkoly's symptoms did not improve,

even with the increased dose, including in a chart note *on July 9, 2019*. Ms. Paris similarly

charted Turkoly's lack of improvement.

  29. On January 11, 2020, Dr. Parsons, responded to questions Dr. Cumberbatch had

propounded. Dr. Parsons opined that Turkoly suffered from major depressive disorder and panic

disorder, moderate to severe. He also concluded that due to "Fibromyalgia, chronic fatigue

syndrome and accompanying depression and anxiety" Turkoly was functionally impaired.

Dr. Parsons concluded that Turkoly would be unable to return to "any" work. He explained that

Turkoly's psychiatric impairments were "related to and exacerbated by her medical issues."

Dr. Parsons confirmed that he increased Turkoly's Lexapro dosage and she was taking that

higher dosage, but she only had a partial response. He explained that he did not change her

medication further because he felt Turkoly's "medical illness needs to stabilize and improve"

first. Similarly, he also stated that he did not feel Turkoly would benefit from more frequent

therapy or partial hospitalization.

  30. Dr. Cumberbatch issued an addendum to her report in response to Dr. Parsons'

additional information. Dr. Cumberbatch concluded that Dr. Parsons' opinion lacks merit

because he only treated Turkoly once per month, he did not increase her medication, he did not

consider treatments such as electroconvulsive shock therapy or transcranial magnetic

stimulation, and he did not consider hospitalization. Dr. Cumberbatch explained that a disabling

PAGE 12 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

mental health condition should warrant such interventions. Dr. Cumberbatch acknowledged that there was conflicting evidence in the record about Turkoly's physical impairments and reiterated that physical impairments were beyond the scope of Dr. Cumberbatch's report. Still, she discounted Dr. Parsons' explanation that he did not pursue more aggressive treatment because he considered Turkoly's impairments to be primarily caused by her medical illness.

31.    Dr. Cumberbatch stated in her original report that if Turkoly continues to claim disability based on psychiatric conditions, then records that Lincoln could consider would be treatment records from a board-certified psychiatrist documenting significant symptoms or the results of cognitive screens or neuropsychiatric testing. Dr. Cumberbatch did not describe any limitations or conditions to such testing to render it acceptable. Dr. Cumberbatch similarly highlighted in her addendum report as a deficiency in Dr. Parsons' treatment of Turkoly that he did not refer Turkoly for neuropsychiatric examination.

32.    Both Dr. Parsons (in records from June 2019 through February 2020) and Ms. Paris (in records from May through July 2019) continued to note the ineffectiveness of the psychiatric medications. They noted suspicions that Turkoly's fatigue, pain, and brain fog were caused by a physical condition and that her anxiety and depression were secondary to that physical condition.

33.    The Court gives little weight to Dr. Cumberbatch's selection of July 9, 2019, as the date Turkoly's disability ended. Whether any patient responds to an increase in medication is specific to that patient and broadly assessing that two months is sufficient time for a patient to improve to an increase in medication is not a reasonable basis to assess a disability end date. It also is contradicted by Turkoly's contemporaneous treatment records, which showed she did not improve with medication, particularly on July 9, 2019.

34.     On January 15, 2020, Dr. Jonathan Rosen, MD, Board Certified in Family

Medicine, issued a report on Turkoly's physical conditions. Dr. Rosen discounted Turkoly's CFS

because she had not "had adequate evaluation to rule out rheumatologic causes for her symptoms

with no standard laboratory testing or radiography for those diseases and no referral to a

rheumatologist." He also stated that CFS was "difficult to invoke in the face of depression and

anxiety disorder." On January 30, 2020, Dr. Rosen included an addendum to his report, adding

that Turkoly should be exempted from work that requires "frequent air travel."

35.     On March 25, 2020, Lincoln terminated Turkoly's LTD benefits, as of March 24,

2020. Turkoly appealed.

36.     In spring 2020 Turkoly and her family traveled to Hawaii. They were in Hawaii

when the COVID-19 pandemic began. They decided to stay in Hawaii and ultimately relocated

there permanently.

37.     On June 2, 2020, Turkoly began treatment with Dr. Steven Rogoff, MD, in

Hawaii. Dr. Rogoff referred Turkoly for a neuropsychological examination.

38.     On August 2, 2020, DocuSign terminated Turkoly's job, effective August 3, 2020.

39.     Turkoly underwent a neuropsychological evaluation with Shelly Ludolph, PsyD,

of Lighthouse Therapy & Diagnostic Services in Hawaii. The dates of the evaluation were

September 22, 2020, September 29, 2020, October 6, 2020, and October 13, 2020. Dr. Ludolph

issued her report on November 10, 2020.

40.     Dr. Ludolph conducted a diagnostic interview and had Turkoly perform several

objective tests: Wechsler Memory Scale, Third Edition (WMS-III); Wechsler Adult Intelligence

Scale, Third Edition (Wais-III); Bender-Gestalt Visual-Motor Test Second Edition (Bender

Gestalt II); Comprehensive Trail Making Test (CTMT); Delis Kaplan Executive Function

System (D-KEFS); Verbal Fluency Task; the Beery VMI Developmental Test of Visual

Perception; the Beery VMI Developmental Test of Visual-Motor Integration; and the Hooper

Visual Organization Test.

41.    The WAIS-III measures intellectual ability. The full-scale IQ measures overall

intellectual ability, the verbal and performance IQs measure verbal and performance tasks. The

index scores measure four major components of intelligence. In the WAIS-III, Turkoly scored as

follows: Full-Scale IQ, 37th percentile, average range; Verbal IQ, 58th percentile, average range;

Performance IQ, 14th percentile, low average range; Verbal Comprehension Index, 82nd

percentile, high average range; Perceptual Organization Index, 37th percentile, average range;

Working Memory Index, 1st percentile, deficient range; and Processing Speed Index, 0.4th

percentile, deficient range.

42.    The WMS-III test assesses memory and attention functions using both auditory

and visual stimuli. In the WMS-III, Turkoly scored as follows: Auditory Immediate, 18th

percentile, low average; Visual Immediate, 7th percentile, borderline; Immediate Memory, 1st

percentile, extremely low;  Auditory Delayed, 13th percentile, low average; Visual Delayed, 7th

percentile, borderline; Auditory Reception Delayed, 1st percentile, extremely low; General

Memory (only delayed subtest scores), 4th percentile, borderline; and Working Memory, 2nd

percentile, extremely low.

43.    In the CTMT, Turkoly scored below average on two trails and severely impaired

on one. In the Bender Gestalt II, Turkoly scored high average in the copying phase and average

in the recall phase. In the Hooper Visual Organization test, Turkoly performed in the mild deficit

range. The Beery motor test showed mild impairment and the Beery perception test showed

significant impairment. Turkoly performed in the average range for the D-KEFS and Verbal Fluency tests.

44.     Considering Turkoly's test results, Dr. Ludolph opined that Turkoly's memory functioning was greatly impaired. Dr. Ludolph described that short term memory would be "extremely difficult" for Turkoly and that she would "struggle to process information in a timely manner." Dr. Ludolph also explained that Turkoly's executive functioning was impaired, including "remembering a list of things to do, or steps to complete a task."

45.     On December 30, 2020, Jeremy B. Hertza, PsyD, Board Certified in Neuropsychology, reviewed Plaintiff's records and issued a report on Plaintiff's neuropsychological condition. Dr. Hertza found that the records supported diagnoses of panic disorder without agoraphobia and mild neurocognitive disorder. He noted that fibromyalgia was outside the scope of his report. Dr. Hertza discounted Dr. Ludolph's neuropsychological report because "no validity measures were utilized." He then determined that "in the context of generally unremarkable mental status exams, and no high level mental health treatment, impairment is not supported from 03/25/2020 to present."

46.     On February 8, 2021, Kevin Trangle, MD, MBA, Board Certified in Internal Medicine, Preventative Medicine, and Occupational Medicine, reviewed Plaintiff's records, spoke with Dr. Rogoff, and issued a report on Plaintiff's medical condition. Dr. Trangle discussed in detail Plaintiff's medical records. He concluded that she had a "plethora of subjective complaints and a many diagnoses reported by the claimant, most of which are not supported by actual clinical findings." He twice noted that Dr. Hertza discounted Dr. Ludolph's testing because it did not contain sufficient validity markers. Dr. Trangle also opined that the mild cognitive disorder diagnosed by Dr. Ludolph does not cause any limitations based on the

mental status examinations in the record that failed to show any cognitive dysfunction other than "some diminished concentration."

47.    Dr. Trangle acknowledged that fibromyalgia and CFS were "diagnoses of exclusion." He also acknowledged that there "are no established laboratory or other diagnostic tests which support either of these diagnoses." He stated Turkoly met the subjective criteria. He then, however, stated: "None of the testing performed in this case necessarily support either fibromyalgia or CFS."

48.    On March 10, 2021, Dr. Ludolph responded to Dr. Hertza's report. She described the markers of validity in her report as follows: (1) she used a battery of tests common in neuropsychological examinations, which are vigorously tested and are the standard of care in the industry; (2) she observed Turkoly's completion of the tasks, and how Turkoly presented and completed the tasks demonstrated that she performed to the best of her ability, including asking for clarification and for instructions to be repeated; (3) Turkoly's test results are consistent with her longitudinal medical history; and (4) Turkoly's test results are not extreme and are internally consistent—someone who attempts to "game" the examination generally obtains extreme results and not low results that "cluster around the same functional impairments" like Turkoly's results.

49.    Dr. Ludolph also added her opinion about Turkoly's ability to work. Dr. Ludolph noted that she had conducted the evaluation upon referral by Turkoly's primary physician to provide a cognitive baseline to help with treatment and that she has no "stake in the outcome" of Turkoly's insurance dispute. Dr. Ludolph described, however, than because she took the time to respond to Dr. Hertza, Dr. Ludolph felt it "worthwhile to offer a vocational interpretation of [her] evaluation." Because Turkoly "worked in a high-level sales position in the technology industry,"

Dr. Ludolph concluded that Turkoly "is not presently capable of that work given the degree of impairment to her executive functioning and memory."

50.      On April 5, 2021, Dr. Hertza issued a report responding to Dr. Ludolph's statements on validity markers. Dr. Hertza concluded that his opinion remained unchanged. Dr. Hertza stated: "There are a variety of [validity] measures used, such as TOMM, WMT, and RDS. These measures can be standalone or embedded and typically at least 2 should be used."

51.      Lincoln did not obtain its own neuropsychological evaluation of Plaintiff. Lincoln had trouble finding providers in Hawaii to perform independent medical evaluations and Lincoln "anticipated" it would have the same problem if it tried to schedule a neurocognitive examination. Lincoln also stated that scheduling another examination after Dr. Ludolph's examination would be too soon under professional standards, which require spacing of such examinations to avoid learned behaviors and ensure the integrity of the examination.

52.      On May 3, 2021, the Social Security Administration found Turkoly disabled as of March 1, 2020, and granted her application for disability insurance benefits. Turkoly's attorney notified Lincoln of the Social Security Administration's decision.

53.      On May 25, 2021, Lincoln denied Turkoly's appeal of the denial of her LTD benefits beyond March 24, 2020. Lincoln recited for 14 pages the findings and conclusions of its experts, Drs. Rosen, Cumberbatch, Hertza, and Trangle. In noting Turkoly's dispute that Lincoln improperly required specific validity markers for Dr. Ludolph's testing, Lincoln responded:

> Dr. Ludolph notes validity measures were considered in her assessment of Ms. Turkoly, however in Dr. Hertza's review of the raw data it was noted that she did not utilize professionally accepted validity testing and thus the report cannot be validated as a forensic assessment of Ms. Turkoly's functional capacity. Consistent with professional ethics and guidelines, neuropsychological raw test data should be maintained and reviewed, by appropriately trained and licensed experts in

accordance with the guidance published by the American
Psychological Association. As such that neuropsychological raw
test data is restricted to the appropriate professionals, we must
defer to the conclusions as noted by Dr. Hertza, which again
contends the November 2020 neuropsychological testing failed to
include professionally accepted means of validity testing.

AR 96.

54.    Lincoln also noted that Turkoly's last regular treatment record was from

Dr. Rogoff on July 16, 2020. Lincoln asserted that without regular treatment or additional

neurocognitive testing, Turkoly's medical condition could not be fully assessed and she could

not establish that she was disabled after March 24, 2020.

55.    Lincoln concluded that

the available information does not contain physical examinations,
mental status examination, diagnostic test results, or other forms of
medical documentation to support that her symptoms are of such
severity, frequency, and duration that they resulted in restrictions
or limitations rendering her unable to perform her own occupation
beyond March 24, 2020.

AR 99.

## CONCLUSIONS OF LAW

This case involves a dispute over benefits during the initial 24-month "own occupation"

period of LTD benefits. Under Turkoly's LTD policy issued by Lincoln, a person is disabled for

this period if

during the Elimination Period and the next 24 months of Disability
the Covered Person, as a result of Injury or Sickness, is unable to
perform with reasonable continuity the Substantial and Material
Acts necessary to pursue his Own Occupation in the usual and
customary way.

AR 2238.

Lincoln argues that Turkoly provides insufficient evidence that she was disabled from

March 25, 2020 to June 4, 2021, the rest of her "own occupation" period. Lincoln points to its

several independent medical evaluators, who reviewed the medical records and concluded that

the records did not support a finding of disability. Turkoly argues why the Court should discount

each of those medical opinions.

The key opinion, however, is the neuropsychological evaluation from Dr. Ludolph. The

results of her testing show that Turkoly would be unable to perform her managerial job. The

deficits in executive functioning and memory found by Dr. Ludolph would preclude Turkoly

from performing this position as performed in the national economy, as Dr. Ludolph concluded

in her supplemental report.

Lincoln argues that Dr. Ludolph's evaluation should be disregarded because it does not

contain validity markers. Turkoly responds that Dr. Ludolph's opinion contains sufficient

validity markers, as described by Dr. Ludolph. Turkoly also argues that Lincoln's experts and

other representatives stated that neuropsychological testing was the type of evidence required to

demonstrate Turkoly's disability, and Lincoln did not provide any parameters or limitations on

such testing. Thus, Lincoln may not disregard Dr. Ludolph's testing after-the-fact for failing to

include requirements not previously established. Turkoly cites *Mason v. Fed. Express Corp.*, 165

F. Supp. 3d 832 (D. Alaska 2016). Because the Court finds this latter argument dispositive, the

Court does not address whether Dr. Ludolph's testing contained sufficient validity markers.

In *Mason*, the claimant had a neuropsychological test, which concluded that the claimant

had a cognitive disorder. *Id.* at 839-40. Aetna, the ERISA plan administrator, discounted the

neuropsychological examination in part because it did not contain sufficient validity measures.

*Id.* at 842. The court in *Mason* found this violated ERISA's notice provision, explaining:

> Although Aetna informs Mason that he was required to submit
> "medical documentation that clearly states the significant objective
> findings that substantiate [his] disability," such as physician exam
> reports, office notes, or diagnostic test results such as lab tests, it

PAGE 20 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

> does not clearly state that Aetna would disregard his diagnostic test
> results if they do not contain "consistency or validity testing
> results." If Aetna believed that validity testing results were
> necessary, it was required to say so "in a manner calculated to be
> understood by" Mason at a time when he had a meaningful
> opportunity to present evidence on this point.

*Id.* at 853 (footnotes omitted) (brackets in original).

Similar to the denial notice in *Mason*, Lincoln's March 25, 2020 denial notice informed Turkoly that she could request review of the denial, and in doing so should submit "[o]ffice treatment notes, diagnostic tests results, lab results, hospital records and pharmacy records, dated February 2019 to the present." AR 687. Lincoln emphasized that Turkoly's medical "records do not contain the results of any objective cognitive screens or tests confirming that she has any cognitive abnormalities" and that "[t]here are no objective measures of her cognitive status to review." AR 683-84. Lincoln repeated that "Dr. Coffin supplies a letter stating that claimant cannot engage in her job functions due to fatigue, pain and cognitive issues, however there is no documentation of cognitive testing or specific impairments noted." AR 686. The denial letter made clear that the lack of objective cognitive testing was critical to Lincoln's denial of Turkoly's claim. Lincoln did not mention validity markers or provide any criteria for the objective cognitive testing it found lacking.

Additionally, Dr. Cumberbatch's December 2019 report specifically listed neuropsychological testing as one of two types of acceptable evidence that Lincoln could consider going forward. AR 839. Dr. Cumberbatch did not describe any required validity markers, nor did Lincoln provide separate notice of required validity markers. In her addendum report, Dr. Cumberbatch again endorsed neuropsychological testing, discounting Dr. Parsons' opinion by stating: "Even though he thinks Ms. Turkoly has cognitive impairments, he has not done any common scales of cognition or sent her for neuropsychiatric testing." AR 823. Further,

Lincoln's final denial letter of May 25, 2021, again highlighted neuropsychological testing. After explaining that Lincoln discounted Dr. Ludolph's testing, Lincoln states: "In the absence of medical evidence, such as office treatment notes, consultation reports, mental health records, *neuro-cognitive treatment or additional testing*, physical/occupational/therapeutic therapy, etc. Ms. Turkoly's medical condition cannot be fully assessed." AR 98 (emphasis added).

Lincoln emphasized the need for neuropsychological testing. Lincoln, however, did not conduct its own testing of Turkoly. Lincoln asserted that given its challenges in finding an independent medical examiner in Hawaii, it "anticipated" that it would not have been able to find a provider to conduct neuropsychological testing in Hawaii and that is why it did not attempt to do so during the appeal review process. *Id.* That Turkoly found a provider in Hawaii to conduct such testing shows that there are such providers available and renders Lincoln's contention unpersuasive. Turkoly obtained the evidence that Lincoln asserted was critical. Then Lincoln discounted that evidence on grounds Lincoln had never disclosed to Turkoly. This violates ERISA's notice provision. *See* 29 C.F.R. § 2560.503-1(g); *cf. Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.").

Lincoln also contends that it could not conduct its own neuropsychological testing after Dr. Ludolph conducted her testing because professional standards requires spacing such examinations. That may be true, but Lincoln may not spotlight neuropsychological testing, decline to obtain such testing itself, reject the testing obtained by Turkoly on previously undisclosed grounds, and then rely on professional standards to decline to obtain other testing

that may confirm the results obtained by Turkoly. Lincoln did not discount Dr. Ludolph's testing

on any grounds other than the lack of validity markers.[2] The Court rejects this reasoning and

accepts Dr. Ludolph's examination and opinion. Thus, the Court concludes that Turkoly is

unable to perform the work of her "own occupation."

**CONCLUSION**

The Court GRANTS IN PART Plaintiff's Motion for Judgment. ECF 17. The Court

GRANTS the motion with respect to the "own occupation" period and DENIES the motion, as

stipulated by Plaintiff, with respect to the "any occupation" period. The Court DENIES

Defendant's Cross Motion for Judgment. ECF 35. The Court REVERSES the determination by

Lincoln that Turkoly was not disabled as of March 25, 2020. The Court ORDERS Lincoln to

reinstate Turkoly's benefits from March 25, 2020, through June 4, 2021, which is the remainder

of the 24-month "own occupation" period of her long-term disability plan. The Court makes no

findings related to Turkoly's "any occupation" period, which has not yet been administratively

exhausted. The parties shall meet and confer to address the amount of back benefits owed, as

well as reasonable attorney's fees and costs to be awarded. If appropriate, the parties shall submit

---

[2] Dr. Trangle opined that the "mild cognitive impairment" diagnosed by Dr. Ludolph would not cause functional limitations because mental status examinations in the record were benign. Dr. Trangle, however, disregarded Dr. Ludolph's cognitive testing based on Dr. Hertza's conclusion that they lacked validity markers. Thus, Dr. Trangle did not address the significant impairments in memory and executive functioning that is the basis of Dr. Ludolph's opinion about Turkoly's inability to perform her occupation and that opinion remains rejected solely based on the lack of validity markers. Further, Turkoly's mental status examinations vary, were often performed by doctors who do not specialize in psychological treatment, and are "a mere snapshot of plaintiff's functioning on a particular day, and do[] not constitute substantial evidence." *Steele v. Saul*, 520 F. Supp. 3d 1198, 1210 (D. Alaska 2021) (cleaned up). The Court finds that Turkoly's mental status examinations are not more persuasive than the battery of specifically-designed neurocognitive objective tests administered by Dr. Ludolph. Thus, even if Dr. Trangle's opinion that Turkoly's "mild cognitive impairment" did not cause functional limitations could be considered to contradict Dr. Ludolph's opinion based on her testing, the Court is more persuaded by Dr. Ludolph's opinion.

to the Court a stipulated proposed judgment. If the parties are unable to agree on all outstanding issues within 28 days of these Findings of Fact and Conclusions of Law, the parties shall file a joint statement of all issues that need further resolution by the Court, along with a proposed briefing schedule.

**IT IS SO ORDERED**.

DATED this 20th day of September, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge